1  Daniel Alberstone (SBN 105275)
   dalberstone@baronbudd.com
2  Roland Tellis (SBN 186269)
   rtellis@baronbudd.com
3  Mark Pifko (SBN 228412)
   mpifko@baronbudd.com
4  BARON & BUDD, P.C.
   15910 Ventura Boulevard, Suite 1600
5  Encino, California 91436
   Telephone: (818) 839-2333
6  Facsimile: (818) 986-9698

7  Attorneys for Plaintiffs
   DIANA ELLIS, JAMES SCHILLINGER,
8  and RONALD LAZAR, individually, and on
   behalf of other members of the public
9  similarly situated

10                UNITED STATES DISTRICT COURT

11              NORTHERN DISTRICT OF CALIFORNIA

12

13  DIANA ELLIS, JAMES SCHILLINGER,      Case Number  CV 12  3897
    and RONALD LAZAR, individually, and
14  on behalf of other members of the public
    similarly situated,                  **CLASS ACTION COMPLAINT FOR:**

15
                                         (1)  Violations of California's Unfair
16           Plaintiffs,                       Competition Law (Cal. Bus. & Prof.
                                              Code §§ 17200 *et seq.*);
17     vs.
                                         (2)  Violations of the Racketeer
18  J.P. MORGAN CHASE & CO., a                Influenced and Corrupt
    Delaware corporation, J.P. MORGAN         Organizations Act (18 U.S.C. §
19  CHASE BANK, N.A., a national              1962(c));
    association, for itself and as successor by
20  merger to Chase Home Finance, LLC, and
    CHASE HOME FINANCE LLC, a            (3)  Violations of the Racketeer
21  Delaware limited liability company,       Influenced and Corrupt
                                              Organizations Act (18 U.S.C. §
22           Defendants.                      1962(d));

23                                       (4)  Unjust Enrichment; and

24                                       (5)  Fraud

25
                                         **Jury Trial Demanded**
26

27

28

---
CLASS ACTION COMPLAINT

1    For their complaint against J.P. Morgan Chase & Co., J.P. Morgan Chase Bank,

2    N.A., and Chase Home Finance LLC (collectively "Defendants"), Plaintiffs Diana Ellis,

3    James Schillinger, and Ronald Lazar ("Plaintiffs"), individually, and on behalf of all

4    other members of the public similarly situated, based on information and belief, allege

5    as follows:

6                              **NATURE OF THE ACTION**

7        1.    Plaintiffs' claims against Defendants in this action were originally brought as

8    part of the action captioned as *Bias et al. v. Wells Fargo & Company et al.*, case no. 4:12-

9    cv-00664-YGR (N.D. Cal., filed Feb. 10, 2012).  However, by Order dated July 13, 2012,

10   this Court, the Honorable Yvonne Gonzalez Rogers presiding, found, on the Court's own

11   motion, that the claims with respect to the Defendants in this action were not properly

12   joined in a single action with the claims against the other defendants in the *Bias* action.

13   As a result, the Court ordered Plaintiffs "to re-file their claims against [Defendants as an]

14   additional, separate action."[1]  Accordingly, consistent with the Court's order, Plaintiffs

15   hereby bring this separate action against J.P. Morgan Chase & Co., J.P. Morgan Chase

16   Bank, N.A., and Chase Home Finance LLC.

17       2.    This case concerns fraudulent practices committed by Defendants in

18   connection with their home mortgage loan servicing businesses.  Taking advantage of

19   economic downturn and the increasing number of loans in default, Defendants service

20   these loans according to uniform practices designed to maximize fees assessed on

21   borrowers' accounts when they are behind on their payments.  Consistent with these

22   practices, Defendants use automated mortgage loan management systems, made up of an

23   enterprise of subsidiaries, inter-company departments, divisions, and third-party "property

24   preservation" vendors, to engage in a scheme to conceal the unlawful assessment of

25

26   [1] *See Bias et al. v. Wells Fargo & Company et al.*, N.D. Cal., case no. 4:12-cv-00664-YGR, *Order

27   Granting in Part and Denying in Part Motion of Defendants Wells Fargo & Company and Wells Fargo
     Bank, N.A. to Sever and Transfer, and Severing Claims as to Other Defendants on the Court's Own

28   Motion*, July 13, 2012 (Dkt. No. 59).

1   improperly marked-up or unnecessary third party fees for default-related services,

2   cheating borrowers who can least afford it.

3       3.      More specifically, when home mortgage borrowers get behind on their

4   payments and go into "default," Defendants assess fees on borrowers' accounts for

5   various default-related services, typically performed by third parties, purportedly designed

6   to protect the lender's interest in the property.  However, Defendants are not permitted to

7   mark-up the fees for such services to earn a profit.  Nor are Defendants permitted to assess

8   borrowers' accounts for default-related service fees that are unnecessary.  Nevertheless, as

9   discussed in detail below, using false pretenses to conceal the truth from borrowers, that is

10  precisely what Defendants do.

11      4.      In effect, to generate hefty profits, the lending industry has substituted

12  inflated interest rates with inflated fees.  Defendants formed enterprises, associations of

13  subsidiaries, affiliated companies, and "property preservation" vendors, and designed

14  schemes to disguise hidden, marked-up, or unnecessary fees so that they could earn

15  additional, undisclosed profits.  Through these unlawful enterprises, Defendants mark-up

16  the fees charged by vendors, often by 100% or more, and then, without disclosing the

17  mark-up, assess borrowers' accounts for the hidden profits.  Furthermore, in connection

18  with their schemes, Defendants also have a practice of routinely assessing fees for default-

19  related services, even when they are unnecessary.  Employing this strategy, Defendants

20  are able to quietly profit from assessing borrowers' accounts for third party default-related

21  service fees at the expense of struggling consumers.

22      5.      Many borrowers reasonably believe the lender from whom they obtained

23  their mortgage will hold and service their loan until it is paid off.  Instead, however,

24  through relatively recent mortgage industry practices, such as securitization and the sale

25  of mortgage backed securities, that is often not the case.  In today's market, loans and the

26  rights to service them are bought and sold at will, multiple times over.

27      6.      A borrower's relationship is typically with the mortgage servicer rather than

28  the lender who originated the loan.  Defendants Chase Home Finance LLC, and now its

2

successor, J.P. Morgan Chase Bank, N.A., are some of the largest mortgage servicers in the United States. As mortgage servicers, Defendants J.P. Morgan Chase Bank, N.A. and Chase Home Finance LLC are responsible for the day-to-day management of loan accounts, including handling customer inquiries, collecting and crediting loan payments, sending default notices to delinquent borrowers, negotiating loan modifications, and directing foreclosure activities, including engaging the services of foreclosure counsel, even if the foreclosure is brought in the name of the owner of the loan, rather than the servicer.

7.     Borrowers depend on their mortgage servicers to handle servicing-related tasks accurately and with skill. Because financial institutions like Defendants who generate loan servicing revenue through operating subsidiaries like Chase Home Finance LLC, and subsidiaries like J.P. Morgan Chase Bank, N.A., do not profit directly from interest payments made by borrowers, rather than ensuring that borrowers stay current on their loans, Defendants are more concerned with generating revenue from fees assessed against the mortgage accounts they service. According to one member of the Board of Governors of the Federal Reserve System, "a foreclosure almost always costs the investor [who owns the loan] money, but [it] may actually earn money for the servicer in the form of fees."[2]

8.     Financial institutions like Defendants see opportunity where investors see failure because borrowers are captives to companies who service their loans. Accordingly, when borrowers go into default and Defendants unilaterally decide to instruct third parties to perform default-related services, borrowers have no option but to accept Defendants' choice of providers.

9.     Taking advantage of these circumstances, the Defendants formed an

---

[2] *See* Sarah Bloom Raskin, Member Board of Governors of the Federal Reserve System, *Remarks at the National Consumer Law Center's Consumer Rights Litigation Conference*, Boston Massachusetts, Nov. 12, 2010, available at www.federalreserve.gov/newsevents/speech/raskin20101112a.htm (last visited Jan. 23, 2012).

