1

2

3  UNITED STATES DISTRICT COURT

4  NORTHERN DISTRICT OF CALIFORNIA

5

6

7  DIANA ELLIS, JAMES SCHILLINGER, and          Case No.: 12-cv-03897-YGR
   RONALD LAZAR, individually and on behalf
8  of other members of the general public          **ORDER GRANTING IN PART AND DENYING IN**
   similarly situated,                              **PART DEFENDANTS' MOTION TO DISMISS**

9
                    Plaintiffs,
10
              vs.
11
12 J.P. MORGAN CHASE & CO., J.P.
   MORGAN CHASE BANK, N.A., and
13 CHASE HOME FINANCE LLC,

14                  Defendants.

15

16

17        Named Plaintiffs Diana Ellis, James Schillinger, and Ronald Lazar filed a Class Action

18 Complaint against Defendants J.P. Morgan Chase & Co., J.P. Morgan Chase Bank, N.A., and

19 Chase Home Finance LLC (collectively, "Chase" or "Defendants").  (Dkt. No. 1.)  Plaintiffs allege

20 Chase engaged in fraudulent practices by charging marked-up or unnecessary fees in connection

21 with Defendants' home mortgage loan servicing businesses.  This action was filed separately as to

22 these Defendants pursuant to a previous order of the Court.  (*See Bias, et al. v. Wells Fargo & Co.,*

23 *et al.*, Case No. 12-cv-00664-YGR [Dkt. No. 59].)

24        Defendants filed a Motion to Dismiss Plaintiffs' Complaint Pursuant to Fed. R. Civ. P.

25 12(b)(1) and 12(b)(6) on August 21, 2012, seeking dismissal of the Complaint with prejudice.

26 (Dkt. No. 6.)  On September 4, 2012, Plaintiffs filed their Opposition to the Chase Defendants'

27 Motion to Dismiss Plaintiffs' Complaint Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).  (Dkt.

28 No. 11.)  Chase filed their Reply in Support of Motion to Dismiss Complaint on September 11,

2012.  (Dkt. No. 14.)  The Court held oral argument on November 6, 2012.  (Dkt. No. 21.)

Having carefully considered the papers submitted and the pleadings in this action, oral argument at the hearing held on November 6, 2012, and for the reasons set forth below, Defendants' Motion to Dismiss:

- Is **DENIED** based on a lack of subject matter jurisdiction pursuant to 12 U.S.C. section 1818(i) of the National Bank Act;

- Is **DENIED** based on the doctrines of primary jurisdiction and equitable abstention;

- Is **DENIED** based on preemption by the National Bank Act;

- Is **DENIED** based on a lack of standing under Article III, the California Business and Professions Code section 17200, *et seq.*, and the Racketeer Influenced and Corrupt Organizations Act ("RICO");

- Is **GRANTED** as to the second and third claims for violations of RICO and conspiracy to violate RICO **WITH LEAVE TO AMEND**; and

- Is **DENIED** as to the fourth and fifth claims for unjust enrichment and fraud, respectively.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs allege that Defendants have engaged and continue to engage in fraudulent practices in connection with their home mortgage loan servicing business.[1]  (Compl. ¶ 2.)

---

[1] Plaintiffs are citizens of California, Tennessee, and Oregon.  (Compl. ¶¶ 18–20, 60–69.)  Plaintiffs allege that J.P. Morgan Chase & Co. is a corporation organized under the laws of Delaware with its principal place of business in New York.  (*Id.* ¶ 21.)  Defendant J.P. Morgan Chase Bank, N.A. is a subsidiary of J.P. Morgan Chase & Co. and is a national bank organized and existing as a national association under the National Bank Act, 12 U.S.C. section 21, *et seq.*, with its principal place of business in Columbus, Ohio.  (*Id.* ¶ 22.)  Plaintiffs further allege that Defendant Chase Home Finance LLC is a subsidiary of the other Defendants and a Delaware limited liability company with its principal place of business in New Jersey.  (*Id.* ¶ 23.)  Plaintiffs assert that J.P. Morgan Chase & Co. exercises specific and financial control over other Defendants' operations, dictates their policies and practices, and exercises power and control over them with regard to the conduct alleged in the Complaint.  (*Id.* ¶ 26.)  J.P. Morgan Chase & Co. is further alleged to be the ultimate recipient of the "ill-gotten gains" alleged in the Complaint.  (*Id.*)  Plaintiffs allege that executives at the highest levels of J.P. Morgan Chase & Co. and J.P. Morgan Chase Bank, N.A. organized the fraudulent scheme, which was then carried out by executives and employees of all Defendants.  (*Id.*)

Defendants allegedly adopted a uniform practice designed to maximize fees assessed on delinquent borrowers' accounts. (*Id.* ¶¶ 2–4.) As part of the scheme, Defendants "formed an enterprise with their respective subsidiaries, affiliates, and 'property preservation' vendors, . . . unlawfully mark[ed] up default-related fees charged by third parties[,] and assess[ed] them against borrowers' accounts" for an undisclosed profit. (*Id.* ¶ 9.) Specifically, "Defendants order[ed] default-related services from their subsidiaries and affiliated companies, who, in turn, obtain[ed] the services from third-party vendors." (*Id.* ¶ 40.) The third-party vendors charged Defendants for their services, but Defendants "assess[ed] borrowers a fee that [wa]s significantly marked-up from the third-party vendors' actual fees for the services." (*Id.*) Through the unlawful enterprise, Defendants marked-up fees charged by vendors, "often by 100% or more," and failed to disclose the mark-ups and hidden profits to borrowers. (*Id.* ¶ 4.)

In addition to marked-up fees, Defendants had a "practice of routinely assessing fees . . . even when they [we]re unnecessary." (Compl. ¶ 4.) Plaintiffs allege that: "even if the property inspections were properly performed and actually reviewed by someone at the bank, Chase's continuous assessment of fees for these inspections on borrowers accounts [*sic*] [wa]s still improper because of the frequency with which they [we]re performed. If the first inspection report show[ed] that the property [wa]s occupied and in good condition, it [would be] unnecessary and inappropriate for Chase's system to automatically continue to order monthly inspections. Nothing in the reports justifie[d] continued monitoring." (*Id.* ¶ 52.)

Plaintiffs allege that their mortgage contracts disclosed that Defendants will pay for default-related services when necessary, which would be reimbursed by borrowers, but "[n]owhere [wa]s it disclosed to borrowers that the servicer may mark-up the actual cost of those services to make a profit, nor d[id] it permit such fees to be assessed on borrowers' accounts when they [we]re unnecessary." (Compl. ¶ 42.) Defendants identified the marked-up fees as "Miscellaneous Fees," "Corporate Advances," "Other Fees," or "Advances" on mortgage statements. (*Id.* ¶¶ 10, 49 & 50.) Plaintiffs allege that the marked-up fees included Broker's Price Opinion fees ("BPOs"), appraisal fees, and inspection fees. (*Id.* ¶¶ 30, 43–45, 49–50 & 52.) A "significant number" of BPOs were "ordered by Chase's Bankruptcy Processing team and Collection Department in San Diego,

California." (*Id.* ¶ 49.)

Plaintiffs also allege that Defendants used a sophisticated home loan management program provided by Fidelity National Information System, Inc. called Mortgage Servicing Package (the "Program"). (Compl. ¶¶ 36.)  The Program "automatically implement[ed] decisions about how to manage borrowers' accounts based on internal software logic" and imposed the default-related fees when a loan was past due. (*Id.* ¶ 37.)  The parameters and guidelines for the Program were inputted by Defendants and "designed by the executives" at J.P. Morgan Chase & Company and J.P. Morgan Chase Bank, N.A. (*Id.* ¶¶ 35–37.)  "Chase Home Finance LLC and J.P. Morgan Chase Bank, N.A. assess[ed] fees for default-related services on borrowers accounts through these systems." (*Id.* ¶ 37.)  In addition, Plaintiffs allege that Defendants use a "Bankruptcy Work Station" platform "infused with computer logic to manage a loans [*sic*] during pending bankruptcy" and a program called "FORTRACS" which "automate[d] default management processing, decisionmaking and documentation of a loan." (*Id.* ¶ 38.)

The Complaint alleges "Chase" serviced the mortgages. (Compl. ¶¶ 61, 64 & 67.)  As to Plaintiff Diana Ellis, Chase assessed $154.24 for "Miscellaneous Fees" on a July 1, 2011 Mortgage Loan Statement. (*Id.* ¶ 62.)  Plaintiff Ellis alleges this fee was marked-up and unnecessary, and that "over the history of her loan, her account was assessed numerous other unlawful and unnecessary fees for default-related services." (*Id.*)  Plaintiff Ellis alleges on information and belief that she "paid some or all of the unlawful fees assessed on her account." (*Id.*)  As to Plaintiff James Schillinger, Chase continually assessed fees for default-related services, including property inspections, on his account. (*Id.* ¶ 65.)  He alleges such fees were charged on dates including October 18, 2011, October 28, 2011, and February 18, 2012.  Plaintiff Schillinger alleges that he "paid some or all of the unlawful fees assessed on his account." (*Id.*)  As to Plaintiff Ronald Lazar, Chase continually assessed fees, including fees for property inspections, on his account in 2010 and 2011. (*Id.* ¶ 68.)  The fees were identified as "Miscellaneous Fees." (*Id.*)  In addition, Chase sent Plaintiff Lazar an "Acceleration Warning" dated June 2, 2011, in which it demanded he pay $86.80 in "Other Fees" and $28.00 in "Advances."  The Acceleration Warning letter stated that "Other Fees and Advances include those amounts allowed by your Note and Security Instrument." (*Id.*)

United States District Court
Northern District of California

Plaintiff Lazar alleges that he "paid some or all of the unlawful fees assessed on his account.  (*Id.* ¶ 69.)  As to each Plaintiff, they allege they cannot provide details of each and every fee assessed because Defendants maintain the complete accounting.  (*Id.* ¶¶ 62, 65 & 69.)

Plaintiffs allege that "Defendants are under a continuous duty to disclose to [them and class members] the true character, quality, and nature of the fees they assess on borrowers' accounts." (Compl. ¶ 71.)  Chase "actively concealed the true character . . . of the[] assessment of marked-up fees against borrowers' accounts" and borrowers "reasonably relied upon Defendants' knowing, affirmative, and active concealment."  (*Id.*)  In addition, Chase "falsely represent[ed] on statements provided to borrowers that 'Other Fees' and 'Advances,' which are charges for BPOs and property inspections, include 'amounts allowed by [borrowers'] Note and Security Instrument.'"  (*Id.* ¶ 53 (first alteration supplied).)

With respect to damages, borrowers allege harm resulting from: (i) charges for default-related services accumulated over time such that borrowers were driven further into default and/or ensured to stay in default; (ii) damage to credit scores; (iii) the inability to obtain favorable interest rates on future loans because of their default; and (iv) in some cases, foreclosure.  (Compl. ¶¶ 55–59.)

On the basis of the allegations summarized above, Plaintiffs bring this action on behalf of two sub-classes.  The first sub-class is a nationwide class consisting of:

> All residents of the United States of America who had a loan serviced by Chase Home Finance LLC at any time, or a loan serviced by J.P. Morgan Chase Bank, N.A. from May 1, 2011 continuing through the date of final disposition of this action, and whose accounts were assessed fees for default-related services, including Broker's Price Opinions, and inspection fees, at any time, continuing through the date of final disposition of this action.

(Compl. ¶ 76 [the "Nationwide Sub-Class"].)  The second sub-class consists of:

> All residents of the State of California who had a loan serviced by Chase Home Finance LLC at any time, or a loan serviced by J.P. Morgan Chase Bank, N.A. from May 1, 2011 continuing through the date of final disposition of this action, and whose accounts were assessed fees for default-related services, including Broker's Price Opinions, and inspection fees, at any time, continuing through the date of final disposition of this action.