CLASS ACTION COMPLAINT

1  enterprise with their respective subsidiaries, affiliates, and "property preservation"

2  vendors, and then, developed a uniform practice of unlawfully marking up default-related

3  fees charged by third parties and assessing them against borrowers' accounts so that

4  Defendants can earn undisclosed profits in connection with these services.

5       10.    Defendants are aware that it is improper to mark-up the fees assessed on

6  borrowers' accounts for default-related services.  Therefore, Defendants fraudulently

7  conceal these fees on borrowers' accounts, omitting any information about Defendants'

8  additional profits, by identifying them on mortgage statements with cryptic descriptions,

9  such as "Miscellaneous Fees" or "Corporate Advances."

10       11.    Indeed, Defendants' practices are designed to avoid detection even when

11  examined in bankruptcy proceedings.  As one court has explained, "[l]enders have

12  apparently been operating under the assumption that the fees and costs in their proofs of

13  claim are invulnerable to challenge because debtors lack the sophistication, the debtors'

14  bar lacks the financial motivation, and bankruptcy courts lack the time."[3]  "[T]he Court

15  believes that certain members of the mortgage industry are *intentionally* attempting to

16  game the system by requesting undocumented and potentially excessive fees."[4]

17       12.    The rampant abuses by mortgage servicers have led federal regulators to

18  enter into numerous Consent Orders, but according to Mark Pearce, Director, Division of

19  Depositor and Consumer Protection, Federal Deposit Insurance Corporation, "these

20  consent orders do not fully identify and remedy past errors in mortgage-servicing

21  operations of large institutions; in fact, the scope of the interagency review did not

22  include a review of . . . the fees charged in the servicing process.  Much work remains to

23  identify and correct past errors and to ensure that the servicing process functions

24

25

26

27  [3] *In re: Prevo*, 394 B.R. 847, 848 (Bankr. S.D. Tex. 2008).

28  [4] *Id.* at 851 (emphasis added).

1    effectively, efficiently, and fairly going forward."[5]  Moreover, the Consent Orders do not

2    reach the type of conduct at issue here.

3        13.    Plaintiffs bring this action, seeking injunctive relief and damages on behalf of

4    themselves and the thousands of borrowers who have been victimized by the Defendants'

5    uniform schemes.

6    **JURISDICTION AND VENUE**

7        14.    Jurisdiction is proper in this Court under 28 U.S.C. § 1332(d)(2).  The matter

8    in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000

9    and is a class action in which members of the class of plaintiffs are citizens of states

10   different from Defendants.  Further, greater than two-thirds of the members of the Class

11   reside in states other than the states in which Defendants are a citizens.

12       15.    This Court also has jurisdiction over this matter under 28 U.S.C. §§ 1331,

13   1961, 1962 and 1964.  This Court has personal jurisdiction over Defendants under 18

14   U.S.C. §1965.  In addition, under 28 U.S.C. § 1367, this Court may exercise supplemental

15   jurisdiction over the state law claims because all of the claims are derived from a common

16   nucleus of operative facts and are such that Plaintiffs ordinarily would expect to try them

17   in one judicial proceeding.

18       16.    Venue lies within this judicial district under 28 U.S.C. § 1391(b)(1) and

19   (c)(2) because Defendants' contacts are sufficient to subject them to personal jurisdiction

20   in this District, and therefore, Defendants reside in this District for purposes of venue, or

21   under 28 U.S.C. § 1391(b)(2) because certain acts giving rise to the claims at issue in this

22   Complaint occurred, among other places, in this District.

23

24

---

25   [5] *See* Mark Pearce, Director, Division of Depositor and Consumer Protection, Federal Deposit Insurance
Corporation, *Mortgage Servicing: An Examination of the Role of Federal Regulators in Settlement
26   Negotiations and the Future of Mortgage Servicing Standards*, before the Subcommittees on Financial
Institutions and Consumer Credit, and Oversight and Investigations Committee on Financial Services,
27   U.S. House of Representatives, July 7, 2011, available at
http://financialservices.house.gov/UploadedFiles/070711pearce.pdf (last visited, Feb. 1, 2012).
28

**Intradistrict Assignment**

17.     Consistent with Northern District of California Civil Local Rule 3-5(b), assignment to the San Francisco or Oakland Division is appropriate under Civil Local Rules 3-2(c) and 3-2(d), because acts giving rise to the claims at issue in this Complaint occurred, among other places, in this District, in San Francisco and Oakland.

## PARTIES

18.     Plaintiff Diana Ellis is an individual and a citizen of California.

19.     Plaintiff James Schillinger is an individual and a citizen of Tennessee.

20.     Plaintiff Ronald Lazar is an individual and a citizen of Oregon.

21.     Defendant J.P. Morgan Chase & Co. is a corporation organized under the laws of Delaware, with its principal place of business in New York, New York.

22.     Defendant J.P. Morgan Chase Bank, N.A. is a subsidiary of J.P. Morgan Chase & Co., is a successor by merger to Chase Home Finance LLC, and is a national bank organized and existing as a national association under the National Bank Act, 12 U.S.C. §§ 21 *et seq.*, with its principal place of business in Columbus, Ohio.

23.     Defendant Chase Home Finance LLC, was, during relevant times at issue in this Complaint, a subsidiary of J.P. Morgan Chase & Co. and J.P. Morgan Chase Bank, N.A., and a Delaware limited liability company, with its principal place of business in Iselin, New Jersey.

24.     Whenever, in this Complaint, reference is made to any act, deed, or conduct of Defendants committed in connection with the enterprise, the allegation means that Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees or representatives, each of whom was actively engaged in the management, direction, control or transaction of the ordinary business and affairs of Defendants and the enterprise.

25.     Plaintiffs are informed and believe, and based thereon, allege that, at all material times herein, each Chase defendant, J.P. Morgan Chase & Co., J.P. Morgan Chase Bank, N.A., and Chase Home Finance LLC (collectively, "Chase"), was the agent,

1  servant, or employee of the other Chase defendants, and acted within the purpose, scope,

2  and course of said agency, service, or employment, and with the express or implied

3  knowledge, permission, and consent of the other Chase defendants, and ratified and

4  approved the acts of the other Chase defendants.

5       26.   J.P. Morgan Chase & Co. exercised, and exercises, specific and financial

6  control over the operations of J.P. Morgan Chase Bank, N.A., and Chase Home Finance

7  LLC, and it dictates, and dictated, the policies and practices of J.P. Morgan Chase Bank,

8  N.A., and Chase Home Finance LLC. J.P. Morgan Chase & Co. also exercises power and

9  control over the specific activities at issue in this lawsuit, and it is the ultimate recipient of

10  the ill-gotten gains described herein. The fraudulent scheme at issue in this case was

11  organized by executives working at the highest levels of J.P. Morgan Chase & Co. and

12  J.P. Morgan Chase Bank, N.A., and carried out by both executives and subordinate

13  employees working for J.P. Morgan Chase & Co., J.P. Morgan Chase Bank, N.A., and

14  Chase Home Finance LLC.

15                 **FACTUAL BACKGROUND**

16       27.   America's lending industry is in turmoil, and the lending community has

17  divorced itself from the borrowers it once served. Traditionally, when people wanted to

18  borrow money, they went to a bank or a "savings and loan." Banks loaned money and

19  borrowers promised to repay the bank, with interest, over a specific period of time. The

20  originating bank kept the loan on its balance sheet, and serviced the loan -- processing

21  payments, and sending out applicable notices and other information -- until the loan was

22  repaid. The originating bank had a financial interest in ensuring that the borrower was

23  able to repay the loan.

24       28.   Today, however, the process has changed. Mortgages are now packaged,

25  bundled, and sold to investors on Wall Street through what is referred to in the financial

26  industry as mortgage backed securities or MBS. This process is called securitization.

27  Securitization of mortgage loans provides financial institutions like Defendants with the

28  benefit of immediately being able to recover the amounts loaned. Securitization

7

1 | essentially eliminates the financial institution's risk from potential default. But, by
2 | eliminating the risk of default, mortgage backed securities have disassociated the lending
3 | community from borrowers. Numerous unexpected consequences have resulted from the
4 | divide between lenders and borrowers.