(*Id.* ¶ 76 [the "California Sub-Class"].)

The Complaint alleges five claims: first, a violation of California Business and Professions Code section 17200, *et seq.* ("UCL" or "Section 17200") based on the allegedly unlawful, unfair, and fraudulent business practices summarized above.[2] (Compl. ¶¶ 90–102.) Specifically, Defendants omitted a true itemization that identified the nature of each fee and "conceal[ed] the fact the category identified as 'Miscellaneous Fees' reflect[ed] marked-up and/or unnecessary fees that were never incurred by Defendants." (*Id.* ¶ 93.) Plaintiff Ellis and California borrowers reasonably relied on Chase Home Finance LLC and J.P. Morgan Chase Bank, N.A. and believed the charges were valid and that they were obligated to pay the amounts specified in communications with those Defendants. (*Id.* ¶¶ 93 & 99.) The failure to disclose the fact that the purportedly owed amounts had been marked-up or that they were unnecessary violated the disclosures in the mortgage agreements. (*Id.* ¶ 94.) In addition, Defendants lulled borrowers into a sense of trust and dissuaded them from challenging the unlawful fees by telling them "in statements and other documents from Chase Home Finance LLC and J.P. Morgan Chase Bank, N.A., that such fees are 'allowed by [borrowers'] Note and Security Instrument.'" (*Id.* ¶ 99 (alteration in original).) Plaintiff Ellis alleges that had she known the true nature of the mark-ups or unnecessary fees, she would have disputed them and not paid them. (*Id.* ¶ 99.)

Plaintiffs' second claim alleges a violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. section 1962(c). (Compl. ¶¶ 103–124.) The alleged "enterprise" consisted of: (i) J.P. Morgan Chase & Company, J.P. Morgan Chase Bank, N.A., and Chase Home Finance LLC, including their directors, employees, and agents; (ii) their subsidiaries, affiliated companies, and intercompany divisions; and (iii) their "property preservation" vendors[3] and their real estate brokers who provide BPOs. (*Id.* ¶¶ 2, 4, 9, 33, 46 & 106.) This "association-in-fact" enterprise is an "ongoing, continuing group . . . of persons and entities associated together for the

---

[2] The UCL claim is brought on behalf of Plaintiff Ellis and members of the California Sub-Class. (Compl. ¶ 91.) All other claims in this action are brought on behalf of all Plaintiffs and the members of the Nationwide Sub-Class. (*Id.* ¶¶ 104, 126, 131 & 141.)

[3] The property preservation vendors include: Safeguard Real Estate Properties, LLC, d/b/a Safeguard Properties, LLC; Mortgage Contracting Services, LLC; and LPS Field Services, Inc. (Compl. ¶ 106.)

United States District Court
Northern District of California

common purpose of limiting costs and maximizing profits by fraudulently concealing assessments for unlawfully marked-up and/or unnecessary fees for default-related services on borrowers' accounts." (*Id.* ¶ 107; *see id.* ¶ 46.)  The enterprise members—while "systematic[ally] link[ed]" through contractual and financial ties—act according to policies established by Chase executives but also "have an existence separate and distinct from the enterprise." (Compl. ¶¶ 108–109.) Plaintiffs allege that Defendants' scheme constituted "racketeering activity" based on acts of mail and wire fraud (18 U.S.C. sections 1341 and 1343), through which the enterprise "provided mortgage invoices, loan statements, payoff demands, or proofs of claims to borrowers, demanding that borrowers pay fraudulently concealed marked-up or unnecessary fees for default-related services, such as BPOs or property inspections." (*Id.* ¶¶ 110–112.)  Defendants made "false statements" using the mail and wires, including telling borrowers in statement and other documents that the fees were "allowed by [their] Note[s] and Security Instrument[s]." (*Id.* ¶¶ 114–115.) Defendants also accepted payments through the mail and wires.  (*Id.* ¶ 112.)  Plaintiffs seek treble damages under RICO.

Plaintiffs' third claim alleges a conspiracy to violate RICO.  (Compl. ¶¶ 125–129.) Defendants allegedly conspired to violate RICO as summarized above, were aware of the nature and scope of the enterprise's unlawful scheme, and agreed to participate in said scheme.  Plaintiffs' fourth claim alleges that Defendants have been unjustly enriched by their wrongful acts and omissions of material fact.  (*Id.* ¶¶ 130–139.)  Plaintiffs seek restitution and an order disgorging all profits obtained by Defendants.  (*Id.* ¶ 139.)  Plaintiffs' fifth claim alleges fraud as summarized above.  (*Id.* ¶¶ 140–152.)

In the pending Motion, Defendants make five primary arguments.  (Mot. at 1.)  First, this Court lacks subject matter jurisdiction of this action pursuant to 12 U.S.C. section 1818(i) of the National Bank Act based on a consent order entered between J.P. Morgan Chase Bank, N.A. and the United States Department of Treasury's Office of the Comptroller of Currency ("OCC") on April 13, 2011 ("Consent Order").  Second, the Court should abstain from taking jurisdiction under the doctrines of primary jurisdiction and/or equitable abstention.  Third, Plaintiffs' claims are preempted by the National Bank Act.  Fourth, Plaintiffs lack standing because they have not

1    suffered injury-in-fact.  Fifth, Plaintiffs fail to state a claim upon which relief can be granted.

2    Defendant J.P. Morgan Chase  & Co. also seeks dismissal because it is a non-operating holding

3    corporation that "could not conceivably have taken any action ascribed to 'Chase' or the 'Chase

4    Enterprise.'"  (Mot. at 25.)

5         Plaintiffs oppose all of these arguments and request leave to amend if the Court dismisses

6    any claim.  The Court addresses each claim in turn.

7    **II.    JURISDICTIONAL ARGUMENTS UNDER FED. R. CIV. P. 12(b)(1)**

8         Both Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) are raised in this Motion.

9    Although there is no mandatory "sequencing of jurisdictional issues," jurisdictional questions

10   ordinarily must precede merits determinations in dispositional order.  *Sinochem Int'l. Co. Ltd. v.*

11   *Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) (citing *Ruhrgas AG v. Marathon Oil Co.*,

12   526 U.S. 574, 584 (1999)).  The Court therefore proceeds first with its jurisdictional analysis of the

13   pending Motion under Rule 12(b)(1).  Those issues include the first three of Defendants' five

14   arguments referenced above, namely whether: (1) 12 U.S.C. section 1818(i) divests this Court of

15   subject matter jurisdiction; (2) the Court should abstain from taking jurisdiction under the doctrines

16   of primary jurisdiction and/or equitable abstention; and (3) Plaintiffs' claims are preempted by the

17   National Bank Act.  Although Defendants argue Plaintiffs' lack of standing under both Rules

18   12(b)(1) and 12(b)(6), the Court will address standing in the Rule 12(b)(6) portion of this Order.

19        **A.     Legal Standard Under Fed. R. Civ. P. 12(b)(1)**

20        A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) tests the subject matter

21   jurisdiction of the Court.  *See, e.g.*, *Savage v. Glendale Union High Sch.*, 343 F.3d 1036, 1039–40

22   (9th Cir. 2003), *cert. denied*, 541 U.S. 1009 (2004).  When subject matter jurisdiction is challenged,

23   the burden of proof is placed on the party asserting that jurisdiction exists.  *Scott v. Breeland,* 792

24   F.2d 925, 927 (9th Cir.1986) (holding that "the party seeking to invoke the court's jurisdiction

25   bears the burden of establishing that jurisdiction exists").  Accordingly, the court will presume lack

26   of subject matter jurisdiction until the plaintiff proves otherwise in response to the motion to

27   dismiss.  *Kokkonen v. Guardian Life Ins. Co. of Am.,* 511 U.S. 375, 376–78 (1994).

28        Motions under Rule 12(b)(1) may be either "facial" or "factual."  *Safe Air for Everyone v.*

United States District Court
Northern District of California

*Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004) (citing *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000)).  In a facial attack, the movant argues that the allegations of a complaint are insufficient to establish federal jurisdiction.  *Id.*  By contrast, a factual attack or "speaking motion" disputes the allegations that would otherwise invoke federal jurisdiction.  *Id.*  In resolving a factual attack, district courts may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment.  *Id.* (citing *Savage*, 343 F.3d at 1039 n.2).  Courts consequently need not presume the truthfulness of a plaintiff's allegations in such instances.  *Id.* (citing *White*, 227 F.3d at 1242).  Indeed, "[o]nce the moving party has converted a motion to dismiss into a factual motion by presenting affidavits or other evidence properly before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction."  *Id.* (quoting *Savage*, 343 F.3d at 1039 n.2).  Further, the existence of disputed material facts will not preclude a trial court from evaluating for itself the merits of jurisdictional claims, except where the jurisdictional and substantive issues are so intertwined that the question of jurisdiction is dependent on the resolution of factual issues going to the merits.  *Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir. 1983) (citing *Thornhill Publ'g Co. v. Gen. Tel. Corp.*, 594 F.2d 730, 733–35 (9th Cir. 1979)).

The Court treats Defendants' Motion as a factual attack on subject matter jurisdiction and therefore considers all admissible evidence in the record.

**B.    Request for Judicial Notice**

Fed. R. Evid. 201 allows a court to take judicial notice of "matters of public record," but not facts that may be subject to a reasonable dispute.  *Lee v. City of Los Angeles,* 250 F.3d 668, 689–90 (9th Cir. 2001).  Facts that may be judicially noticed must be "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).

The parties have filed numerous requests for judicial notice ("RJN") in connection with this Motion.  Defendants seek judicial notice of eight documents in support of their Motion based on Fed. R. Evid. 201(b).  (Defendants' Request for Judicial Notice in Support of Motion to Dismiss

1   Complaint [Dkt. No. 7] ["Motion RJN"].)[4]

2          Defendants seek judicial notice of four additional documents with their Reply based on Fed.

3   R. Evid. 201.  (Defendants' Request for Judicial Notice in Support of Reply in Support of Motion

4   to Dismiss Complaint [Dkt. No. 15] ["Reply RJN"].)  Defendants contend these documents consist

5   of administrative publications available on government websites and/or are opinions or pleadings

6   capable of accurate and ready determination by resort to official court files.[5]

7          Plaintiffs seek judicial notice of three exhibits in conjunction with their Opposition based on

8   Fed. R. Evid. 201.  (Declaration of Roland Tellis in Support of Plaintiffs' Opposition to Chase

9   Defendants' Motion to Dismiss Plaintiffs' Complaint Pursuant to Fed. R. Civ. P. 12(b)(1) and

10  12(b)(6) [Dkt. No. 11-1] ["Opposition RJN"].)[6]  Each document is publicly-available.

11         No objections to the above RJNs were filed with the Court, nor did the parties raise any

12  objection at oral argument when asked by the Court.  Finally, pursuant to an Order of this Court,

13  the parties have filed a Joint Stipulation for Submission and Judicial Notice of Supplemental

14  Exhibit.  (Dkt. No. 30.)  Exhibit A is the Amendment to April 13, 2011 Consent Order, dated

---

[4] Exhibits A and C–G to the Motion RJN consist of the Consent Order and status reports, stipulations, or publications relating to the Consent Order executed by and/or issued by the OCC. Exhibit B is a printout from the Federal Deposit Insurance Corporation ("FDIC") website reflecting that JPMorgan Chase Bank, National Association is FDIC insured.  Exhibit H is a copy of civil minutes dated August 6, 2012 in *Bakenie v. JPMorgan Chase Bank, N.A.*, No. SACV 16-60 JVS (MLGx) (C.D. Cal.) (Selna, J.).