5 |      29.    Among other things, securitization has created an industry of companies in
6 | the lending industry like Defendants, who no longer make money primarily from interest
7 | on the loans they originate. Thus, lenders no longer have the financial interest in the
8 | repayment of loans that they once did. Instead, financial institutions like Defendants,
9 | through their network of subsidiaries, operating entities and divisions, service or
10 | administer mortgages for hedge funds and investment houses who own the loans. Rather
11 | than earn income from the interest on these loans, financial institutions like Chase Home
12 | Finance LLC and J.P. Morgan Chase Bank, N.A. are paid a fee for their loan
13 | administration services.

14 |      30.    Additionally, under agreements with investors (pooling and service
15 | agreements), loan servicers like Chase Home Finance LLC and J.P. Morgan Chase Bank,
16 | N.A. assess fees on borrowers' accounts for default-related services in connection with
17 | their administration of borrowers' loans. These fees include Broker's Price Opinion fees
18 | and appraisal fees. Defendants' collection of these fees, however, exemplifies how
19 | America's lending industry has run off the rails.

20 |      31.    As one Member of the Board of Governors of the Federal Reserve System
21 | has explained, "[w]hile an investor's financial interests are tied more or less directly to the
22 | performance of a loan, the interests of a third-party servicer are tied to it only indirectly, at
23 | best. The servicer makes money, to oversimplify it a bit, by maximizing fees earned and
24 | minimizing expenses while performing the actions spelled out in its contract with the
25 | investor. . . . The broad grant of delegated authority that servicers enjoy under pooling
26 | and servicing agreements (PSAs), combined with an effective lack of choice on the part of
27 |
28 |

1    consumers, creates an environment ripe for abuse."[6]

2        32.    For financial institutions like Defendants, who are determined to maximize

3    the money they earn from loans serviced by Chase Home Finance LLC and J.P. Morgan

4    Chase Bank, N.A., the right to charge third party fees has opened the door to a world of

5    exploitation.  As a result of the disassociation between loan servicers and the monies

6    generated from the interest borrowers pay on their loans, Defendants have been

7    incentivized to find other ways to grow their profits.

8        33.    Defendants, with their subsidiaries, affiliated companies, intercompany

9    divisions, and third-party "property preservation" vendors, each formed an unlawful

10    enterprise and decided to game the system, under the guise of collecting default-related

11    service fees purportedly incurred by third parties, and then, they sought to increase

12    mortgage servicing revenues by fraudulently concealing marked-up or unnecessary fees

13    assessed on borrowers' accounts.

14        34.    In short, as explained by Adam J. Levitin, Associate Professor of Law at the

15    Georgetown University Law Center, in testimony to the United States House Financial

16    Services Committee, Subcommittee on Housing and Community Opportunity, "Servicers'

17    business model also encourages them to cut costs wherever possible, even if this involves

18    cutting corners on legal requirements, and to lard (sic) on junk fees and in-sourced

19    expenses at inflated prices."[7]

20

21

22

23

24

25

26

27

28

---

[6] *See* Sarah Bloom Raskin, Member Board of Governors of the Federal Reserve System, *Remarks at the National Consumer Law Center's Consumer Rights Litigation Conference*, Boston Massachusetts, Nov. 12, 2010, available at www.federalreserve.gov/newsevents/speech/raskin20101112a.htm (last visited Jan. 23, 2012).

[7] *See* Adam J. Levitin, *Robo-Singing, Chain of Title, Loss Mitigation, and Other Issues in Mortgage Servicing*, before the House Financial Services Committee, Subcommittee on Housing and Community Opportunity, Nov. 18, 2010, available at http://financialservices.house.gov/Media/file/hearings/111/Levitin111810.pdf (last visited Feb. 1, 2012).

CLASS ACTION COMPLAINT

## DEFENDANTS' AUTOMATED LOAN SERVICING PRACTICES

35.     To maximize profits, Defendants assign the complex task of administering the millions of loans serviced by Chase Home Finance LLC and J.P. Morgan Chase Bank, N.A. to computer software programs. The software programs are designed to manage borrowers' accounts and assess fees, according to protocols and policies designed by the executives at J.P. Morgan & Company and J.P. Morgan Chase Bank, N.A.

36.     Defendants automate Chase Home Finance LLC and J.P. Morgan Chase Bank, N.A.'s loan servicing businesses through a computer software program provided by Fidelity National Information Services, Inc., which is called Mortgage Servicing Package ("Fidelity MSP"). Fidelity MSP is a sophisticated home loan management program, and is one of the most widely used such programs in the United States.

37.     When a loan is originated, guidelines for managing the loan are imported into Fidelity MSP. Loans serviced by Chase Home Finance LLC and J.P. Morgan Chase Bank, N.A. are then automatically managed by the software according to those guidelines. For example, among other things, if a loan in the system is past due, the guidelines instruct the computer when to impose default-related fees. Chase Home Finance LLC and J.P. Morgan Chase Bank, N.A. also assess other charges and fees against borrowers' accounts by using "wrap around" software packages that work with the Fidelity MSP system. Based on parameters inputted into these programs, Defendants' computer systems automatically implement decisions about how to manage borrowers' accounts based on internal software logic. Chase Home Finance LLC and J.P. Morgan Chase Bank, N.A. assess fees for default-related services on borrowers' accounts through these systems.

38.     The Fidelity MSP software used by Defendants also has a platform called Bankruptcy Work Station ("BWS") that is purportedly infused with computer logic designed to manage a loans during a pending bankruptcy. Additionally, to manage loans in default, Defendants also use a software program called "FORTRACS." "FORTRACS automates default management processing, decisioning and documentation of a loan.

With fully integrated modules and synchronization of activities, it supports the lender's credit and collateral risk management through loss mitigation, foreclosure processing, bankruptcy monitoring, claims processing and REO management."[8]

## MARKED-UP AND UNNECESSARY FEES
## FOR DEFAULT-RELATED SERVICES

39.     In their loan servicing operations, Defendants follow a strategy to generate fraudulently concealed default-related fee income.  Rather than simply obtain default-related services directly from independent third-party vendors, and charge borrowers for the actual cost of these services, Defendants assess borrowers' accounts for services that are unnecessary and they unlawfully add additional, undisclosed profits on to the third party charges before they are assessed on borrowers' accounts.

40.     Defendants' scheme works as follows.  Defendants order default-related services from their subsidiaries and affiliated companies, who, in turn, obtain the services from third-party vendors.  The third-party vendors charge Defendants for their services. Defendants, in turn, assess borrowers a fee that is significantly marked-up from the third-party vendors' actual fees for the services.  As a result, even though the mortgage market has collapsed, and more and more borrowers are falling into delinquency, Defendants continue to earn substantial profits by assessing undisclosed, marked-up fees for default-related services on borrowers' accounts.

---

[8] *See* http://www.isgn.com/Products/Fortracs.htm (last visited Feb. 8, 2012).

41.    The mortgage contract between a lender and a borrower generally consists of two documents:  the promissory note ("Note") and the mortgage or deed of trust ("Security Instrument").  The mortgage contacts serviced by Defendants are substantially similar because they conform to the standard Fannie Mae/Freddie Mac form contract. These contracts contain disclosures regarding what occurs if borrowers default on their loans.  The Security Instrument discloses to borrowers that, in the event of default, the loan servicer will:

> pay for whatever is reasonable or appropriate to protect the note holder's interest in the property and rights under the security instrument, including protecting and/or assessing the value of the property, and securing and/or repairing the property.

42.    The Security Instrument further discloses that any such amounts disbursed by the servicer shall become additional debt of the borrower secured by the Security Instrument and shall bear interest at the Note rate from the date of disbursement.  The Note further discloses that the note holder:

> will have the right to be paid back by [the borrower] for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law.  Those expenses include, for example, reasonable attorneys' fees.

Thus, the mortgage contract discloses to borrowers that the servicer will pay for default-related services when necessary, and will be reimbursed by the borrower.  Nowhere is it disclosed to borrowers that the servicer may mark-up the actual cost of those services to make a profit, nor does it permit such fees to be assessed on borrowers' accounts when they are unnecessary.

43.     Broker's Price Opinions ("BPOs") are a significant category of default-related service fees that, in furtherance of Defendants' unlawful enterprises, are assessed on borrowers' accounts with substantial, undisclosed mark-ups, fraudulently generating revenue in the loan servicing business.