[5] Exhibit A is an engagement letter between Deloitte & Touche LLP and J.P. Morgan Chase Bank, N.A. regarding a foreclosure review pursuant to the Consent Order with the OCC.  Exhibit B is an excerpt of the Consent Judgment between Chase, the United States, and 49 State Attorneys General in *United States v. Bank of America Corporation, et al.*, No. 1:12-cv-361 (D.D.C. Apr. 4, 2012). Exhibit C is an exhibit to Consent Judgment attached as Exhibit B.  Exhibit D consists of Remarks by John Walsh, Acting Comptroller of the Currency before the 2012 National Interagency Community Reinvestment Conference on March 26, 2012.

[6] Exhibit 1 is a Statement of Mark Pearce, Director of the Division of Depositor and Consumer Protection of the FDIC, made before the Subcommittees on Financial Institutions and Consumer Credit, and Oversight and Investigations Committee on Financial Services of the U.S. House of Representatives on July 7, 2011.  Exhibit 2 is a "Borrowers' Quick Reference Guide to the Financial Remediation Framework" available on the OCC website.  Exhibit 3 is a copy of the complete Consent Judgment and exhibits in *United States v. Bank of America Corporation, et al.*, No. 1:12-cv-361 (D.D.C. Apr. 4, 2012).

United States District Court
Northern District of California

United States District Court
Northern District of California

1   February 28, 2013.

2          It does not appear to the Court that, with regard to certain exhibits, the parties have

3   meaningfully attempted to explain what *facts* are subject to judicial notice.  Fed. R. Evid. 201(b).

4   Moreover, the Court does not believe that all of the documents filed by the parties are necessary to

5   the Court's determination on this Motion.  However, based on the lack of objection by the parties,

6   the Court **GRANTS** judicial notice of the requested documents for determination of this Motion to

7   the extent that the documents consist of court documents, OCC orders or stipulations, or formal

8   publications of the OCC.  The Court takes judicial notice of the fact that other documents are

9   publicly-available in the form presented to the Court, but not of any "facts" therein unless

10  otherwise specified by this Order.

11      **C.      First Jurisdictional Argument: Applicability of 12 U.S.C. Section 1818(i)**

12              **("Section 1818(i)")**

13          Defendants argue that Section 1818(i) divests this Court of subject matter jurisdiction

14  because the conduct alleged and relief sought is "subsumed, regulated, and governed entirely by the

15  Consent Order."  (Mot. at 2.)

16              **i.      Scope of the Consent Order**

17              On April 13, 2011, J.P. Morgan Chase Bank, N.A. consented to the issuance of a

18  Consent Cease and Desist Order by the OCC.  (Motion RJN, Ex. A (Consent Order).)  The Consent

19  Order issued after an "interagency horizontal review of major residential mortgage servicers" and

20  "examination of the residential real estate mortgage foreclosure processes of JPMorgan Chase

21  Bank, N.A., . . . ('Bank')."  Consent Order at 1.[7]  The OCC "identified certain deficiencies and

22  unsafe or unsound practices in residential mortgage servicing and in the Bank's initiation and

23  handling or foreclosure proceedings."  *Id.*  The "unsafe and unsound banking practices" identified

24  by the OCC were found to have been "[i]n connection with certain foreclosures of loans in [the

25  Bank's] residential mortgage servicing portfolio."  *Id.*, Art. I §§ 2–3.  Without admitting or denying

26  _____

    [7] The Court notes that the "Bank" referenced in the Consent Order was J.P. Morgan Chase Bank,
27  N.A., but the Consent Order also applied to subsidiaries of the Bank, even though those
    subsidiaries were not named as parties to the Order.  Consent Order, Art. XIII § 7.  This Order may
28  refer to the "Bank" in the Consent Order as Chase, or vice versa.

CASE4:12-cv-03897-YGR   Document31   Filed06/13/13   Page12 of 39

the OCC's findings, the Bank "committed to taking all necessary and appropriate steps to remedy the deficiencies and unsafe or unsound practices identified by the OCC, and to enhance the Bank's residential mortgage servicing and foreclosure processes." *Id.* at 1–2. The Consent Order stated that it was intended to and shall be construed as a "final order issued pursuant to 12 U.S.C. [section] 1818(b)." *Id.*, Art. XIII § 8.

The Bank agreed to submit to the OCC a comprehensive action plan describing actions necessary to achieve compliance with the Consent Order. Consent Order, Art. III § 1. Once accepted by the OCC, the Bank was prohibited from "tak[ing] any action that would constitute a significant deviation from, or material change to, the requirements of the Action Plan or [the Consent Order], unless and until the Bank [receives] a prior written determination of no supervisory objection from the Deputy Comptroller." *Id.* The Action Plan sought to "achieve[] and maintain[] effective mortgage servicing, foreclosure, and loss mitigation activities . . . , as well as associated risk management, compliance, quality control, audit, training, staffing, and related functions." *Id.*, Art. III § 2 (defining "loss mitigation" to include "activities related to special forbearances, modifications, short refinances, short sales, cash-for-keys, and deeds-in-lieu of foreclosure").

Among other things, the Bank agreed to implement a Compliance Program to ensure that mortgage servicing and foreclosure operations, including loss mitigation (as defined above) and loan modification, complied with all legal requirements, OCC supervisory guidance, and requirements of the Consent Order. *Id.*, Art. IV § 1. The Consent Order explicitly required that the Compliance Program include, among other things: (i) policies and procedures to conduct, oversee, and monitor mortgage servicing, loss mitigation, and foreclosure operations; (ii) processes to ensure that the Bank has properly documented ownership of the promissory note and mortgage or deed of trust at all stages of foreclosure and bankruptcy litigation, and that all affidavits filed in foreclosure proceedings are properly executed and notarized; (iii) "processes to ensure that all fees, expenses, and other charges imposed on the borrower are assessed in accordance with the terms of the underlying mortgage note, mortgage, or other customer authorization with respect to the imposition of fees, charges, and expenses, and in compliance with all applicable Legal Requirements and OCC supervisory guidance"; and (iv) ongoing testing for compliance with

United States District Court
Northern District of California

1   applicable legal requirements and OCC supervisory guidance.  *Id.*, Art. IV § 1(a)–(q).  Additional

2   policies were to be adopted by the Bank regarding "outsourcing foreclosure or related functions,

3   including Loss Mitigation and loan modification, and property management functions for

4   residential real estate acquired through or in lieu of foreclosure" to third-party agents, contractors,

5   or consulting or law firms.  *Id.*, Art. V § 1.

6          Article VII of the Consent Order (entitled Foreclosure Review) further required the Bank to

7   retain an independent consultant to conduct an independent review of certain residential foreclosure

8   actions or proceedings.  Recently, the OCC and Bank agreed to modifications to the Consent Order,

9   resulting in the Amendment to April 13, 2011 Consent Order.  (Dkt. No. 30-1 ["Amendment"] at

10  1.)  Specifically, the Amendment superseded Article VII of the previous Consent Order relating to

11  the Foreclosure Review.[8]  The Amendment recognized that the prior order "required the Bank . . .

12  to retain an independent consultant (the 'IC') to conduct an independent review of certain

13  residential mortgage loan foreclosure actions or proceedings for borrowers who had a pending or

14  completed foreclosure on their primary residence any time from January 1, 2009 to December 21,

15  2010 (the 'In-Scope Borrower Population'), the purposes of which were set forth in paragraph 3 of

16  Article VII of the 2011 Consent Order (the 'Independent Foreclosure Review')."[9]  Amendment at

17  1–2.  The Amendment acknowledged that the Bank had taken steps to comply with their

18  obligations under Article VII of the Consent Order.  *Id.* at 2.[10]

---

19  [8] While the Amendment superseded Article VII of the prior Consent Order, it "d[id] not replace the
20  other remaining Articles of the 2011 Consent Order or the agreement by and between the Bank and
    the [OCC] dated February 27, 2012, both of which shall remain in effect without modification."
21  Amendment at 1.

22  [9] Among the many purposes of the Foreclosure Review, the independent consultant was to
23  determine "whether a delinquent borrower's account was only charged fees and/or penalties that
    were permissible under the terms of the borrower's loan documents, applicable state and federal
24  law, and were reasonable and customary" and "whether the frequency that fees were assessed to
    any delinquent borrower's account (including broker price opinions) was excessive under the terms
25  of the borrower's loan documents, and applicable state and federal law."  Consent Order, Art. VII
26  §§ 3(e)–(f).

27  [10] The OCC issued a Financial Remediation Framework for Use in Independent Foreclosure
    Review on June 21, 2012.  (Motion RJN, Ex. F.)  The framework provided "examples of situations
28  where compensation or other remediation is required for financial injury due to servicer errors,

United States District Court
Northern District of California

Under the Amendment, the Bank agreed to: (i) make a cash payment to a qualified settlement fund for distribution to the In-Scope Borrower Population in accordance with a distribution plan developed by the OCC and the Board of Governors of the Federal Reserve System in their discretion[11]; and (ii) take other loss mitigation and other foreclosure prevention actions.[12] Amendment at 2. "[T]he amount of any payments to borrowers made pursuant to th[e] Amendment to the Consent Order do[es] not in any manner reflect specific financial injury or harm that may have been suffered by borrowers receiving payments, except as expressly provided for in th[e] Amendment to the Consent Order, nor do the payments constitute either an admission or a denial by the Bank of any wrongdoing or a civil money penalty under 12 U.S.C. [section] 1818(i)." Amendment at 2–3; *see id.*, Art. V § 1 (OCC agreed not to initiate further enforcement actions against Bank and subsidiaries with respect to findings in Article I of Consent Order, the matters addressed in Article VII of the Consent Order (Foreclosure Review), and "any other past mortgage servicing or foreclosure-related practices that are addressed by the 2011 Consent Order through the execution date of this Amendment to the Consent Order").

As to the above-referenced payments by the Bank, the Amendment explicitly states that:

> In no event shall the Bank request or require any borrower to execute a waiver of any claims against the Bank (including any agent of the Bank) in connection with any payment or Foreclosure Prevention assistance pursuant to this Amendment to the Consent Order. However, nothing herein shall operate to bar the Bank from asserting in the future in any separate litigation, or as part of a settlement related to the Bank's foreclosure and servicing practices, any right that may exist under applicable law to offset the amounts received by a borrower through the distribution process set forth above. Nothing herein shall operate to amend or modify in any respect any preexisting settlement between the Bank or an affiliate thereof and a borrower in the In-Scope Borrower Population.

misrepresentations, or other deficiencies. The independent consultants will use the Framework to recommend remediation for financial injury identified during the Independent Foreclosure Review."

[11] The Bank agreed to make a cash payment of $753,250,131.00 into the qualified settlement fund for borrowers who had a pending or completed foreclosure on their primary residence any time from January 1, 2009 to December 31, 2010. Amendment, Art. I § 1.

[12] By no later than January 7, 2015, the Bank will provide loss mitigation or other foreclosure prevention actions in the amount of $1,205,200,210.00. Amendment, Art. IV § 1.

Amendment, Art. V § 3.

### ii.     Jurisdictional Framework Under Section 1818(i)

Section 1818(i)(1) of Title 12 of the United States Code provides in full:

> The appropriate Federal banking agency may in its discretion apply to the United States district court, or the United States court of any territory, within the jurisdiction of which the home office of the depository institution is located, for the enforcement of any effective and outstanding notice or order issued under this section or under section 1831o or 1831p-1 of this title, and such courts shall have jurisdiction and power to order and require compliance herewith; but *except as otherwise provided* in this section or under section 1831o or 1831p-1 of this title *no court shall have jurisdiction to affect by injunction or otherwise* the issuance or enforcement of any notice or order under any such section, *or to review, modify, suspend, terminate, or set aside any such notice or order.*

(Emphasis supplied.)