44.     As discussed above, by charging marked-up fees for BPOs, Defendants violate the disclosures made to borrowers.  Furthermore, the wrongful nature of the marked-up fees is demonstrated by the fact that Defendants conceal the marked-up profits assessed on borrowers' accounts.

45.     Although Defendants assess fees for BPOs on borrowers' accounts in amounts ranging from approximately $95 to $125, as of December 2010, under Fannie Mae guidelines, the maximum reimbursable rate for an exterior BPO is $80,[9] and in practice, the actual cost is much less.  According to the National Association of BPO Professionals, the actual cost of a BPO may be as little as $30.[10]

46.     Defendant J.P. Morgan Chase & Co., its subsidiaries, defendant J.P. Morgan Chase Bank, N.A., and defendant Chase Home Finance LLC, their "property preservation" vendors, and the real estate brokers who provide BPOs for Chase, formed an enterprise and devised a scheme to defraud borrowers and obtain money from them by means of false pretenses.  Chase Home Finance LLC, and now, its successor, J.P. Morgan Chase Bank, N.A., service approximately 9 million mortgage loans, which is about 12% of the loans in the United States.[11]

47.     According to defendant J.P. Morgan Chase & Co.'s 2010 Annual Report, "[w]hen it becomes likely that a borrower is either unable or unwilling to pay, the Firm

---

[9] *See* Fannie Mae, *Broker Price Opinion Providers and Pricing Structure*, available at https://efanniemae.com/sf/guides/ssg/annltrs/pdf/2010/ntce121710a.pdf (last visited Feb. 1, 2012).

[10] *See* National Association of BPO Professionals (NABPOP), *Broker Price Opinion – BPO Brief*, available at http://www.nabpop.org/Advocacy-BPOBrief-2.php (last visited Feb. 2, 2012).

[11] *See* J.P. Morgan Chase & Co. 2010 Annual Report at p. 39, available at http://files.shareholder.com/downloads/ONE/1653115906x0x458380/ab2612d5-3629-46c6-ad94-5fd3ac68d23b/2010_JPMC_AnnualReport_.pdf (last visited Jan. 24, 2012).

1   obtains a broker's price opinion of the home based on an exterior-only valuation."[12]

2       48.     Plaintiffs are informed and believe, and on that basis, allege that using the

3   enterprise and Defendants' computerized automated mortgage loan management system,

4   Chase Home Finance LLC and J.P. Morgan Chase Bank, N.A. unlawfully charged and

5   continue to charge marked-up or unnecessary fees for default-related services.

6   Furthermore, to fraudulently conceal their actions and mislead borrowers about the true

7   nature of its actions, Defendants employs a corporate practice that omits true nature of the

8   fees that are being assessed on borrowers' accounts.

9       49.     Plaintiffs are informed and believe, and on that basis, allege that Defendants

10  conceal these marked-up fees for default-related services on borrowers accounts, by

11  identifying the charges only as "Miscellaneous Fees," "Corporate Advances," "Other

12  Fees," or "Advances" on borrowers' statements.  Under the these categories, Chase Home

13  Finance LLC and J.P. Morgan Chase Bank, N.A. assess fees for BPOs on borrowers'

14  accounts, charging from $95 to $125, when in fact, on information and belief, the actual

15  cost of each BPO is approximately $50 or less.  Plaintiffs are informed and believe, and

16  on that basis, allege that a significant number of these BPOs are ordered by Chase's

17  Bankruptcy Processing team and Collection Department in San Diego, California.

18      50.     Plaintiffs are informed and believe, and on that basis, allege that under the

19  "Miscellaneous Fees," "Corporate Advances," "Other Fees," or "Advances" categories on

20  borrowers' statements, Chase also assesses unnecessary fees for property inspections.  In

21  order to generate profits from these fees, Chase's automated loan management system is

22  set up to order property inspections and assess fees against borrowers when they are a

23  certain number of days late on their mortgage, regardless of whether the assessment of

24  such fees is necessary.  Although such inspections purportedly are conducted to guard

25  against property loss, Defendants' practices are designed to ensure that these fees are

26  _____

27  [12] *See* J.P. Morgan Chase & Co. 2010 Annual Report, available at
    http://files.shareholder.com/downloads/ONE/1653115906x0x458380/ab2612d5-3629-46c6-ad94-

28  5fd3ac68d23b/2010_JPMC_AnnualReport_.pdf (last visited Jan. 24, 2012).

1   charged to as many accounts as possible, even if the inspections are unnecessary.

2       51.     When a loan is delinquent, Chase Home Finance LLC and J.P. Morgan

3   Chase Bank, N.A. repeatedly contacts borrowers by telephone and by letter. In these

4   communications, Chase determines whether the property is occupied. Nevertheless,

5   Plaintiffs are informed and believe, and on that basis, allege that guidelines inputted into

6   Chase's loan management software system automatically trigger property inspections if a

7   loan is past due by a certain number of days. After a borrower's account is past due by a

8   set number of days, as inputted into the software, Chase's computer automatically

9   generates a work order for a property inspection without human intervention. Moreover,

10  so long as a borrower's account is past due by the requisite number of days inputted into

11  the loan management software, Chase's system automatically continues to order

12  inspections, regardless of whether they are necessary.

13      52.     Plaintiffs are informed and believe, and on that basis, allege that even if the

14  property inspections were properly performed and actually reviewed by someone at the

15  bank, Chase's continuous assessment of fees for these inspections on borrowers accounts

16  is still improper because of the frequency with which they are performed. If the first

17  inspection report shows that the property is occupied and in good condition, it is

18  unnecessary and inappropriate for Chase's system to automatically continue to order

19  monthly inspections. Nothing in the reports justifies continued monitoring.

20      53.     In order to further lull borrowers into a sense of trust, conceal Chase's

21  unlawful fees, and dissuade borrowers from challenging Chase's unlawful fee

22  assessments, Chase falsely represents on statements provided to borrowers that "Other

23  Fees" and "Advances," which are charges for BPOs and property inspections, include

24  "amounts allowed by [borrowers'] Note and Security Instrument."

25      54.     As a result of Chase's unlawful enterprise, hundreds of thousands of

26  unsuspecting borrowers are cheated out of millions of dollars.

27

28

## BORROWERS SUFFER HARM
## AS A RESULT OF DEFENDANTS' PRACTICES

55.     In addition to the direct monetary damages caused to borrowers, in the form of the difference between the actual cost of the services provided and the marked-up fees assessed on borrowers' accounts, borrowers suffer other, less obvious injuries as a result of the practices described herein.

56.     The assessment of these marked-up fees can make it impossible for borrowers to become current on their loan.  Charges for default-related services can add hundreds or thousands of dollars to borrowers' loans over time, driving them further into default.

57.     When borrowers get behind on their mortgage, and fees for these default-related services are stacked on to the past-due principal and interest payments, Defendants' practices make it increasingly difficult for borrowers to ever bring their loan current.  Even if borrowers pay the delinquent principal and interest payments, the marked-up fees for default-related services ensure that borrowers stay in default.  After paying delinquent principal and interest, although the next payment comes in on time, often through automatic payment deductions from borrowers' bank accounts, part of the payment is applied to the fees first, so there is not enough to cover the entire monthly payment.  This makes that payment late, creating a cascade of more fees, and more arrears, that keeps borrowers in delinquency.  By the time borrowers are aware, Defendants are threatening to foreclose unless a huge payment is made, and the weight of these unnecessary fees drops borrowers into a financial abyss.

58.     As a result of Defendants' practices, which force borrowers to move deeper into default, borrowers suffer damage to their credit score.  Defendants provide information about borrowers' payment history to credit reporting companies, including whether they have been late with a payment or missed any payments.  By keeping borrowers in default with these practices, Defendants affect whether borrowers can get a loan in the future – and what borrowers' interest rate will be on such loans.

59.     Additionally, as a result of Defendants' practices, which force borrowers to move deeper into default, borrowers are driven into foreclosure.