As recently explained by a Central District of California court in an action against Chase Home Finance LLC and related entities, Section 1818(i)(1) contains two parts: both a jurisdiction-granting clause and jurisdiction-divesting clause.  *Rex v. Chase Home Finance LLC*, 905 F. Supp. 2d 1111, 1124–26(C.D. Cal. 2012) (examining whether Section 1818(i) divested court of jurisdiction based on same Consent Order as here, where Chase defendants allegedly failed to release plaintiffs from obligation to pay short sale deficiencies despite promises to do so).

In its analysis, the *Rex* court found it necessary to consider other provisions of Section 1818 such that the jurisdictional bar in sub-section (i) could be read in the context of the entire statute. *Id.* at 1125–26 (citing *In re JPMorgan Chase Mortg. Modification Litig.*, 880 F. Supp. 2d 220, 231 (D. Mass. 2012) ["*In re JP Morgan Chase*"]).  Specifically, it looked to Section 1818(c)(2), which provides that a recipient of a cease-and-desist order "may seek an injunction in district court restraining enforcement of the order," and Section 1818(h)(2), which "authorizes court of appeals review of final [federal banking agency] orders."  *Rex*, 905 F. Supp. 2d at 1126 (alteration in original).  The court ultimately concluded that because the judicial mechanisms of Section 1818 focused on the ability of either the federal banking agency or recipient of a cease-and-desist order to obtain review of the order, it was "clear that the Jurisdiction-Divesting Clause was 'not intend[ed] to . . . prohibit non-parties from exercising their separate remedies at law."  *Id.* at 1126

United States District Court
Northern District of California

1  (quoting *In re JPMorgan Chase*, 880 F. Supp. 2d at 231) (alterations in original).  Instead, "the

2  primary purpose of [Section 1818] is to prevent federal courts from usurping the OCC's power to

3  enforce its own consent orders *against parties to the orders*."  *Rex*, 905 F. Supp. 2d at 1126

4  (quoting *In re JPMorgan Chase*, 880 F. Supp. 2d at 231) (emphasis and alteration in original).

5  Also significant to both the *In re JP Morgan Chase* and *Rex* courts was the fact that Section 1818

6  does not otherwise provide for a *non-party* to a consent order to challenge findings made therein.

7  *In re JPMorgan Chase*, 880 F. Supp. 2d at 232 (jurisdictional bar not meant to displace non-party's

8  right to present claims to federal court); *Rex*, 905 F. Supp. 2d at 1126.

### iii.    Analysis

10        Defendants argue Plaintiffs' claims would "necessarily affect the Consent Order"

11  and, therefore, the Court is expressly precluded under Section 1818(i) from exercising jurisdiction.

12  (Mot. at 2–3 & 10.)  Where judicial adjudication and award of relief would affect the OCC's

13  administration, compliance, enforcement of a Consent Order, Section 1818(i) prohibits jurisdiction.

14  (*Id.* at 3.)  For this proposition, Defendants rely primarily on two district court cases, *Bakenie v.*

15  *JPMorgan Chase Bank, N.A.*, No. SACV 12-60 JVS (MLGx), 2012 WL 4125890 (C.D. Cal. Aug.

16  6, 2012) and *American Fair Credit Ass'n v. United Credit Nat'l Bank*, 132 F. Supp. 2d 1304 (D.

17  Colo. 2001).

18        In *Bakenie*, the court analyzed the same April 13, 2011 Consent Order.  There, plaintiffs

19  alleged damage arising from improper notarial practices, specifically that "various foreclosure

20  documents were acknowledged by non-notaries, outside of the presence of the signers, without

21  verification of the signer's identification, and without proper recordation in a sequential journal."

22  2012 WL 4125890, at *1 (quoting First Am. Compl.).  The court agreed that these particular

23  foreclosure-related claims affected the enforcement of the Consent Order.  *Id.* at *3; *see American*

24  *Fair Credit Ass'n*, 132 F. Supp. 2d at 1306–07, 1312 (Section 1818(i) divested court's jurisdiction

25  over claims brought by non-party to consent orders because state law claims sought money

26  damages from party to consent order in direct contravention of the order).

27        Under *Bakenie* and *American Fair Credit Ass'n*, Defendants contend that the OCC has

28  raised and redressed the *same* default-related fees that Plaintiffs here challenge.  (Mot. at 12.)

United States District Court
Northern District of California

16

1   Defendants claim they are investigating and remediating those claims, including determining

2   whether: (i) fees charged were permissible, customary, and reasonable under terms of the loan

3   documents and applicable state and federal law; (ii) the frequency of fees charged on delinquent

4   borrowers' accounts (including BPOs) was excessive under the loan documents and applicable law;

5   and (iii) errors, misrepresentations, or other deficiencies resulted in financial injury to borrowers.

6   (*Id.* (citing Consent Order, Art. VII §§ 3(e)–(f), (h)).)  Defendants argue that this action will require

7   the Court to determine what the "actual cost" of default-related services is, whether what was

8   charged was necessary or reasonable, and whether the failure to disclose the actual cost versus the

9   charged cost was a material omission constituting fraud.  (Mot. at 13.)  Thus, *if* the Court finds that

10   the fees were unreasonable but the independent review finds the opposite, this would "affect"

11   Defendants' ability to comply "with the OCC or the Court."  (*Id.*)[13]  Finally, Defendants emphasize

12   that the appropriate course for Plaintiffs to seek remedy is under the Consent Order, which makes

13   millions of dollars of relief available to borrowers.  (Mot. at 14.)

14        Plaintiffs counter with four primary arguments.  First, the Consent Order targeted JP

15   Morgan Chase Bank's foreclosure practices only and required creation of a foreclosure compliance

16   program and improvements the administration of foreclosure activities.  An independent review

17   under the Consent Order separately required an examination of pending foreclosures between

18   January 1, 2009 and December 31, 2010.  (Opp. at 1.)  Plaintiffs argue that independent

19   consultant's findings regarding whether fees previously charged (including BPOs) were

20   permissible, reasonable, and/or assessed too frequently were strictly limited to the foreclosure

21   context.  (*Id.* (citing Consent Order, Art. VII).)  Importantly, Plaintiffs assert this review did not

22   contemplate or address the fraud alleged here.  (Opp. at 2.)

23        Second, Plaintiffs argue that the OCC explicitly intended that borrowers receiving

24   compensation under the Consent Order retain the right to pursue other legal remedies regarding

25   their mortgages.  (Opp. at 2; *see* Opposition RJN, Ex. 2 ("question and answer" portion of OCC

---

26   [13] Defendants also seem to argue that even if the Court and the independent review both conclude
27   the fees were reasonable, jurisdiction is still lacking because Defendants would not know whose
     orders control.  (Mot. at 13.)

28

United States District Court
Northern District of California

1    website regarding Consent Order); Amendment, Art. V § 3 (preservation of borrowers' rights in the

2    Amendment).)

3         Third, Section 1818(i) does not divest the Court from exercising "parallel or co-extensive

4    subject matter jurisdiction." (Opp. at 4.)[14]  It only narrowly prohibits a court from "modifying or

5    countermanding" OCC orders.  Plaintiffs argue that Defendants provide no authority in which a

6    court declined jurisdiction over a class action, as here, where the parties did not expressly seek to

7    set aside or modify a federal banking order or to enjoin regulatory proceedings.  (*Id.*)  In addition,

8    Plaintiffs distinguish *Bakenie* because the challenges to Chase's foreclosure and notarial practices

9    there were "squarely covered" by the Consent Order.  (Opp. at 5.)  Plaintiffs instead rely on *In re*

10   *JP Morgan Chase* and the district court's holding that Congress did not intend to prohibit non-

11   parties from exercising separate remedies even where the OCC and a defendant have entered into a

12   consent order.  (*Id.* at 6.)

13        Fourth, Plaintiffs argue this action would not "affect" the Consent Order under Section

14   1818(i) because they "do not seek any remedies that are inconsistent with the Consent Order" nor

15   do they seek to set aside the order.  (Opp. at 7.)  Plaintiffs point out that Defendants, despite

16   reiterating that they are prohibited from significantly deviating or materially changing their actions

17   under the Consent Order, have failed to articulate how this would occur if this action were to

18   proceed.  (*Id.*)  By analogy, Plaintiffs refer to the National Mortgage Settlement Consent Judgment

19   between the federal government and state attorneys general and five major financial institutions,

20   including J.P. Morgan Chase Bank, N.A.  *United States of America v. Bank of America Corp., et*

21   *al.*, No. 1:12-cv-361 (D.D.C. Apr. 4, 2012) ("NMS Consent Judgment"); *see* Opposition RJN, Ex. 3

22   and Reply RJN, Ex. B.  With respect to that action, Chase did not assert a lack of subject matter

23   jurisdiction even though it agreed to comply with certain standards for mortgage servicing,

24   including as to third-party servicing fees.[15]  Plaintiffs reason that if the NMS Consent Judgment

25   ――――――――――――――――――
     [14] The Court notes that despite Plaintiffs' frequent references to "parallel or coextensive subject

26   matter jurisdiction," the Court sees no such terminology in either Section 1818(i) or *American Fair*
     *Credit Ass'n*—which Plaintiffs appear to cite as authority.

27

28   [15] Specifically, Chase agreed it "shall not impose unnecessary or duplicative property inspection,
     property preservation or valuation fees on the borrower" including a prohibition on "impos[ing] its

Section was entered, Section 1818(i) must not really divest federal courts of jurisdiction.  (Opp. at 8.)[16]

The Court finds that Section 1818(i) does not divest this Court of jurisdiction for four reasons.  First, the deficiencies and unsafe or unsound practices identified by the OCC were primarily, if not entirely, devoted to foreclosures.  Importantly, Defendant's independent consultant, Deloitte & Touche LLP, was only charged with making determinations regarding fees and their frequency (including BPOs) with respect to a defined group of borrowers—those active *in foreclosure* between January 1, 2009 and December 31, 2010.  (Consent Order, Art. VII §§ 1 & 3(e)–(f); Motion RJN, Ex. C (Interim Status Report: Foreclosure-Related Consent Orders dated November 2011) at 5 (sought to provide relief to borrowers who "suffered financial injury as a result of [the Bank's] errors, misrepresentations, or other deficiencies in foreclosure actions . . ."); Motion RJN, Ex. E (Interim Status Report: Foreclosure-Related Consent Orders dated June 2012) at 7; Motion RJN, Ex. G (Interagency Review of Foreclosure Policies and Practices dated April 2011) at 1–2 (review "did not include a complete analysis of the payment history of each loan prior to foreclosure or the potential mortgage-servicing issues outside of the foreclosure process").)  The Consent Order did not require remediation to borrowers for financial injuries outside of the scope of the review.  (*See* November 2011 Interim Status Report at 5.)  Moreover, Deloitte assumed that fraud of the nature alleged here did not occur.  (Reply RJN, Ex. A (Engagement Letter) at 15 (assuming that fees permissible under state laws or Fannie Mae guidelines were reasonable and not excessive, services were "actually rendered" if there was an invoice, and "all fees and penalties

---

own mark-ups on Servicer initiated third-party default or foreclosure related services."  NMS Consent Judgment at A-36–A-37.  Moreover, "[c]laims and defenses asserted by third parties, including individual mortgage loan borrowers on an individual and class basis" were not released and were specifically reserved by the NMS Consent Judgment.  *Id.* at G-6 & G-10.

[16] Defendants respond that the NMS was "expressly negotiated" between Chase and the OCC such that it would not "affect" the OCC Consent Order.  (Reply at 5; *see* NMS Consent Judgment at F-36 (reserving and not releasing claims pursuant to Section 1818 or "any action by the [federal banking agency] to enforce the Consent Order").)

were assessed in accordance with the applicable loan documents")).)[17]  As such, the steps taken to

remedy the deficiencies were not intended to address a fraudulent scheme, as alleged here.