## PLAINTIFFS' CLAIMS AGAINST CHASE

60.     Plaintiff Ellis is a resident of Los Angeles County, California.

61.     Plaintiff Ellis has a mortgage serviced by Chase.

62.     A "Mortgage Loan Statement," dated July 1, 2011, issued to Plaintiff Ellis by defendant Chase included an assessment of $154.24 for "Miscellaneous Fees." Plaintiff is informed and believes, and on that basis, alleges that these fees included unlawful marked-up and unnecessary fees for default-related services, and that over the history of her loan, her account was assessed numerous other unlawful and unnecessary fees for default-related services. Defendants alone maintain a complete accounting of all fees assessed and paid, and the details of each and every fee assessed and paid cannot be alleged with complete precision without access to Defendants' records. Nevertheless, Plaintiffs are informed and believe, and on that basis allege, that Plaintiff Ellis paid some or all of the unlawful fees assessed on her account.

63.     Plaintiff Schillinger is a resident of Shelby County, Tennessee.

64.     Plaintiff Schillinger has a mortgage serviced by Chase.

65.     Chase continually assessed fees for default-related services, including property inspections, on the mortgage account of Plaintiff Schillinger, including on October 18, 2011, October 28, 2011, and February 18, 2012. Defendants alone maintain a complete accounting of all fees assessed and paid, and the details of each and every fee assessed and paid cannot be alleged with complete precision without access to Defendants' records. Nevertheless, Plaintiffs are informed and believe, and on that basis allege, that Plaintiff Schillinger paid some or all of the unlawful fees assessed on his account.

66.     Plaintiff Lazar is a resident of Coos County, Oregon.

67.     Plaintiff Lazar has a mortgage serviced by Chase.

68.     Chase continually assessed fees for default-related services, including

17

property inspections, on the mortgage account of Plaintiff Lazar. On mortgage statements provided to Plaintiff Lazar in 2010 and 2011, these assessments were identified as "Miscellaneous Fees." Chase sent Plaintiff Lazar an "Acceleration Warning" letter dated June 2, 2011, demanding that Plaintiff Lazar pay Chase $86.80 for "Other Fees," and $28.00 for "Advances." The June 2, 2011 letter further stated, "Other Fees and Advances include those amounts allowed by your Note and Security Instrument."

69.     Defendants alone maintain a complete accounting of all fees assessed and paid, and the details of each and every fee assessed and paid cannot be alleged with complete precision without access to Defendants' records. Nevertheless, Plaintiffs are informed and believe, and on that basis allege, that Plaintiff Lazar paid some or all of the unlawful fees assessed on his account.

## STATUTE OF LIMITATIONS

70.     Any applicable statutes of limitations have been tolled by Defendants' knowing and active concealment, denial, and misleading actions, as alleged herein. Plaintiffs and members of the Class, as defined below, were kept ignorant of critical information required for the prosecution of their claims, without any fault or lack of diligence on their part. Plaintiffs and members of the Class could not reasonably have discovered the true nature of the Defendants' marked-up fee scheme.

71.     Defendants are under a continuous duty to disclose to Plaintiffs and members of the classes the true character, quality, and nature of the fees they assess on borrowers' accounts. Defendants knowingly, affirmatively, and actively concealed the true character, quality, and nature of their assessment of marked-up fees against borrowers' accounts. Plaintiffs and members of the Class reasonably relied upon Defendants' knowing, affirmative, and active concealment. Based on the foregoing, Defendants are estopped from relying on any statutes of limitation as a defense in this action.

72.     The causes of action alleged herein did or will only accrue upon discovery of the true nature of the charges assessed against borrowers' accounts, as a result of Defendants' fraudulent concealment of material facts. Plaintiffs and members of the

1   Class did not discover, and could not have discovered, through the exercise of reasonable
2   diligence, the true nature of the unlawful fees assessed against their accounts.

3       73.    Legal scholars have explained that, as a result of these deceptive practices, it
4   is impossible for borrowers to determine that they are victims of these violations, because
5   "without a true itemization that identifies the nature of each fee, parties cannot verify that
6   a mortgage claim is correctly calculated . . . the servicer could be overreaching and
7   charging fees that are not permitted by law or by the terms of the contract. . . . By
8   obscuring the information needed to determine the alleged basis for the charges, servicers
9   thwart effective review of mortgage claims. The system can only function as intended if
10  complete and appropriate disclosures are made."[13]

11      74.    Additionally, judges examining similar conduct have found that, "[a]t the
12  heart of the problem is [the loan servicer's] failure to disclose to its borrowers/debtors, the
13  trustee, or the Court, the nature or amount of fees and charges assessed . . . [l]ack of
14  disclosure facilitates the injury.  Naive borrowers/debtors, trustees and creditors rightly
15  assume that [the loan servicer] is complying with the plain meaning of its notes,
16  mortgages, court orders and confirmed plans.  Why would anyone assume otherwise? . . .
17  How are they to challenge a practice or demand correction of an error they do not know
18  exists."[14]

### CLASS ACTION ALLEGATIONS

20      75.    Plaintiffs bring this action, on behalf of themselves and all others similarly
21  situated, as a class action under Rule 23 of the Federal Rules of Civil Procedure.

22      76.    The classes Plaintiffs seek to represent (collectively, the "Class") are defined
23  as follows:

> All residents of the United States of America who had a loan
> serviced by Chase Home Finance LLC at any time, or a loan
> serviced by J.P. Morgan Chase Bank, N.A. from May 1, 2011

---

[13] *See* Katherine Porter, *Misbehavior and Mistake in Bankruptcy Mortgage Claims*, 87 Tex. L. Rev. 121,
155 (2008).

[14] *See In re: Jones*, 418 B.R. 687, 699 (E.D. La. 2009).

continuing through the date of final disposition of this action, and whose accounts were assessed fees for default-related services, including Broker's Price Opinions, and inspection fees, at any time, continuing through the date of final disposition of this action (the "Nationwide Subclass").

All residents of the State of California who had a loan serviced by Chase Home Finance LLC at any time, or a loan serviced by J.P. Morgan Chase Bank, N.A. from May 1, 2011 continuing through the date of final disposition of this action, and whose accounts were assessed fees for default-related services, including Broker's Price Opinions, and inspection fees, at any time, continuing through the date of final disposition of this action (the "California Subclass").

77.     Plaintiffs reserve the right to amend the Class definitions if discovery and further investigation reveals that the Class should be expanded or otherwise modified.

78.     Plaintiffs reserve the right to establish sub-classes as appropriate.

79.     This action is brought and properly may be maintained as a class action under the provisions of Federal Rules of Civil Procedure 23(a)(1)-(4) and 23(b)(1), (b)(2) or (b)(3), and satisfies the requirements thereof.  As used herein, the term "Class Members" shall mean and refer to the members of the Class.

80.     Community of Interest:  There is a well-defined community of interest among members of the Class, and the disposition of the claims of these members of the Class in a single action will provide substantial benefits to all parties and to the Court.

81.     Numerosity:  While the exact number of members of the Class is unknown to Plaintiffs at this time and can only be determined by appropriate discovery, membership in the Class is ascertainable based upon the records maintained by Defendants.  At this time, Plaintiffs are informed and believe that the Class includes hundreds of thousands of members.  Therefore, the Class is sufficiently numerous that joinder of all members of the Class in a single action is impracticable under Federal Rule of Civil Procedure Rule 23(a)(1), and the resolution of their claims through the procedure of a class action will be of benefit to the parties and the Court.

82.    <u>Ascertainablity</u>:  Names and addresses of members of the Class are available from Defendants' records.  Notice can be provided to the members of the Class through direct mailing, publication, or otherwise using techniques and a form of notice similar to those customarily used in consumer class actions arising under California state law and federal law.

83.    <u>Typicality</u>:  Plaintiffs' claims are typical of the claims of the other members of the Class which they seek to represent under Federal Rule of Civil Procedure 23(a)(3) because each Plaintiff and each member of the Class has been subjected to the same deceptive and improper practices and has been damaged in the same manner thereby.

84.    <u>Adequacy</u>:  Plaintiffs will fairly and adequately represent and protect the interests of the Class as required by Federal Rule of Civil Procedure Rule 23(a)(4). Plaintiffs are adequate representatives of the Class, because they have no interests which are adverse to the interests of the members of the Class.  Plaintiffs are committed to the vigorous prosecution of this action and, to that end, Plaintiffs have retained counsel who are competent and experienced in handling class action litigation on behalf of consumers.