Second, the Complaint on its face does not seek to "review, modify, suspend, terminate, or set aside" the Consent Order.  *See* Section 1818(i).

Third, the recent Amendment to the Consent Order indicates that the OCC did not intend for third-parties to waive their rights by requesting a review of their mortgages.[18]  From this express reservation, the Court must conclude that third-party actions were not intended to be barred by the Consent Order.  This finding is consistent with recent cases addressing the same jurisdictional arguments under Section 1818(i) asserted by the same Defendants over the same Consent Order.

Fourth, even if the Court assumes that Section 1818(i) or the Consent Order somehow intended to divest federal courts' jurisdiction over third-party actions, Defendants have not sufficiently articulated how the outcome of this action "necessarily affects" the OCC's enforcement of the Consent Order.  Defendants repeatedly assert that Plaintiffs should not be permitted to "double down on the Consent Order" but fail to explain how adjudication of this action would actually "review, modify, suspend, terminate, or set aside" the Consent Order itself, nor how it would "affect" the OCC's enforcement in the first place.  The "double down" argument contrasts the explicit provisions in the Amendment that: (i) borrowers shall not be required to execute a waiver of their claims against the Bank "in connection with any payment or Foreclosure Prevention assistance pursuant to th[e] Amendment"; *and* (ii) the Bank shall not be barred from asserting in separate litigation "any right that may exist under applicable law to *offset the amounts received* by a borrower through the distribution process set forth [in the Amendment]."  (Amendment, Art. V § 3

[17]  The Court takes judicial notice of these statements in the Engagement Letter because such letter was provided to the OCC pursuant to the Consent Order under Article VII, section 2.  The document is publicly-available on the OCC's website and Plaintiffs have not objected to this Court taking judicial notice.

[18] "In no event shall the Bank request or require any borrower to execute a waiver of any claims against the Bank (including any agent of the Bank) in connection with any payment or Foreclosure Prevention assistance pursuant to this Amendment to the Consent Order.  However, nothing herein shall operate to bar the Bank from asserting in the future in any separate litigation . . . any right that may exist under applicable law to offset the amounts received by a borrower through the distribution process set forth above."  Amendment, Art. V § 3.

United States District Court
Northern District of California

(emphasis supplied); *see* June 2012 Interim Status Report at 6 ("OCC will not permit servicers to require borrowers to sign a waiver of their ability to pursue claims against the servicer in order to receive compensation under the Independent Foreclosure Review").).   It is unclear how Plaintiffs' action "necessarily affect[s] or "obstruct[s] the OCC's efforts to provide relief" where an offset would prohibit a double recovery by borrowers in the class.  (Mot. at 2:2–5; *see id.* at 2:22–23, 3:8– 11, 13:4–6 & 13:18–20.)  Defendants have not provided any authority or evidence that an overlap of borrowers who may require offset is sufficient to divest this Court of jurisdiction.

The primary cases relied upon by Defendants are inapposite and do not support a lack of jurisdiction.  *Bakenie* is distinguishable from the case at hand because the alleged improper practices related to "improper notarial practices" by plaintiffs whose properties were subjected to foreclosure.  2012 WL 4125890, at *1.  Unlike this case, the OCC made specific findings relating to notarial practices as to foreclosed borrowers.  Consent Order, Art. I § 2(a)–(b).  *American Fair Credit* does not control either.  There, the consent orders expressly prohibited a payment of money to the plaintiff; here, a "direct contravention" of the Consent Order or Amendment has not been identified, particularly in light of the offset provision in the Amendment.  *See American Fair Credit*, 132 F. Supp. 2d at 1312.

In sum, the Court agrees with the well-reasoned analysis of Section 1818(i) by the district courts in *Rex* and *In re JPMorgan Chase*.  This section itself seeks to ensure that federal courts do not interject themselves into the relationship between the OCC and parties when it comes to enforcement or review of a consent order.  *Rex*, 905 F. Supp. 2d at 1126; *In re JPMorgan Chase*, 880 F. Supp. 2d at 231–32.  The statute at large does not seek to prohibit third-parties from asserting claims, nor did the Consent Order itself purport to do so.

For the foregoing reasons, the Court **DENIES** Defendant's Motion to Dismiss based on the argument that Section 1818(i) divests the Court of subject matter jurisdiction.

### D.   Second Jurisdictional Argument: Doctrine of Primary Jurisdiction and Equitable Abstention

Defendants advance both the doctrines of primary jurisdiction and equitable abstention as additional reasons that this Court should not adjudicate Plaintiffs' claims.

The doctrine of primary jurisdiction allows a court to stay a proceeding or dismiss a complaint pending the resolution "of an issue within the special competence of an administrative agency." *Clark v. Time Warner Cable*, 523 F.3d 1110, 1114 (9th Cir. 2008). Primary jurisdiction applies in a limited set of circumstances, "only if a claim requires resolution of an issue of first impression, or of a particularly complicated issue that Congress has committed to a regulatory agency, and if protection of the integrity of a regulatory scheme dictates preliminary resort to the agency which administers the scheme." *Id*. (internal citations and quotations omitted). Although no fixed formula exists for applying the doctrine of primary jurisdiction (*Davel Comm'ns, Inc. v. Qwest Corp.*, 460 F.3d 1075, 1086 (9th Cir. 2006)), the Ninth Circuit has considered whether (1) the issue is within the "conventional experiences of judges" or "involves technical or policy considerations within the agency's particular field of expertise," (2) the issue "is particularly within the agency's discretion," and (3) "there exists a substantial danger of inconsistent rulings." *Maronyan v. Toyota Motor Sales, U.S.A., Inc.*, 658 F.3d 1038, 1048–49 (9th Cir. 2011) (internal citations omitted).[19] The court must also balance the parties' need to resolve the action expeditiously against the benefits of obtaining the federal agency's expertise on the issues. *Nat'l Comm'ns Ass'n, Inc. v. American Telephone & Telegraph Co. Co.*, 46 F.3d 220, 223 (2d Cir. 1995) (cited in *Maronyan*, 658 F.3d at 1049).

"The judicially-created equitable abstention doctrine gives courts discretion to abstain from deciding a UCL claim." *Wehlage v. EmpRes Healthcare, Inc.*, 791 F. Supp. 2d 774, 784 (N.D. Cal. 2011) (citing *Desert Healthcare Dist. v. PacifiCare FHP, Inc.,* 94 Cal. App. 4th 781, 795 (Cal. Ct. App. 2001) *and Alvarado v. Selma Convalescent Hosp.,* 153 Cal. App. 4th 1292, 1297–98 (Cal. Ct. App. 2007)). Underlying the doctrine is the rationale that "because the remedies available under the UCL, namely injunctions and restitution, are equitable in nature," courts have discretion to abstain from employing them. *Desert Healthcare*, 94 Cal. App. 4th at 795. "Abstention under the

---

[19] In determining whether the doctrine of primary jurisdiction applies, the Ninth Circuit also has considered: "(1) [the] need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory authority that (4) requires expertise or uniformity in administration." *Clark*, 523 F.3d at 1115 (citing *Syntek Semiconductor Co., Ltd., v. Microchip Tech. Corp.*, 307 F.3d 775, 781 (9th Cir. 2002)).

United States District Court
Northern District of California

doctrine may be appropriate if: (1) resolving the claim requires 'determining complex economic policy, which is best handled by the legislature or an administrative agency;' (2) 'granting injunctive relief would be unnecessarily burdensome for the trial court to monitor and enforce given the availability of more effective means of redress;' or (3) 'federal enforcement of the subject law would be more orderly, more effectual, less burdensome to the affected interests.'" *Wehlage*, 791 F. Supp. 2d at 784–85 (quoting *Alvarado*, 153 Cal. App. 4th at 1298); *see Shamsian v. Dep't of Conservation,* 136 Cal. App. 4th 621, 642 (Cal. Ct. App. 2006) (court has discretion to abstain where: (1) the requested relief would "interfere with the department's administration of the act and regulation of beverage container recycling and potentially risk throwing the entire complex economic arrangement out of balance" and (2) the "public's need for" the relief "is not so great as to warrant judicial interference in the administrative scheme designed to address those needs"). The equitable abstention doctrine applies in rare instances. *Rex*, 905 F. Supp. 2d at 1134.

Defendants argue that primary jurisdiction applies because the OCC has special expertise to: (i) enforce claims requiring the resolution of issues under their regulatory scheme; and (ii) apply uniform and consistent treatment of the complex and comprehensive issues involving home loan servicing practices, especially in a context where the OCC has already determined that Defendants have engaged in unsound practices. (Mot. at 14–15.)

Plaintiffs disagree and note this is a fraud case. Primary jurisdiction applies "only if a claim requires resolution of an issue of first impression" or is "a particularly complicated issue that Congress has committed to a regulatory agency." (Opp. at 8 (citing *Clark*, 523 F.3d at 1114).) Plaintiffs argue neither is implicated here. (Opp. at 9; Dkt. No. 25.)

This case asserts claims for violations of RICO and the UCL, fraud, and unjust enrichment. These are areas within the conventional experience of this Court and, despite Defendants' characterizations that this Court will be resolving issues under the OCC's regulatory scheme, the Court is not persuaded that uniformity or consistency will be threatened by adjudicating these claims. While Defendants have rightfully pointed out that there may be administrative difficulties in determining the offsets for class members, these inconveniences alone are not a reason to abstain from this action. Such determinations are frequently made in class actions or can be addressed at

United States District Court
Northern District of California

the class certification stage.  Indeed, the purpose of the Amendment itself is to provide the "greatest benefit to borrowers . . . in a more timely manner than would have occurred under the Independent Foreclosure Review."  Amendment at 2.  Abstention does not serve this purpose.

For the foregoing reasons, the Court **DENIES** Defendants' Motion to Dismiss based on the doctrines of primary jurisdiction and equitable abstention.

### E.      Third Jurisdictional Argument: Preemption Under National Bank Act

Defendants next argue that Plaintiffs' claims are preempted under the National Bank Act and related OCC regulations.

The National Bank Act ("NBA") vests national banks such with authority to exercise "all such incidental powers as shall be necessary to carry on the business of banking."  12 U.S.C. § 24 (Seventh).  Real estate lending is expressly designated as part of the business of banking.  12 U.S.C. § 371(a).  As the agency charged with administering the NBA, the OCC "has the primary responsibility for the surveillance of the 'business of banking' authorized by the [NBA]."  *Martinez v. Wells Fargo Home Mortg.*, 598 F.3d 549, 554–55 (9th Cir. 2010) (citations omitted).  "To carry out this responsibility, the OCC has the power to promulgate regulations and to use its rulemaking authority to define the "incidental powers" of national banks beyond those specifically enumerated in the statute."  *Id.* at 555 (citing 12 U.S.C. § 93a).)  The regulations possess the same preemptive effect of the NBA itself.  *Martinez*, 598 F.3d at 555.

"In analyzing preemption, [courts must] ask whether the state law 'prevent[s] or significantly interfere[s] with the national bank's exercise of its powers.'"  *Gutierrez v. Wells Fargo Bank, N.A.*, 704 F.3d 712, 722 (9th Cir. 2012) ("*Gutierrez II*") (quoting *Barnett Bank of Marion Cnty., N.A. v. Nelson*, 517 U.S. 25, 33 (1996)) (first alteration supplied).  "[S]tate laws of general application continue to apply to national banks when 'doing so does not prevent or significantly interfere with the national bank's exercise of its powers.'"  *Gutierrez II*, 704 F.3d at 722 (quoting *Barnett Bank*, 517 U.S. at 33).