85.    <u>Superiority</u>: A class action is superior to all other available methods of the fair and efficient adjudication of the claims asserted in this action under Federal Rule of Civil Procedure 23(b)(3) because:

(a)    The expense and burden of individual litigation make it economically unfeasible for members of the Class to seek to redress their claims other than through the procedure of a class action.

(b)    If separate actions were brought by individual members of the Class, the resulting duplicity of lawsuits would cause members to seek to redress their claims other than through the procedure of a class action; and

(c)    Absent a class action, Defendants likely would retain the benefits of their wrongdoing, and there would be a failure of justice.

86.    Common questions of law and fact exist as to the members of the Class, as

21

1   required by Federal Rule of Civil Procedure 23(a)(2), and predominate over any questions
2   which affect individual members of the Class within the meaning of Federal Rule of Civil
3   Procedure 23(b)(3).

4       87.    The common questions of fact include, but are not limited to, the following:

5       (a)    Whether Defendants engaged in unlawful, unfair, misleading, or
6   deceptive business acts or practices in violation of California Business
7   & Professions Code sections 17200 *et seq.*;

8       (b)    Whether Defendants' practice of charging marked-up fees to
9   borrowers, as alleged herein, is illegal;

10      (c)    Whether Defendants were members of, or participants in the
11  conspiracy alleged herein;

12      (d)    Whether Defendants engaged in a pattern or practice of racketeering,
13  as alleged herein;

14      (e)    Whether documents and statements provided to Plaintiffs and
15  members of the Class omitted material facts;

16      (f)    Whether Plaintiffs and members of the class sustained damages, and if
17  so, the appropriate measure of damages; and

18      (g)    Whether Plaintiffs and members of the Class are entitled to an award
19  of reasonable attorneys' fees, pre-judgment interest, and costs of this
20  suit.

21      88.    In the alternative, this action is certifiable under the provisions of Federal
22  Rule of Civil Procedure 23(b)(1) and/or 23(b)(2) because:

23      (a)    The prosecution of separate actions by individual members of the
24  Class would create a risk of inconsistent or varying adjudications with
25  respect to individual members of the Class which would establish
26  incompatible standards of conduct for Defendants;

27      (b)    The prosecution of separate actions by individual members of the
28  Class would create a risk of adjudications as to them which would, as a

practical matter, be dispositive of the interests of the other members of the Class not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

(c)    Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole and necessitating that any such relief be extended to members of the Class on a mandatory, class-wide basis.

89.    Plaintiffs are not aware of any difficulty which will be encountered in the management of this litigation which should preclude its maintenance as a class action

## FIRST CAUSE OF ACTION

## BROUGHT ON BEHALF OF THE CALIFORNIA SUBCLASS

### Violation of Unfair Business Practices Act
### (California Business & Professions Code §§ 17200 *et seq.*)

90.    Plaintiffs incorporate by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

91.    Plaintiff Ellis brings this cause of action on behalf of herself and the members of the California Subclasses.

92.    California Business and Professions Code section 17200 prohibits "any unlawful, unfair or fraudulent business act or practice." For the reasons described above, Defendants have engaged in unfair, or fraudulent business acts or practices in violation of California Business and Professions Code sections 17200 *et seq.*

93.    In the course and conduct of their loan servicing and collection, Defendants omit a true itemization that identifies the nature of each fee, and they fail to disclose the nature of the charges and fees assessed. Defendants conceal the fact the category identified as "Miscellaneous Fees" reflects marked-up and/or unnecessary fees that were never incurred by Defendants. Relying on Chase Home Finance LLC and J.P. Morgan

1   Chase Bank, N.A., Plaintiff Ellis, and members of the California Subclass believe they are

2   obligated to pay the amounts specified in Chase Home Finance LLC and J.P. Morgan

3   Chase Bank, N.A.'s communications.

4        94.    In truth and in fact, borrowers are not obligated to pay the amounts that have

5   been specified in Chase Home Finance LLC and J.P. Morgan Chase Bank, N.A.'s

6   communications concerning default-related services, such as BPOs. Defendants omit the

7   fact that the amounts they represent as being owed have been marked-up beyond the

8   actual cost of the services, or they are unnecessary, in violation of disclosures in the

9   mortgage contract. Contrary to Chase Home Finance LLC and J.P. Morgan Chase Bank,

10   N.A.'s communications, Defendants are not legally authorized to assess and collect these

11   fees.

12        95.    Defendants' omissions of material facts, as set forth herein, constitutes an

13   unlawful practice because they violate Title 18 United States Code sections 1341, 1343,

14   and 1962, as well as California Civil Code sections 1572, 1573, 1709, 1710, and 1711,

15   among others, and the common law.

16        96.    Defendants' omissions of material facts, as set forth herein, also constitute

17   "unfair" business acts and practices within the meaning of California Business and

18   Professions Code sections 17200 *et seq.*, in that Defendants' conduct was injurious to

19   consumers, offended public policy, and was unethical and unscrupulous. Plaintiff Ellis

20   also asserts a violation of public policy by withholding material facts from consumers.

21   Defendants' violation of California's consumer protection and unfair competition laws in

22   California resulted in harm to consumers.

23        97.    There were reasonable alternatives available to Defendants to further

24   Defendants' legitimate business interests, other than the conduct described herein.

25        98.    California Business and Professions Code section 17200 also prohibits any

26   "fraudulent business act or practice." Defendants' concealment of material facts, as set

27   forth above, was false, misleading, or likely to deceive the public within the meaning of

28   California Business and Professions Code section 17200. Defendants' concealment was

1  made with knowledge of its effect, and was done to induce Plaintiff Ellis and members of

2  the California Subclass to pay the marked-up and/or unnecessary fees for default-related

3  services.

4       99.   Plaintiff Ellis and members of the California Subclass relied on their

5  reasonable expectation that Defendants would comply with the disclosures set forth in the

6  mortgage agreement, Notes, and Security Instruments, and as a result, Plaintiff Ellis and

7  members of the California Subclass relied on Chase Home Finance LLC and J.P. Morgan

8  Chase Bank, N.A.'s disclosures about the fees on their statements, reasonably believing

9  the "Miscellaneous Fees" or "Corporate Advances" to be valid charges that were not

10  unlawfully marked-up and/or unnecessary.  Indeed, to lull borrowers into a sense of trust

11  and dissuade them from challenging Defendants' unlawful fee assessments, Defendants

12  further conceal their scheme by telling borrowers, in statements and other documents from

13  Chase Home Finance LLC and J.P. Morgan Chase Bank, N.A., that such fees are

14  "allowed by [borrowers'] Note and Security Instrument."  Had the true nature of the fees

15  been disclosed to Plaintiff Ellis and the members of the California Subclass, they would

16  have been aware of the mark-ups, or unnecessary nature of the fees, and Plaintiff Ellis and

17  the members of the California Subclass would have disputed the charges and not paid

18  them.

19       100.   Plaintiff Ellis and the members of the California Subclass have been injured

20  in fact and suffered a loss of money or property as a result of Defendants' fraudulent,

21  unlawful, and unfair business practices.  Plaintiff Ellis and the members of the California

22  Subclass would not have paid Defendants' unlawful fees or they would have challenged

23  the assessment of such fees on their accounts had it not been for Defendants' concealment

24  of material facts.

25       101.   Defendants have thus engaged in unlawful, unfair, and fraudulent business

26  acts entitling Plaintiff Ellis and the members of the California Subclass to judgment and

27  equitable relief against Defendants, as set forth in the Prayer for Relief.

28       102.   Additionally, under Business and Professions Code section 17203, Plaintiff

25

Ellis and members of the California Subclass seek an order requiring Defendants to immediately cease such acts of unlawful, unfair, and fraudulent business practices, and requiring Defendants to correct their actions.

## SECOND CAUSE OF ACTION

### Violations of the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1962(c))

103.   Plaintiffs incorporate by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

104.   Plaintiffs bring this cause of action on behalf of themselves and the members of the Nationwide Subclass.

### THE ENTERPRISE

105.   Defendants J.P. Morgan Chase & Co., J.P. Morgan Chase Bank, N.A., and Chase Home Finance LLC are each persons within the meaning of Title 18 United States Code section 1961(3).