As to the UCL claim, Defendants argue that Plaintiff Ellis' claim for excessive, unnecessary, or undisclosed default-related service fees are preempted for four reasons: "(1) by regulation, fee-setting is a business decision; (2) by regulation, state-law claims may not be used to

24

United States District Court
Northern District of California

1   impose disclosure requirements; (3) by regulation, claims concerning both origination and

2   processing are preempted; and, (4) UCL claims are preempted when the predicate conduct is

3   preempted."  (Mot. at 16 (citing *Martinez*, 598 F.3d at 556).)[20]

4        Under these regulations, Defendants assert that any determination regarding the

5   establishment of fees, the failure to disclose information about actual costs incurred for services,

6   and claims regarding servicing of mortgages are preempted.  (Mot. at 17; *see Martinez*, 598 F.3d at

7   557.)  Because these "predicate acts" are preempted, Defendants argue any resulting UCL claim is

8   preempted.

9        As to the unjust enrichment and fraud claims, Defendants similarly assert these are

10   preempted because the claims are based on "assumptions about the reasonableness of default-

11   related fees and services, which is the exclusive province of the OCC."  (Mot. at 18.)  The RICO

12   claims are preempted because they are based on an alleged breach of contract between Plaintiffs

13   and Chase, and not fraudulent communications.  (*Id.*)

14        Plaintiffs respond by emphasizing that Northern District of California courts have held that

15   "consumer protection laws of general application are not preempted by federal banking laws."

16   *Jefferson v. Chase Home Finance*, No. C. 06-6510 TEH, 2008 WL 1883484, at *10 (N.D. Cal. Apr.

17   29, 2008).  Plaintiffs argue that they do not ask this Court to determine what an appropriate BPO or

18   inspection fee should be, and they do not challenge the Chase's ability to charge fees.  Rather, their

---

19   [20] Specifically, Defendants identify the applicable regulations as 12 C.F.R. section 7.4002(a), which

20   provides that "[a] national bank may charge its customers non-interest charges and fees, including
     deposit and account service charges."  A bank engages in "safe and sound banking principles" in

21   establishing such charges and fees "if [it] employs a decision-making process through which is
     considers the following factors, among others: (i) The cost incurred by the bank in providing the

22   service; (ii) The deterrence of misuse by customers of banking services; (iii) The enhancement of
     the competitive position of the bank in accordance with the bank's business plan and marketing

23   strategy; and (iv) The maintenance of the safety and soundness of the institution."  12 C.F.R. §

24   7.4002(b)(2)(i)–(iv).

25   In addition, 12 C.F.R. section 34.4(a) provides that a national bank may make real estate loans

26   without regard to state law limitations concerning:  "(9) Disclosure and advertising, including laws
     requiring specific statements, information, or other content to be included in credit application

27   forms, credit solicitations, billing statements, credit contracts, or other credit-related documents;
     (10) Processing, origination, servicing, sale or purchase of, or investment or participation in,

28   mortgages."  12 C.F.R. § 34.4(a)(9)–(10).

claims target Defendants' fraudulent practices of utilizing software that automatically inflates fees, charges the inflated fees to borrowers, and demands payment by borrowers by stating the fees must be paid pursuant to the mortgage agreements.  At most, Plaintiffs contend that adjudication of these claims would have no more than an "incidental effect" on Chase's lending activities.  (Opp. at 14.)

The Court finds that under the Ninth Circuit's opinion in *Gutierrez II*, the UCL claim may proceed at least as to the fraudulent prong.  In *Gutierrez II*, the Ninth Circuit examined Wells Fargo's practices with regard to posting account debits and overdraft fees following a bench trial before the district court.  The district court found that, among other things, Wells Fargo's practices violated the unfair and fraudulent prongs of Section 17200.[21]  The Ninth Circuit held that "federal law preempts state regulation of the posting order as well as any obligation to make specific, affirmative disclosures to bank customers" *but* that "[f]ederal law does not . . . preempt California consumer law with respect to fraudulent or misleading representations concerning posting."  704 F.3d at 716.  As to the preempted state regulation, the court held that the posting process was integrally related to the receipt of deposits, which normally falls within the federal banking regulatory power.  *Id.* at 723.  In addition, the OCC specifically delegated to banks the method of calculating fees.  *Id.* at 724 (citing 12 C.F.R. § 7.4002(b)).  With respect to the overdraft fees at issue in *Gutierrez*, "[t]he OCC has interpreted these incidental powers to include the power to set account terms and the power to charge customers non-interest charges and fees."  704 F.3d at 724. In other words, "federal law authorizes national banks to establish a posting order as part and parcel of setting fees, which is a pricing decision" specifically within the power of national banks.  *Id.*

On remand, the district court re-visited certain injunctive relief and restitution issues in light of the Ninth Circuit's holding that:

> [T]he National Bank Act preempts the application of the "unfair" prong of Section 17200 to a national bank's order of posting.  Both the posting order itself, and any requirement to make particular disclosures are within the exclusive purview of the National Bank Act.  Liability based on failure to disclose was likewise preempted

---

[21] The "fraudulent" conduct violating Section 17200 included failure to disclose (or to adequately disclose) the challenged practices and making misleading statements to consumers regarding the practice.  *Gutierrez v. Wells Fargo Bank, N.A.*, 730 F. Supp. 2d 1080, 1126–28 (N.D. Cal. 2010) ("*Gutierrez I*").

United States District Court
Northern District of California

on the ground that it was tantamount to mandating specific disclosures.

Liability based on the "fraudulent" prong of Section 17200 for false and misleading statements, however, was held not preempted.  [The Ninth Circuit] held that for these purposes Section 17200 is a non-discriminatory state law of general applicability that did not impose disclosure requirements in conflict with federal law.  Rather, it prohibited statements that are likely to mislead the public.

*Gutierrez v. Wells Fargo Bank, N.A.*, No. C 07-05923 WHA, --- F. Supp. 2d ---, 2013 WL 2048030, at *1–2 (N.D. Cal. May 14, 2013) ("*Gutierrez III*"); *see Gutierrez II*, 704 F.3d at 727 ("we hold that Gutierrez's claim for violation of the fraudulent prong of the [UCL] by making misleading misrepresentations with regard to its posting method is not preempted, and we affirm the district court's finding to this extent"); *Gutierrez I*, 730 F. Supp. 2d at 1129 ("Wells Fargo affirmatively reinforced the expectation that transactions were covered in the sequence made while obfuscating its contrary practice of posting transactions in high-to-low order to maximize the number of overdrafts assessed on customers.").

Based on *Gutierrez*, Defendants' blanket argument that the UCL claim is preempted in its entirety fails.  As will be discussed in more detail *infra*, Plaintiffs have sufficiently stated a claim for fraud which, as pled, also states a claim for a UCL violation under the fraudulent prong.  Plaintiffs have alleged both that Defendants failed to advise them of actual costs of services and inflated fees, and also that false statements were made to borrowers when Defendants told them the fees were in accordance with their mortgage agreements.  Failure to adequately disclose this practice can shape reasonable expectations of consumers and be misleading.  *See Gutierrez III*, 2013 WL 2048030, at *2.  As such, Defendant's Motion to Dismiss the entire first claim for violation of the UCL is **DENIED**.  Defendant's Motion that unjust enrichment and fraud are preempted is likewise **DENIED** because those claims do not invade the exclusive province of the OCC.  Rather, they—as generally applicable state laws—"do not significantly interfere with the bank's ability to . . . calculate fees."  *Gutierrez II*, 704 F.3d at 727.[22]

For the foregoing reasons, the Court **DENIES** Defendants' Motion to Dismiss based on

---

[22] Defendants argue that the RICO claims are preempted because they are based on state law breach of contract claims.  (Mot. at 18.)  The Court finds that this argument, although couched as preemption, attacks the substance of the RICO claims and is unrelated to preemption by the NBA.  The Court will address RICO, *infra*.

United States District Court
Northern District of California

1   preemption.

2   **III.    FAILURE TO STATE A CLAIM UNDER FED. R. CIV. P. 12(b)(6)**

3          In this section, the Court addresses Defendants' fourth and fifth primary arguments: that

4   Plaintiffs lack standing because they have not suffered injury-in-fact and, even if they do have

5   standing, they fail to state a claim upon which relief can be granted.

6          **A.    Legal Standard Under Fed. R. Civ. P. 12(b)(6)**

7          Pursuant to Fed. R. Civ. P. 12(b)(6), a complaint may be dismissed against a defendant for

8   failure to state a claim upon which relief may be granted against that defendant.  Dismissal may be

9   based on either the lack of a cognizable legal theory or the absence of sufficient facts alleged under

10  a cognizable legal theory.  *Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir. 1990);

11  *Robertson v. Dean Witter Reynolds, Inc.,* 749 F.2d 530, 533–34 (9th Cir. 1984).  For purposes of

12  evaluating a motion to dismiss, the court "must presume all factual allegations of the complaint to

13  be true and draw all reasonable inferences in favor of the nonmoving party."  *Usher v. City of Los*

14  *Angeles,* 828 F.2d 556, 561 (9th Cir. 1987).  Any existing ambiguities must be resolved in favor of

15  the pleading.  *Walling v. Beverly Enters.,* 476 F.2d 393, 396 (9th Cir. 1973).

16         **B.    Standing under Article III, UCL, and RICO**

17         Defendants assert Plaintiffs lack standing in three ways.  First, Plaintiffs have failed to

18  allege an "injury in fact" to establish Article III standing.  (Mot. at 19 ("No Plaintiff alleges that he

19  or she made any actual payments to any Defendant related to any allegedly improper fees.").)

20  Second, Plaintiff Ellis has not alleged that she "lost money or property" and thus cannot pursue her

21  UCL claim without economic injury.  (Mot. at 19–20.)  Third, Plaintiffs have failed to allege harm

22  to a specific business or property interest—or a "concrete financial loss"—as required under RICO.

23  (*Id.* at 19 (citing *Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969, 975 (9th Cir. 2008).)

24         Plaintiffs respond that they "unambiguously allege that they '*paid* some or all of the

25  unlawful fees assessed on [their] account[s].'"  (Opp. at 14 (citing Compl. ¶¶ 62, 65 & 68)

26  (emphasis and alteration in original).)  They argue these allegations alone are sufficient to allege

27  standing under Article III, the UCL, and RICO.

28         The Court is satisfied with the allegations as pled and finds there is standing to pursue these

United States District Court
Northern District of California

claims.  Plaintiffs allege on information and belief that they have paid some or all of the unlawful

fees assessed on their accounts.  (Compl. ¶¶ 62, 65 & 68.)  The Court must take these allegations as

true and in the light most favorable to Plaintiffs, even if made on information and belief.  Such

allegations state an economic injury that qualifies as injury-in-fact under the UCL.  *See Kwikset*

*Corp. v. Superior Court*, 51 Cal. 4th 310, 323 (2011) (economic injury may be shown where

plaintiff "surrender[s] in a transaction more, or acquire[s] in a transaction less, than he or she

otherwise would have"); *see* Cal. Bus. & Prof. Code § 17204 (UCL claim may be brought "by a

person who has suffered injury in fact and has lost money or property as a result of the unfair

competition.").  "[A] party who has lost money or property generally *has* suffered injury in fact."

*Kwikset*, 51 Cal. 4th at 322 (emphasis in original).  For these same reasons, Article III standing is

also satisfied.

As to RICO standing, the "[c]ivil remedies" provision of RICO permits "[a]ny person

injured in his business or property by reason of a violation of [18 U.S.C.] section 1962 . . . [to] sue"

and recover treble damages and the cost of the suit, including a reasonable attorney's fee.  18

U.S.C. § 1964(c).  "To have standing under [Section] 1964(c), a civil RICO plaintiff must show: (1)

that his alleged harm qualifies as injury to his business or property; and (2) that his harm was 'by

reason of' the RICO violation, which requires the plaintiff to establish proximate causation."

*Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969, 972 (9th Cir. 2008) (internal citation

omitted).  With regard to the requirement of injury to business or property, "[i]n the ordinary

context of a commercial transaction, a consumer who has been overcharged can claim an injury to

her property, based on a wrongful deprivation of her money. . . . Money, of course, is a form of

property."  *Id.* at 976 (internal citation omitted).[23]

Plaintiffs allege they have paid marked-up fees and thus satisfy RICO standing.  A

---

[23] However, where a plaintiff is a governmental entity not acting as a "consumer" but "to enforce
the laws or promote the general welfare" the analysis is slightly different.  *Canyon County*, 519
F.3d at 976–80.  Canyon County sought to recover damages under RICO for monies it spent on
public health care and law enforcement services for undocumented immigrants.  *Id.* at 971.
Financial loss in *that* specific context was insufficient to allege injury to one's "business or
property."  *Id.* at 975–76.  Accordingly, the Ninth Circuit held that the county lacked RICO
standing.  *Id.* at 976–80.

United States District Court
Northern District of California

1  consumer who has been overcharged can claim injury to property under RICO based on a wrongful

2  deprivation of money, which is a form of property.  *Canyon County*, 519 F.3d at 976; *see Dufour v.*

3  *BE LLC*, No. C 09-03770 CRB, 2010 WL 2560409, at *11 (N.D. Cal. June 22, 2010) ("Plaintiffs

4  here allege that they were deprived of their money based upon Defendants' conduct, which is

5  sufficient.").

6      For these reasons, the Court **DENIES** Defendants' Motion to Dismiss based on lack of

7  standing.

8      **C.      RICO Claims**

9          **1.      Second Claim: Substantive RICO Violation: 18 U.S.C. Section 1962(c)
                  ("Section 1962(c)")**

10     Under Section 1962(c), "[i]t shall be unlawful for any person employed by or

11  associated with any enterprise engaged in, or the activities of which affect, interstate or foreign

12  commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's

13  affairs through a pattern of racketeering activity or collection of unlawful debt."   To state a

14  claim, a plaintiff must allege: "(1) conduct (2) of an enterprise (3) through a pattern (4) of

15  racketeering activity."  *Odom v. Microsoft Corp.*, 486 F.3d 541, 547 (9th Cir. 2007) (*en banc*).

16  Racketeering activity is also referred to as the "predicate acts."  *Living Designs, Inc. v. E. I. Dupont*

17  *de Numours and Co*., 431 F.3d 353, 361 (9th Cir. 2005).

18     Where a plaintiff alleges "a unified course of fraudulent conduct and rel[ies] entirely on that

19  course of conduct as the basis of a claim[,] . . . the claim is said to be 'grounded in fraud' or to

20  'sound in fraud,' and the pleading of that claim as a whole must satisfy the particularity

21  requirement of [Federal Rule of Civil Procedure] 9(b)."  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d

22  1097, 1103–04 (9th Cir. 2003).  To be alleged with particularity, a plaintiff must allege "the who,

23  what, when, where, and how" of the alleged fraudulent conduct (*Cooper v. Pickett,* 137 F.3d 616,

24  627 (9th Cir. 1997)) and "set forth an explanation as to why [a] statement or omission complained

25  of was false and misleading" (*In re GlenFed, Inc. Sec. Litig.,* 42 F.3d 1541, 1548 (9th Cir. 1994)

26  (*en banc*)).  In other words, "the circumstances constituting the alleged fraud [must] be specific

27  enough to give defendants notice of the particular misconduct . . . so that they can defend against

28  the charge and not just deny that they have done anything wrong."  *Vess,* 317 F.3d at 1106 (first

United States District Court
Northern District of California

1    alteration supplied; internal quotation and citations omitted).  "Rule 9(b)'s requirement that '[i]n all

2    averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with

3    particularity' applies to civil RICO fraud claims."  *Edwards v. Marin Park, Inc.*, 356 F.3d 1058,

4    1065–66 (9th Cir. 2004) (internal citation omitted); *Moore v. Kayport Package Exp., Inc.*, 885 F.2d

5    531, 541 (9th Cir. 1989).

6         Defendants challenge Plaintiffs' RICO claim for failure to sufficiently allege each required

7    element, and a failure to meet the heightened pleading requirements for mail and wire fraud.  (Mot.

8    at 20.)  The Court will first address conduct of an enterprise.

9         Section 1962(c) targets conduct by "any person employed by or associated with any

10   enterprise . . . ."  The Supreme Court has recognized the basic principle that Section 1962(c)

11   imposes a distinctiveness requirement—that is, one must allege two distinct entities: a "person" and

12   an "enterprise"[24] that is not simply the same "person" referred to by a different name.  *Cedric*

13   *Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 & 166 (2001) (holding that under Section

14   1962(c), distinctiveness is satisfied and RICO applies "when a corporate employee unlawfully

15   conducts the affairs of the corporation of which he is the sole owner—whether he conducts those

16   affairs within the scope, or beyond the scope, of corporate authority").  The Court noted that the

17   distinctiveness requirement was consistent with a prior holding that liability "depends on showing

18   that the defendants conducted or participated in the conduct of the '*enterprise's* affairs,' not just

19   their *own* affairs."  *Id.* at 163 (quoting *Reves v. Ernst & Young,* 507 U.S. 170, 185 (1993)).

20        An enterprise that is not a legal entity is commonly known as an "association-in-fact"

21   enterprise.  *Mitsui O.S.K. Lines, Ltd. v. Seamaster Logistics, Inc.*, 871 F. Supp. 2d 933, 939 n.6

22   (N.D. Cal. 2012).  In *Odom v. Microsoft Corp.*, the Ninth Circuit held that "an associated-in-fact

23   enterprise under RICO does not require any particular organizational structure, separate or

24   otherwise."  486 F.3d 541, 551 (9th Cir. 2007) (no requirement of an "ascertainable structure").

25   "[A]n associated-in-fact enterprise is 'a group of persons associated together for a common purpose

---

26   [24] A "'person' includes any individual or entity capable of holding a legal or beneficial interest in
27   property."  18 U.S.C. § 1961(3).  An "'enterprise' includes any individual, partnership, corporation,
     association, or other legal entity, and any union or group of individuals associated in fact although
28   not a legal entity."  18 U.S.C. § 1961(4).

31

of engaging in a course of conduct.'" *Id.* at 552 (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)); *Boyle v. United States*, 556 U.S. 938, 944 (2009). Ninth Circuit precedent requires proof of three elements: (i) a common purpose of engaging in a course of conduct; (ii) evidence of an "ongoing organization, formal or informal"; and (iii) evidence that the various associates function as a continuing unit. *Odom*, 486 U.S. at 552 (citing *Turkette*).[25]

Defendants primarily assert that Plaintiffs fail to allege the existence of an enterprise that is distinct from Defendants themselves because subsidiaries and affiliates of a corporation generally do not constitute an association-in-fact enterprise. (Mot. at 20.) In addition, Plaintiffs direct their claims to Chase's conduct in marking-up fees, charging them to borrowers, and establishing policies that impose the marked-up fees, but they "do not allege that any non-Chase entity has taken any specific action at all in support of the purported enterprise." (*Id.* at 21.) In other words, the "Chase Enterprise" is only Chase and no one else's conduct makes up the enterprise. (*Id.*)

Plaintiff responds that they have, in fact, alleged there were non-Chase members of the enterprise, namely the "property preservation vendors" and real estate brokers who performed BPOs who helped carry out the scheme. (Opp. at 19 (citing Compl. ¶ 106).) Plaintiffs note that an associated-in-fact enterprise does not require any particular organizational structure, separate or otherwise, under the Ninth Circuit's holding in *Odom*. 486 F.3d at 551. Plaintiffs also argue that the enterprise conduct consisted of Chase's use of the mail and wires to engage in its scheme to defraud. (Opp. at 21.)

The Court agrees that Plaintiffs have not sufficiently identified the structure of the enterprise, nor that Defendants have engaged in enterprise conduct distinct from their own affairs. Throughout the Complaint, Plaintiffs allege that the enterprise includes "subsidiaries," "affiliated companies," "intercompany divisions," *and* third-party property preservation vendors and real

---

[25] The Ninth Circuit in *Odom* noted that the definition of an enterprise is, based on its text, "not very demanding." 486 F.3d at 548; *Boyle*, 556 U.S. at 944 ("the very concept of an association in fact is expansive"). In fact, the Supreme Court has recognized that "RICO is to be read broadly" and is to "be liberally construed to effectuate its remedial purposes." *Sedima, S.P.R.I v. Imrex Co., Inc.*, 473 U.S. 479, 497–98 (1985) (quoting Pub. L. 91–452 § 904(a), 84 Stat. 947 (1970)); *see Boyle*, 556 U.S. at 946 (association-in-fact enterprise must have three structural features: a purpose; relationships among those associated with the enterprise; and longevity sufficient to permit these associations to pursue the enterprise's purpose).

estate brokers.  (Compl. ¶¶ 2, 4, 9, 33, 46, 106.)  Defendants "order[ed] default-related services from their subsidiaries and affiliated companies, who, in turn, obtain[ed] the services from third-party vendors."  (*Id.* ¶ 40.)  These vendors charged Defendants for services, but Defendants marked-up the fees in excess of any amounts actually paid.  (*Id.*)  Defendants "provided mortgage invoices, loan statements, payoff demands, or proofs of claims to borrowers" to "demand" payment of fees, but these documents "fraudulently concealed" the true nature of the fees, some of which were "never incurred" at all by Defendants.  (*Id.* ¶¶ 93, 112, 114 & 143.)  Defendants also falsely represented to borrowers in statements and other documents that the fees were "allowed by [their] Note and Security Instrument."  (*Id.* ¶¶ 53 & 115.)  Plaintiffs allege that the enterprise's common purpose was to "limit[] costs and maximiz[e] profits by fraudulently concealing assessments for unlawfully marked-up and/or unnecessary third party fees for default-related services on borrowers' accounts."  (*Id.* ¶ 107.)

These allegations stand in contrast to those alleged in a related action, *Bias, et al. v. Wells Fargo & Co., et al.*, Case No. 12-cv-00664-YGR.  Here, Plaintiffs repeatedly state that subsidiaries, affiliated companies, and intercompany divisions are members of the enterprise.  However, Plaintiffs fail to specifically identify these members or to provide any factual allegations to detail their involvement or make their involvement in the enterprise plausible.  Plaintiffs vaguely allege that unidentified subsidiaries, affiliated companies, and/or intercompany divisions order default-related services from third-party vendors and brokers.  No specific factual allegations explain how this occurs, and without this information, the Court cannot ascertain the structure of the alleged enterprise.  Nor can the Court determine whether Defendants have engaged in conduct of the enterprise, as opposed to their own affairs.

In addition, the Court notes that the "common purpose" here is the same as that alleged against Wells Fargo in *Bias*—to limit costs and maximize profits by fraudulently concealing marked-up and/or unnecessary third party fees.  However, an associated-in-fact enterprise must consist of "a group of persons associated together for a common purpose of engaging in a course of conduct."  *Odom*, 486 F.3d at 552 (quoting *Turkette*).  Plaintiffs' Complaint lacks factual allegations that show that the unidentified enterprise members *associated together* with Defendants

1  *for* that alleged common purpose.  This is unlike in *Bias*, where plaintiffs alleged that Wells Fargo

2  had associated with third party Premiere Asset Services for a common purpose.

3      For these reasons, the Court **DISMISSES** Plaintiffs' RICO claim under Section 1262(c) **WITH**

4  **LEAVE TO AMEND** for failure to sufficiently allege an enterprise.  Plaintiffs' amended complaint

5  must address the deficiencies stated herein, or Plaintiffs may file a motion for leave to amend if

6  future discovery in this action reveals a factual basis for a RICO claim.[26]

7          **2.**      **Third Claim: Conspiracy to Violate RICO: 18 U.S.C. Section 1962(d)**
                **("Section 1962(d)")**

8

9      Under Section 1962(d), "[i]t shall be unlawful for any person to conspire to violate

10  any of the provisions of subsection (a), (b), or (c) of this section."  "To establish a violation of

11  section 1962(d), Plaintiffs must allege either an agreement that is a substantive violation of RICO

12  or that the defendants agreed to commit, or participated in, a violation of two predicate offenses."

13  *Howard v. America Online Inc.*, 208 F.3d 741, 751 (9th Cir. 2000).  The conspiracy defendant

14  "must intend to further an endeavor which, if completed, would satisfy all of the elements of a

15  substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the

16  criminal endeavor."  *Id.* (quoting *Salinas v. United States,* 522 U.S. 52, 65 (1997)).  Moreover, the

17  defendant must also have been "aware of the essential nature and scope of the enterprise and

18  intended to participate in it."  *Id.* (quoting *Baumer v. Pachl,* 8 F.3d 1341, 1346 (9th Cir. 1993)).

19      In *Howard*, the Ninth Circuit affirmed the "district court['s holding] that the failure to

20  adequately plead a substantive violation of RICO precludes a claim for conspiracy."  *Id.*; *see*

21  *Turner v. Cook*, 362 F.3d 1219, 1231 n.17 (9th Cir. 2004) (affirming dismissal of RICO claims,

22  including conspiracy, where plaintiffs failed to allege, among other things, acts of mail fraud, wire

23  fraud, and pattern of racketeering activity).

24      Here, Plaintiffs have failed to allege the requisite substantive elements of RICO under

25  Section 1962(c), and thus their claim for conspiracy under Section 1962(d) also fails.

---

[26] In light of the Court's dismissal on these grounds, the Court declines to address additional
arguments raised by Defendants.  To the extent that Plaintiffs choose to amend their complaint,
Defendants *may not re-argue* on a future motion to dismiss any argument that has been rejected in
this Order.  In addition, Defendants *may not raise* for the first time on a future motion to dismiss
any argument that was *previously available but not raised* on this Motion.

1    For these reasons, Plaintiffs' claim for conspiracy under Section 1962(d) is **DISMISSED**

2    **WITH LEAVE TO AMEND**.

3        **D.**       **Fourth Claim: Unjust Enrichment**

4        Defendants argue the unjust enrichment claim fails because the only cognizable claim in

5    California is a quasi-contractual claim for restitution, which cannot exist where there is a binding,

6    enforceable agreement defining the right of the parties.  (Mot. at 24 (citing *Paracor Fin., Inc. v.*

7    *Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1167 (9th Cir. 1996)).)  According to Defendants, the

8    mortgage contracts "permit" the charges at issue here, and the unjust enrichment is "based upon the

9    contract."  (Reply at 15.)

10       Plaintiffs argue they have pled the required elements of a claim for unjust enrichment: the

11   receipt of a benefit and unjust retention of the benefit at the expense of another.  (Opp. at 24.)

12   Further, the viability of the claim is unaffected by the existence of the agreements.   (*Id.* (citing *In*

13   *re Countrywide Fin. Corp. Mortg. Mktg. & Sales Practices Litig.*, 601 F. Supp. 2d 1201, 1220–21

14   (S.D. Cal. 2009)).)  In *In re Countrywide*, the district court rejected both of defendants' arguments

15   for dismissal of an unjust enrichment claim, holding that "[a]lthough there are contracts at issue in

16   this case, none appears to provide for the specific recovery sought by Plaintiffs' unjust enrichment

17   claim."  *Id.* at 1220–21 (noting conflicting case law regarding whether California recognizes unjust

18   enrichment as a claim and declining to conclude the claim was not legally cognizable).

19       Despite Defendants' arguments that the mortgage agreements preclude the claim here, the

20   Court finds it is premature for the Court to take a position on whether this action derives from the

21   subject matter of the agreements such that a claim for unjust enrichment is unavailable.  *In re*

22   *Countrywide*, 601 F. Supp. 2d at 1220–21.  Under California law, Plaintiffs have pled sufficient

23   facts to support a claim for unjust enrichment.  *Lectrodryer v. SeoulBank*, 77 Cal. App. 4th 723,

24   726 (Cal. Ct. App. 2000); *see also Hirsch v. Bank of America, N.A.*, 107 Cal. App. 4th 708, 721–22

25   (Cal. Ct. App. 2003) (valid claim for unjust enrichment stated where banks collected and retained

26   excessive fees passed through to them by title companies at the expense of plaintiffs).  Whether

27   Plaintiffs will succeed with their burden of establishing this claim should be certified as a

28   nationwide class is not appropriate to determine at this time.

United States District Court
Northern District of California

35

United States District Court
Northern District of California

1        For these reasons, the Court **DENIES** Defendants' Motion to Dismiss the fourth claim for

2   unjust enrichment.

3        **E.**     **Fifth Claim: Fraud**

4        Defendants argue that the fraud claim fails to meet the heightened pleading standard of

5   Federal Rule of Civil Procedure 9(b). (Mot. at 24.) In particular, Plaintiffs have not alleged injury

6   or reliance based "on any specific communication from any Defendant" and have failed to

7   specifically plead the "time, date, and amount of allegedly improper fees charged to the named

8   Plaintiffs" or payment of the same. (*Id.*; Reply at 15.) In addition, Defendant argues that where the

9   fraud claim is based on the omission of material facts, a "duty to disclose" must exist to state a

10   claim. (Mot. at 24.)

11        Plaintiffs disagree, emphasizing that it has provided specific detail regarding the nature of

12   the scheme and that Defendants can adequately prepare an answer to the Complaint. (Opp. at 25.)

13   Plaintiffs identify the mortgage contracts as the source of Defendants' duty to disclose. (*Id.*)

14        Defendants' arguments fail to persuade. As to the claimed lack of specificity, Plaintiffs

15   have provided more detail than Defendants acknowledge. Plaintiffs have alleged numerous

16   instances where deficient information was provided and could have been revealed—namely, in the

17   mortgage agreements themselves, in the mortgage statements reflecting the marked-up fees, or

18   during communications with Chase where it told Plaintiffs that the fees were in accordance with

19   their mortgage agreements. Plaintiffs provide specific dates for statements in which they believe

20   they were charged the marked-up fees, and allege they paid the fees without knowing their true

21   nature. Plaintiffs describe the content of the omission as the failure to inform them that the fees

22   were marked-up and that the majority of the fees ultimately went to Chase, and not third-party

23   vendors performing the services. As discussed above, Plaintiffs have also sufficiently alleged that

24   they did pay the marked-up fees.

25        As to the argument regarding a "duty to disclose," the alleged omissions by Defendants here

26   are interwoven with misrepresentations. Defendants' failure to advise Plaintiffs of the actual costs

27   for services is linked to the inflated costs that Chase expressly demanded as due in monthly

28   mortgage statements and other documents. Using the mortgage agreements as justification,

United States District Court
Northern District of California

1    Defendants allegedly demanded payment for fees that, in some cases, were never actually incurred.

2    (*See* Compl. ¶ 112.)  Moreover, Plaintiffs allege that false representations were made to borrowers

3    when Chase told them that the fees were in accordance with their mortgage contracts—this is

4    distinguishable from an omission.  (Compl. ¶¶ 53 & 115.)  As alleged, the fraud is equally about the

5    failure to disclose material information as it is that the amounts demanded on mortgage statements

6    were false because they did not correspond to the actual amounts owed pursuant to the mortgage

7    agreements relied upon by Defendants.  Based on the alleged nature of the fraudulent scheme, the

8    lack of an explicit "duty to disclose" is not dispositive in light of affirmative fraud that is also

9    alleged.

10          The Court notes that, unlike the unjust enrichment claim, Defendants provide authorities

11   from California, Oregon, and Tennessee in support of dismissing the fraud claim.  Plaintiffs will

12   ultimately bear the burden of establishing whether their fraud claim can be certified as a nationwide

13   class and the Court declines to engage in a choice of law analysis at this juncture.  However,

14   regardless of which state's law applies here, Defendants' argument fails because Plaintiffs have

15   alleged more than a fraud claim of omission here.

16          For the foregoing reasons, the Court **DENIES** Defendants' Motion to Dismiss the fifth claim

17   for fraud.

18          **F.        Request to Dismiss JPMorgan Chase & Co. Under Rule 8**

19          Defendants argue that JPMorgan Chase & Co. must be dismissed as a Defendant for two

20   reasons: first, it is a non-operating holding company that "could not conceivably have taken any

21   action" attributed to the Chase Enterprise.  (Mot. at 25.)  Second, the allegations do not provide fair

22   notice under Federal Rule of Civil Procedure 8 because they are conclusory.  (*Id.* (citing Compl. ¶

23   26).)

24          Plaintiffs concede that JPMorgan Chase & Co. is not itself a national bank or an operating

25   subsidiary thereof (Opp. at 10), but does not specifically address Defendant's argument for

26   dismissal.  Defendants emphasize this lack of opposition, and re-assert that JPMorgan Chase & Co.

27   is merely a holding company that "could not have been involved in any purported conduct here."

28   (Reply at 9 n.1.)

While Plaintiffs did not explicitly state that they oppose this portion of the Motion to Dismiss, they do highlight in their Opposition that there are allegations that each of the Defendants (including J.P. Morgan Chase & Co.) was an active participant in the scheme to defraud.  (*See* Opp. at 23 (citing Compl. ¶ 109).)  The Court further notes that there are additional allegations regarding J.P. Morgan Chase & Co. in the Complaint.  (*See id.* ¶ 26 (J.P. Morgan Chase & Co. exercises specific and financial control over other Defendants' operations, dictates their policies and practices, exercises power and control over them with regard to the conduct alleged in the Complaint, and is the ultimate recipient of the ill-gotten gains).)  Plaintiffs also allege that executives at the highest levels of J.P. Morgan Chase & Co. organized the fraudulent scheme.  (*Id.* ¶¶ 26 & 109.)  At the pleading stage, this states a plausible claim against J.P. Morgan Chase & Co. and Defendants have not provided any concrete reason that it could not have "conceivably" engaged in any part of the conduct alleged in the Complaint.

For these reasons, the Court **DENIES** Defendants' Motion to Dismiss J.P. Morgan Chase & Co. as a Defendant for the claims that have survived this Motion to Dismiss—*i.e.*, the UCL claim, unjust enrichment, and fraud.

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion to Dismiss.  The Motion to Dismiss under Rule 12(b)(1) and Defendants' arguments as to standing are hereby **DENIED**.  The second and third claims for violation of RICO and conspiracy to violate RICO, respectively, are **DISMISSED WITH LEAVE TO AMEND**.  Defendants' Motion to Dismiss the first claim for violation of the UCL, fourth claim for unjust enrichment, and fifth claim for fraud is **DENIED**.

Plaintiffs must file an amended complaint within twenty-one (21) days from the date of this Order.  If Plaintiffs do not wish to file an amended complaint at this time, Plaintiffs are granted leave to file a motion for leave to amend if future discovery reveals a factual basis to support the dismissed RICO claims.  In that case, Plaintiffs shall file a notice stating that they intend to stand on the first, fourth, and fifth claims as pled in the Complaint (Dkt. No. 1), and the Court will deem the Complaint to be operative as of the date of that notice.  Defendants shall have fourteen (14)

1  days to respond to the amended complaint or the filing of the notice described above.

2       This Order terminates Dkt. No. 6.

3       **IT IS SO ORDERED**.

4

5  Dated: June 13, 2013

6                                     **YVONNE GONZALEZ ROGERS**
                                   **UNITED STATES DISTRICT COURT JUDGE**

United States District Court
Northern District of California