106.   At all relevant times, in violation of Title 18 United States Code section 1962(c), J.P. Morgan Chase & Co., J.P. Morgan Chase Bank, N.A., Chase Home Finance LLC, including their directors, employees, and agents, along with their "property preservation" vendors – including Safeguard Real Estate Properties, LLC d/b/a of Safeguard Properties, LLC, Mortgage Contracting Services, LLC, and LPS Field Services, Inc. – and the real estate brokers who provide BPOs for Chase conducted the affairs of an association-in-fact enterprise, as that term is defined in Title 18 United States Code section 1961(4) (the "Chase Enterprise"). The affairs of the Chase Enterprise affected interstate commerce through a pattern of racketeering activity.

107.   The Chase Enterprise is an ongoing, continuing group or unit of persons and entities associated together for the common purpose of limiting costs and maximizing profits by fraudulently concealing assessments for unlawfully marked-up and/or unnecessary fees for default-related services on borrowers' accounts.

108.   While the members of the Chase Enterprise participate in and are part of the enterprise, they also have an existence separate and distinct from the enterprise.  The Chase Enterprise has a systematic linkage because there are contractual relationships, agreements, financial ties, and coordination of activities between Defendants, the real estate brokers who perform BPOs, and the vendors that perform property inspections.

109.   Operating the Chase Enterprise according to policies and procedures developed and established by their executives, J.P. Morgan Chase & Co., and J.P. Morgan Chase Bank, N.A. control and direct the affairs of the Chase Enterprise and use the other members of the Chase Enterprise as instrumentalities to carry out Chase's fraudulent scheme.  These policies and procedures established by Chase's executives include providing statements that fail to disclose the true nature of the marked-up or unnecessary fees, cryptically identifying default-related service fees as "Miscellaneous Fees," or "Corporate Advances," using mortgage loan management software designed to increase the fees assessed on borrowers' accounts, without consideration for whether the assessment of such fees is necessary, failing to provide borrowers with documentation to support assessments of fees for BPOs, and directing property preservation vendors to conduct services without consideration for whether they are necessary.

## THE PREDICATE ACTS

110.   Defendants' systematic schemes to fraudulently conceal assessments of unlawfully marked-up or unnecessary third party fees on the accounts of borrowers who have mortgage loans administered Chase Home Finance LLC and J.P. Morgan Chase Bank, N.A., as described above, was facilitated by the use of the United States Mail and wire.  Defendants' schemes constitute "racketeering activity" within the meaning of Title 18 United States Code section 1961(1), as acts of mail and wire fraud, under Title 18 United States Code sections 1341 and 1343.

111.   In violation of Title 18 United States Code sections 1341 and 1343, Defenants utilized the mail and wire in furtherance of their scheme to defraud borrowers whose loans are serviced by Chase Home Finance LLC and J.P. Morgan Chase Bank,

1    N.A. by obtaining money from borrowers using false or fraudulent pretenses.

2       112.   Through the mail and wire, the Chase Enterprise provided mortgage invoices,

3 loan statements, payoff demands, or proofs of claims to borrowers, demanding that

4 borrowers pay fraudulently concealed marked-up or unnecessary fees for default-related

5 services, such as BPOs or property inspections. Defendants also accepted payments and

6 engaged in other correspondence in furtherance of their scheme through the mail and

7 wire.

8       113.   Defendants fraudulently and unlawfully marked-up fees in violation of

9 borrowers' mortgage agreements because the fees exceed the actual cost of the services,

10 and therefore, they violate the disclosures made to borrowers.

11       114.   The mortgage invoices, loan statements, or proofs of claims provided to

12 borrowers fraudulently concealed the true nature of assessments made on borrowers'

13 accounts. Using false pretenses, identifying the fees on mortgage invoices, loan

14 statements, or proofs of claims only as "Miscellaneous Fees" or "Corporate Advances" to

15 obtain full payments from borrowers, Defendants disguised the true nature of these fees

16 and omitted the fact that the fees include undisclosed mark-ups or were unnecessary. By

17 omitting and fraudulently concealing the true nature of amounts purportedly owed in

18 communications to borrowers, Defendants made false statements using the Internet,

19 telephone, facsimile, United States mail, and other interstate commercial carriers.

20       115.   Furthermore, to lull borrowers into a sense of trust, conceal Defendants'

21 unlawful fees, and dissuade borrowers from challenging Defendants' unlawful fee

22 assessments, Defendants further conceal their scheme from borrowers by telling them, in

23 statements and other documents, that such fees are "allowed by [borrowers'] Note and

24 Security Instrument."

25       116.   Defendants' omissions were material to Plaintiffs and the members of the

26 Class. Had Defendants disclosed the true marked-up or unnecessary nature of the fees for

27 default-related services, Plaintiffs would have been aware and would have challenged

28 Defendants' unlawful fee assessments or they would not have paid them.

CLASS ACTION COMPLAINT

117. Each of these acts constituted an act of mail fraud for purposes of Title 18 United States Code section 1341.

118. Additionally, using the Internet, telephone, and facsimile transmissions to fraudulently communicate false information about these fees to borrowers, to pursue and achieve their fraudulent scheme, Defendants engaged in repeated acts of wire fraud in violation of Title 18 United States Code section 1343.

119. In an effort to pursue their fraudulent scheme, Defendants knowingly fraudulently concealed or omitted material information from Plaintiffs and members of the Class. Defendants' knowledge that their activities were fraudulent and unlawful is evidenced by, among other things, the fact that they did not disclose the mark-ups or unnecessary nature of the fees in their communications to borrowers.

120. The predicate acts specified above constitute a "pattern of racketeering activity" within the meaning of Title 18 United States Code section 1961(5) in which Defendants have engaged under Title 18 United States Code section 1962(c).

121. All of the predicate acts of racketeering activity described herein are part of the nexus of the affairs and functions of the Chase Enterprise racketeering enterprise. The racketeering acts committed by the Chase Enterprise employed a similar method, were related, with a similar purpose, and they involved similar participants, with a similar impact on the members of the Class. Because this case is brought on behalf of a class of similarly situated borrowers and there are numerous acts of mail and wire fraud that were used to carry out the scheme, it would be impracticable for Plaintiffs to plead all of the details of the scheme with particularity. Plaintiffs cannot plead the precise dates of all of Defendants' uses of the mail and wire because this information cannot be alleged without access to Defendants' records.

122. The pattern of racketeering activity is currently ongoing and open-ended, and threatens to continue indefinitely unless this Court enjoins the racketeering activity.

123. Numerous schemes have been completed involving repeated unlawful conduct that by its nature, projects into the future with a threat of repetition.

124.   As a direct and proximate result of these violations of Title 18 United States Code sections 1962(c) and (d), Plaintiffs and members of the class have suffered substantial damages.  Defendants are liable to Plaintiffs and members of the Class for treble damages, together with all costs of this action, plus reasonable attorney's fees, as provided under Title 18 United States Code section 1964(c).

## THIRD CAUSE OF ACTION

### Violation of the Racketeer Influenced and Corrupt Organizations Act, Conspiracy to Violate Title 18 United States Code section 1962(c) (18 U.S.C. § 1962(d))

125.   Plaintiffs incorporate by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

126.   Plaintiffs bring this cause of action on behalf of themselves and the members of the Nationwide Class.

127.   As set forth above, in violation of Title 18 United States Code section 1962(d), defendants J.P. Morgan Chase & Co., J.P. Morgan Chase Bank, N.A., and Chase Home Finance LLC conspired to violate the provisions of Title 18 United States Code section 1962(c).

128.   As set forth above, J.P. Morgan Chase & Co. and J.P. Morgan Chase Bank, N.A., having directed and controlled the affairs of the Citi Enterprise, were aware of the nature and scope of the enterprise's unlawful scheme, and they agreed to participate in it.

129.   As a direct and proximate result, Plaintiffs and the members of the Nationwide Subclasses have been injured in their business or property by the predicate acts which make up Defendants' patterns of racketeering activity in that unlawfully marked-up and/or unnecessary fees for default-related services were assessed on their mortgage accounts.

## FOURTH CAUSE OF ACTION

### Unjust Enrichment

130.   Plaintiffs incorporate by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

131.   Plaintiffs bring this cause of action on behalf of themselves and the members of the Nationwide Subclass.

132.   By their wrongful acts and omissions of material facts, Defendants were unjustly enriched at the expense of Plaintiffs and members of the Class.

133.   The mortgage contract with borrowers like Plaintiffs and the members of the Class discloses that Defendants will pay for default-related services when necessary, and they will be reimbursed by the borrower.  Nowhere in the mortgage contract is it disclosed that Defendants may mark-up the actual cost of those services to make a profit, or that Defendants may incur unnecessary third party fees.

134.   Nevertheless, Defendants mark-up the prices charged by vendors, often by 100% or more, and then, without disclosing the mark-up, assess borrowers' accounts for the higher, marked-up fee so that Defendants can earn a profit.  Additionally, Defendants assess such fees on borrowers' accounts without adequate concern for whether they are necessary.

135.   Thus, Plaintiffs and members of the Class were unjustly deprived.

136.   Defendants are aware that it is improper to mark-up or assess unnecessary third party fees on borrowers' accounts for default-related services.  Therefore, Defendants fraudulently conceal these fees on borrowers' accounts, omitting any information about Defendants' additional profits, by identifying them on mortgage statements only as "Miscellaneous Fees" or "Corporate Advances."

137.   Furthermore, to lull borrowers into a sense of trust, conceal Defendants' unlawful fees, and dissuade borrowers from challenging Defendants' unlawful fee assessments, Defendants further conceal their scheme from borrowers by telling them, in

1 statements and other documents, that such fees are "allowed by [borrowers'] Note and

2 Security Instrument."

3      138.   It would be inequitable and unconscionable for Defendants to retain the

4 profit, benefit and other compensation they obtained from their fraudulent, deceptive, and

5 misleading conduct alleged herein.

6      139.   Plaintiffs and members of the Class seek restitution from Defendants, and

7 seek an order of this Court disgorging all profits, benefits, and other compensation

8 obtained by Defendants from their wrongful conduct.

9                          **FIFTH CAUSE OF ACTION**

10                                  **Fraud**

11      140.   Plaintiffs incorporate by reference in this cause of action each and every

12 allegation of the preceding paragraphs, with the same force and effect as though fully set

13 forth herein.

14      141.   Plaintiffs bring this cause of action on behalf of themselves and the members

15 of the Nationwide Class.

16      142.   Defendants concealed and suppressed material facts, namely, the fact that

17 Defendants mark-up the prices charged by vendors, often by 100% or more, and then,

18 without disclosing the mark-up, assess borrowers' accounts for the higher, marked-up fee

19 so that Defendants can earn a profit.  In truth and in fact, borrowers are not obligated to

20 pay the amounts that have been specified in Defendants' communications for default-

21 related services, such as BPOs.  Contrary to Defendants' communications, Defendants are

22 not legally authorized to assess and collect these fees.

23      143.   Defendants omit a true itemization that identifies the nature of each fee, and

24 they fail to disclose the nature of the charges and fees assessed.  Defendants conceal the

25 fact the category identified as "Corporate Advances" or "Miscellaneous Fees" reflects

26 marked-up and/or unnecessary fees that were never incurred by Defendants.

27      144.   Plaintiffs relied their reasonable expectation that Defendants comply with the

28 disclosures set forth in the mortgage agreement, Notes, Security Instruments, and as a

result, Plaintiffs relied on Defendants' disclosures about the fees on their statements, reasonably believing the "Corporate Advances" or "Miscellaneous Fees" to be valid charges that were not unlawfully marked-up or unnecessary

145. Indeed, to lull borrowers into a sense of trust and dissuade them from challenging Defendants' unlawful fee assessments, Defendants further conceal their scheme by telling borrowers, in statements and other documents, that such fees are "allowed by [borrowers'] Note and Security Instrument."

146. Had the true nature of the fees been disclosed to Plaintiffs and members of the Class, they would have been aware of the mark-ups, or unnecessary nature of the fees, and Plaintiffs would have disputed the charges and not paid them.

147. Defendants knew their concealment and suppression of materials facts was false, misleading, and in violation of the disclosures made to borrowers because the fees exceed the actual cost of the services.

148. As a result of Defendants' fraudulent omissions and failures to disclose, Plaintiffs and members of the Class have been injured in fact and suffered a loss of money or property. Plaintiffs and members of the Nationwide Class would not have paid Defendants' fraudulently marked-up fees or they would have challenged the assessment of such fees on their accounts had it not been for Defendants' concealment of material facts.

149. Defendants omitted and concealed material facts, as discussed above ,with knowledge of the effect of concealing of these material facts. Defendants knew that by misleading consumers, they would generate higher profits.

150. Plaintiffs and members of the Nationwide Class justifiably relied upon Defendants' knowing, affirmative, and active concealment. By concealing material information about their scheme to assess undisclosed marked-up fees on borrowers' accounts, Defendants intended to induce Plaintiffs and members of the Nationwide Class into believing that they owed Defendants money that Defendants were not actually entitled.

151. Defendants acted with malice, oppression, or fraud.

1   152.   As a direct and proximate result of Defendants' omissions and active
2   concealment of material facts, Plaintiffs and each member of the Nationwide Class has
3   been damaged in an amount according to proof at trial.

4                                   **PRAYER FOR RELIEF**

5          Plaintiffs, and on behalf of themselves and all others similarly situated, request the
6   Court to enter judgment against Defendants, as follows:

7          1.      Certifying the Class, as requested herein, certifying Plaintiffs as the
8   representatives of the Class, and appointing Plaintiffs' counsel as counsel for the Class;

9          2.      Ordering that Defendants are financially responsible for notifying all
10  members of the Class of the alleged omissions discussed herein;

11         3.      Awarding Plaintiffs and the members of the Class compensatory damages in
12  an amount according to proof at trial;

13         4.      Awarding restitution and disgorgement of Defendants' revenues or profits to
14  Plaintiffs and members of the Class;

15         5.      Awarding Plaintiffs and the members of the Class treble damages in an
16  amount according to proof at trial;

17         6.      Awarding declaratory and injunctive relief as permitted by law or equity,
18  including:  enjoining Defendants from continuing the unlawful practices as set forth
19  herein, and directing Defendants to identify, with Court supervision, victims of its conduct
20  and pay them restitution and disgorgement of all monies acquired by Defendants by
21  means of any act or practice declared by this Court to be wrongful;

22         7.      Ordering Defendants to engage in corrective advertising;

23         8.      Awarding interest on the monies wrongfully obtained from the date of
24  collection through the date of entry of judgment in this action;

25         9.      Awarding attorneys' fees, expenses, and recoverable costs reasonably
26  incurred in connection with the commencement and prosecution of this action; and

27

28

10.   For such other and further relief as the Court deems just and proper.

Dated: July 24, 2012

BARON & BUDD, P.C.

By: _____
        Mark Pifko

Daniel Alberstone (SBN 105275)
Roland Tellis (SBN 186269)
Mark Pifko (SBN 228412)
BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600
Encino, California 91436
Telephone: (818) 839-2333
Facsimile:  (818) 986-9698

Attorneys for Plaintiffs
DIANA ELLIS, JAMES SCHILLINGER,
and RONALD LAZAR, individually, and
on behalf of other members of the public
similarly situated

1

**DEMAND FOR JURY TRIAL**

2        Plaintiffs hereby demand a trial of their claims by jury to the extent authorized by

3    law.

4

Dated: July 2\_4\_, 2012

5                                              BARON & BUDD, P.C.

6

7                                              By: _____
                                                   Mark Pifko
8
                                               Daniel Alberstone (SBN 105275)
9                                              Roland Tellis (SBN 186269)
                                               Mark Pifko (SBN 228412)
10                                             BARON & BUDD, P.C.
                                               15910 Ventura Boulevard, Suite 1600
11                                             Encino, California 91436
                                               Telephone:  (818) 839-2333
12                                             Facsimile:   (818) 986-9698

13                                             Attorneys for Plaintiffs
                                               DIANA ELLIS, JAMES SCHILLINGER,
14                                             and RONALD LAZAR, individually, and
                                               on behalf of other members of the public
15                                             similarly situated

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT