1
2
3
4
5
6

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

7

**DIANA ELLIS,** *et al.*,

8             Plaintiffs,

9     vs.

10

**J.P. MORGAN CHASE & CO.,** *et al.*,

11            Defendants.

12

Case No.: 12-cv-03897 YGR

**ORDER DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION; DENYING PLAINTIFFS' MOTION TO STRIKE**

Re: Dkt. Nos. 169, 191, 201

13        Before the Court is plaintiffs Diana Ellis, James Schillinger, and Ronald Lazar's

14   (collectively, "Plaintiffs") motion for class certification.  (Dkt. No. 169, "Mtn.")  Plaintiffs also

15   move to strike declarations submitted by Defendants J.P. Morgan Chase & Co., J.P. Morgan

16   Chase Bank, N.A., and Chase Home Finance (collectively, "Defendants" or "Chase") in

17   opposition to Plaintiffs' motion to certify.  (Dkt. No. 191, "Mtn. Strike.")[1]  Having carefully

18   considered the papers submitted and the pleadings in this action, oral argument held September 1,

19   2015, and for the reasons set forth below, the Court hereby **DENIES** Plaintiffs' motion for class

20   certification and **DENIES** Plaintiffs' motion to strike.

21        I.      **FACTUAL BACKGROUND**

22        Chase is comprised of three relevant heritage institutions: Heritage Chase, EMC Mortgage

23   Company ("EMC"), and Washington Mutual Bank ("Washington Mutual").[2]  (Dkt. No. 182-30,

24   "Evans Decl.," ¶ 33.)  In 2008, Heritage Chase acquired the mortgage servicing portfolios of EMC

25

26        [1] The Court resolves the six administrative motions to seal documents submitted in
connection with the substantive motions via separate order entered this date.

27        [2] The Court refers to Chase, as it existed prior to the acquisitions, as "Heritage Chase."
28   EMC, Washington Mutual, and Heritage Chase are collectively referred to herein as the heritage
institutions.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    and Washington Mutual.  (*Id*.)  Pertinent to this litigation, Chase and its heritage institutions have

2    acted as servicers on home mortgage loans throughout the proposed class period.  In this role,

3    Defendants are responsible for providing certain services to protect a mortgage lenders' interest in

4    the property securing the loan.  Among those services are property inspections, which the servicer

5    orders to inspect the property that secures a delinquent loan when a borrower goes into default on

6    their mortgage.  (Dkt. No. 182-19, "Jolley Decl.," Exh. R. at JOLLEY0062.)  Defendants then

7    passed the cost of the property inspection (with no "mark-up") along to the borrower absent the

8    application of an exclusion, such as the delinquent loan being in bankruptcy.  (Dkt. No. 169-2,

9    "Pifko Decl.," Exh. 24 at 482-83.)

10          Prior to 2006, Heritage Chase used a variety of software platforms to service its mortgage

11   loans.  (Evans Decl. ¶ 6.)  Beginning in 2006, Heritage Chase began to use a single automated

12   software management system, Fidelity Mortgage Servicing Package ("MSP"), to manage the

13   process of ordering and charging borrowers for property inspections.  (*Id*. ¶¶ 6, 9.)  The mortgage

14   portfolios of EMC and Washington Mutual were migrated to MSP in 2009.  (*Id*. ¶ 33.)

15          MSP is generally programmed to order an initial property inspection once a borrower is

16   forty-five (45) days delinquent on loan payments and every thirty (30) to thirty-five (35) days

17   thereafter if the borrower remains delinquent.  (Pifko Decl., Exhs. 2, 3, 11, 23.)  Despite this

18   general rule, MSP is programmed to use certain criteria to determine whether to order property

19   inspections.  (Evans Decl. ¶¶ 8-16.)  These criteria have changed over time, and Chase

20   periodically updates MSP to reflect these adjustments.  (*Id*. ¶ 31.)  EMC and Washington Mutual

21   had their own written policies and coding instructions with respect to ordering property

22   inspections when Heritage Chase acquired them in 2008.  (*Id*. ¶ 33.)  Chase first wrote an entity-

23   wide policy for ordering and charging for property inspections in 2011, which continues to be

24   amended periodically.  (*Id*.)

25          Chase and/or the heritage institutions were the servicers on named Plaintiffs' mortgages.

26   Plaintiffs now challenge Defendants' practice of using MSP to order property inspections and

27   charging borrowers for same.  Specifically, Plaintiffs allege that Defendants' practices were not

28   authorized by Plaintiffs' mortgages.  Plaintiffs seek to recover the property inspection fees they

previously paid to Defendants.  Where the fees were assessed but not paid, Plaintiffs request injunctive relief to remove the property inspection fees from their mortgage loan accounts.

II.       **PLAINTIFF'S PROPOSED CLASS DEFINITIONS AND CLAIMS**

Plaintiffs move to certify five classes:

> **1.   California Injunctive Relief Class**
> All residents of California who had a loan serviced by Chase Home Finance LLC or J.P. Morgan Chase Bank, N.A., including their affiliates and predecessors, from January 1, 2003 through May 31, 2013, and whose accounts were assessed, but who have not paid, fees for one or more property inspections.
>
> **2.   Nationwide Unjust Enrichment Class**
> All residents of the United States of America who had a loan serviced by Chase Home Finance LLC or J.P. Morgan Chase Bank, N.A., including their affiliates and predecessors, from January 1, 2003 through May 31, 2013, and who paid fees for one or more property inspections.
>
> **3.   California Fraud/UCL/Rosenthal Act Class**
> All residents of California who had a loan serviced by Chase Home Finance LLC or J.P. Morgan Chase Bank, N.A., including their affiliates and predecessors, from January 1, 2003 through May 31, 2013, and who paid fees for one or more property inspections.
>
> **4.   Tennessee Fraud Class**
> All residents of Tennessee who had a loan serviced by Chase Home Finance LLC or J.P. Morgan Chase Bank, N.A., including their affiliates and predecessors, from January 1, 2003 through May 31, 2013, and who paid fees for one or more property inspections.
>
> **5.   Oregon Fraud Class**
> All residents of Oregon who had a loan serviced by Chase Home Finance LLC or J.P. Morgan Chase Bank, N.A., including their affiliates and predecessors, from January 1, 2003 through May 31, 2013, and who paid fees for one or more property inspections.

(Mtn. at 10-11.)  Plaintiffs seek to certify the California Injunctive Relief Class pursuant to Federal Rule of Civil Procedure 23(b)(2), and the Nationwide Unjust Enrichment Class, California Fraud/UCL/Rosenthal Act class, Tennessee Fraud Class, and Oregon Fraud Class as damages classes pursuant to Rule 23(b)(3).

United States District Court
Northern District of California

United States District Court
Northern District of California

### III.   MOTION FOR CLASS CERTIFICATION

#### A.  Legal Standard

Rule 23, which governs class certification, contains two sets of distinct requirements that Plaintiffs must meet before the Court may certify any of the proposed classes.  First, Plaintiffs must meet all of the requirements under Rule 23(a).  Second, each class must meet at least one of the prongs of Rule 23(b), depending on the nature of the class.

Under Rule 23(a), the Court may certify a class only where "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."  Fed.R.Civ.P. 23(a).  Courts refer to these four requirements as "numerosity, commonality, typicality and adequacy of representation."  *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir. 2012).  In addition to the four requirements set forth in Rule 23(a), most courts have implied an additional threshold requirement: that the members of the class are readily ascertainable.  *See Xavier v. Philip Morris USA, Inc.*, 787 F.Supp.2d 1075, 1089 (N.D.Cal. 2011) ("the party seeking certification must demonstrate that an identifiable and ascertainable class exists"); *Herrera v. LCS Fin. Servs. Corp.*, 274 F.R.D. 666. 672 (N.D.Cal. 2011) ("[w]hile Rule 23(a) is silent as to whether the class must be ascertainable, courts have held that the rule implies this requirement).  If Plaintiffs establish that the threshold requirements of Rule 23(a) are met, Plaintiffs then have the burden to show "through evidentiary proof" that a class is appropriate for certification under one of the provisions in Rule 23(b).  *Comcast Corp. v. Behrend*, 133 S.Ct. 1426, 1432 (2013).

 "[A] court's class-certification analysis must be 'rigorous' and may 'entail some overlap with the merits of the plaintiff's underlying claim.'"  *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S.Ct. 1184, 1194 (2013) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551 (2011)); *see also Mazza*, 666 F.3d at 588.  The Court considers the merits to the extent that they overlap with the Rule 23 requirements.  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 983 (9th Cir. 2011).  The Court must resolve "any factual disputes necessary to determine whether

4

United States District Court
Northern District of California

1  there was a common pattern and practice that could affect the class *as a whole*." *Id.* (emphasis in

2  original). "When resolving such factual disputes in the context of a motion for class certification,

3  district courts must consider 'the persuasiveness of the evidence presented.'" *Aburto v. Verizon*

4  *Cal., Inc.*, 2012 WL 10381, at *2 (C.D. Cal. Jan. 3, 2012) (quoting *Ellis*, 657 F.3d at 982).

5  Ultimately, the district court must exercise its discretion to determine whether a class should be

6  certified. *Califano v. Yamasaki*, 442 U.S. 682, 703 (1979).

### B.  Analysis

With the exception of numerosity, Chase argues that Plaintiffs have failed to meet their

burden with respect to all class certification requirements.  The Court begins with an analysis of

the Rule 23(a) factors.  Finding at the outset that Plaintiffs have not met their burden on Rule

23(a)(2)'s commonality requirement, the Court does not proceed any further in the analysis.

### 1.  Numerosity

The numerosity requirement under Rule 23(a)(1) is undoubtedly met here and Chase does

not contend otherwise.  Plaintiffs submit that there are more than 1.5 million putative class

members in the nationwide class.  (Pifko Decl., Exh. 28.)  With potentially more than one million

class members residing in fifty states, at least as to the nationwide class, the Court agrees that

numerosity is satisfied.

### 2.  Commonality

Rule 23(a)(2) requires that the party seeking certification show "there are questions of law

or fact common to the class."  Fed.R.Civ.P. 23(a)(2).  To satisfy this requirement, a common

question "must be of such a nature that it is capable of class-wide resolution – which means that

the determination of its truth or falsity will resolve an issue that is central to the validity of each of

the claims in one stroke."  *Dukes*, 131 S.Ct. at 2545.  The existence of common questions itself

will not satisfy the commonality requirement, and instead, "[w]hat matters to class certification …

is… the capacity of a classwide proceeding to generate common *answers* apt to drive the

resolution of the litigation."  *Id*. at 2551 (emphasis in original).  Under the commonality inquiry,

"Plaintiffs need not show that every question in the case, or even a preponderance of questions, is

capable of classwide resolution.  So long as there is 'even a single common question,' a would-be

class can satisfy the commonality requirement of Rule 23(a)(2)." *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 544 (9th Cir. 2013) (quoting *Dukes*, 131 S.Ct. at 2556).

Here, Plaintiffs propose one common question as suitable for determination on a classwide basis for all classes. The question, as framed by Plaintiffs, is whether Chase's automated MSP system generated unauthorized property inspection fees that were then assessed to borrowers' accounts by not taking individual circumstances of borrowers into account. (Mtn. at 13-14.) This question, Plaintiffs argue, would drive the ultimate resolution of their claims because it would establish liability class-wide. In that regard, Plaintiffs contend that Chase had a uniform practice that applied to every property inspection it ordered beginning on January 1, 2003, and through May 31, 2013. Thus, in Plaintiffs' view, the legality of Chase's purportedly uniform practice spanning more than a decade is the central issue in this case. To support this proposition, however, Plaintiffs present the Court with no evidence in their opening motion. Plaintiffs' moving papers contain no citation to the record with respect to commonality. (*See* Mtn. at 13-14.) Instead, Plaintiffs summarily contend that Defendants "uniformly applied" the challenged practice to all class members through the Chase MSP system. (Mtn. at 13:22-23) (emphasis removed.) As a result of Plaintiffs' lack of evidence, the Court's inquiry is inevitably guided by Defendants' arguments and evidence presented in opposition to class certification.

Not surprisingly, Chase fundamentally disagrees with Plaintiffs' premise, *i.e.*, that Chase employed a uniform system of ordering and charging for property inspections.[3] In and of themselves, factual *disputes* do not defeat class certification. The crux of Defendants' argument is not a dispute of fact. Rather, it is the *absence* of evidence of a common practice. Defendants maintain that Chase's practices varied over time, depending on heritage institution, depending on investor, and from borrower to borrower. Without showing a uniform practice, Defendants argue that Plaintiffs have not established a common question applicable to the class as a whole (much

---

[3] Defendants also argue that, even if Plaintiffs established that Chase had a uniform practice, they cannot show "in one stroke" that all class members were charged for unlawful property inspections. See *Dukes*, 131 S.Ct. at 2551. In other words, even if Plaintiffs generated a common *question* vis-à-vis a uniform policy, the inquiry could not generate a common *answer* using common *proof*. Because the Court finds that Plaintiffs did not meet their burden to establish a uniform policy, the Court need not reach this secondary inquiry.

United States District Court
Northern District of California

1    less satisfy predominance under Rule 23(b)(3) for the damages classes).  The Court agrees.

2    Absent a showing that Chase had a policy to which class members were uniformly subject for the

3    entire proposed class period, Plaintiffs' motion must fail.

4            Principally, Plaintiffs did not establish that Chase and its heritage institutions had uniform

5    policies throughout the more than ten year class period.  Indeed, Heritage Chase did not even

6    move to the centralized MSP system for purposes of ordering property inspections until 2006 –

7    three years into the proposed class period.  (Evans Decl., ¶¶ 6, 36.)  Prior to 2006, Heritage Chase

8    "used a variety of software platforms to service its mortgage loans."  (*Id.* ¶ 6.)  Plaintiffs do not

9    rebut this evidence in reply.  Moreover, Heritage Chase, EMC, and Washington Mutual were

10   separate entities with separate loan servicing policies prior to 2009.  (*Id.* ¶ 33.)  When Chase

11   purchased EMC and Washington Mutual in 2008, each entity "had their own written policies and

12   coding instructions with respect to ordering property inspections."  (*Id.*; *see* Dkt. No. 182-39,

13   "Slifko Decl.," ¶ 18.)  In 2009, the Washington Mutual and EMC portfolios were migrated to MSP

14   for purposes of ordering property inspections.  (Evans Decl. ¶ 33.)  To that point, Plaintiffs

15   acknowledge that in 2009 Chase "consolidate[d] the pre-2009 policies and procedures from the

16   various heritage entities."  (Reply at 4:1-2.)  Finally, Chase also opines that, since 2009, their

17   policy and practices have continued to change in response to amendments to investor guidelines.

18   (*Id.* ¶¶ 36, 38-40; Slifko Decl., ¶ 18.)  In fact, Chase presents evidence that it did not have an

19   entity-wide written policy on property inspections in place until 2011, and that the policy

20   continues to be amended periodically.  (Evans Decl. ¶ 33.)

21           Plaintiffs' response to this fundamental issue wholly ignores Defendants' evidence that

22   Heritage Chase did not use MSP until 2006 and that the policy continued to evolve through 2013.

23   Plaintiffs present no evidence – much less a preponderance – from which the Court could

24   conclude these different internal policies do not affect the commonality analysis.  *Quesada v. Banc*

25   *of America Inv. Services, Inc.*, 2013 WL 623288, at *4 (N.D.Cal. Feb. 19, 2013) ("The party

26   seeking class certification bears the burden of demonstrating by a preponderance of the evidence

27   that all four requirements of Rule 23(a) … are met").  Plaintiffs' only counterpoint with respect to

28   changes over time focuses on differences among the heritage institution polices.  Namely,

United States District Court
Northern District of California

1    Plaintiffs argue that Chase has failed to identify differences among the property inspection policies

2    of the three heritage institutions.  Critically, though, Defendants do not have any such burden on

3    class certification.  *Dukes*, 131 S.Ct. at 2551 ("[a] party seeking class certification must

4    affirmatively demonstrate his compliance with [Rule 23]"); *Quesada*, 2013 WL 623288, at *4.

5    Plaintiffs cannot shift their burden to Defendants simply because Plaintiffs present no evidence of

6    their own.  Thus, the Court concludes that Plaintiffs have not proffered evidence of a uniform

7    policy throughout the entire class period, especially with respect to each heritage institution.

8            Chase has also presented evidence that it did not have a monolithic policy as indicated by

9    Plaintiffs because inspection practices varied based on the loan investor.  Chase's portfolio of

10   serviced mortgages was comprised of loans guaranteed or owned by numerous institutions,

11   including HUD, FHA, Freddie Mac, Fannie Mae, Chase itself, and other private investors.  (Evans

12   Decl. ¶ 10.)  These investors have different requirements that Chase, as the loan servicer, must

13   follow in ordering property inspections after a borrower becomes delinquent.  According to Jack

14   Evans, Vice President of Property Preservation for Chase, "Chase's MSP system is programmed

15   to account for these investor-by-investor differences."  (*Id*. ¶ 11.)  Specifically, the MSP system is

16   programmed to treat HUD-insured mortgages differently than others:

17

18           [W]hen the data in Chase's MSP system indicates that a
             mortgaged property covered by HUD insurance is occupied
19           by the borrower, Chase will not order a property inspection
             in the absence of special circumstances.  This practice has
20           been in place for many years.  Moreover, from at least 2008
             through 2014, one of the ways that Chase complied with
21           HUD guidance was to have its vendors send out pre-
             inspection mailers asking the borrower to confirm their
22           occupancy of the property.  If the borrower responded that
             they were occupying the property, Chase would block an
23           inspection on the property.

24

25   (*Id*.)  Plaintiffs' only response to Mr. Evan's testimony is a conclusory statement that MSP was

26   not able to account for investor differences, based on evidence presented for the first time in reply.

27   Plaintiffs submit in reply an email from Mr. Evans they construe as a concession that MSP was

28   unable to accommodate investor differences.  (Dkt. No. 197-2, "Supp. Pifko Decl.," Exh. 33;

1   Reply at 2:5-14.)  As an initial matter, the Court hesitates to "consider new arguments or evidence

2   presented for the first time in reply" on class certification where the moving party carries the

3   evidentiary burden.  *In re Flash Memory Antitrust Litig.*, 2010 WL 2332081, at *5 (N.D. Cal. June

4   9, 2010).[4]  Plaintiffs had the initial obligation to present evidence necessary to satisfy the

5   requirements for class certification in their opening motion.  *Id*.  That Plaintiffs chose to devote

6   only one and a half pages of its thirty-page motion to the central issue of commonality is to their

7   own detriment.  Further, Plaintiffs extend Mr. Evans' email beyond its logical conclusion, and

8   Defendants have been left unable to place his statements in context given Plaintiffs' improper

9   presentation of the evidence for the first time on reply.  Thus, Plaintiffs' *post hac* attempt to

10   discredit Mr. Evans is not well taken, particularly when this email was never shown to or

11   authenticated by Mr. Evans at his deposition.  (*See* Dkt. No. 202 at 3:8-10.)  Plaintiffs carry the

12   burden on class certification to demonstrate that Chase uniformly applied a policy of ordering and

13   charging for property inspections, and they have failed to do so.

14          Defendants additionally argue that the Chase MSP system cannot be construed as

15   implementing a uniform policy class-wide because it was programmed to account for borrower

16   circumstances.  Among the factors that determined whether a property inspection would be

17   ordered or charged to a borrower were whether: (i) the property was abandoned, tenant-occupied,

18   or in foreclosure; (ii) the borrower communicated an intent to occupy the property; (iii) the

19   borrower had a home equity loan or a first mortgage; (iv) the borrower entered into a repayment

20   plan or loss mitigation plan; (v) state and local inspection requirements required deviation; and

21   (vi) a manual or customized decision was made by Chase to cancel the order.  (*Id*. ¶¶ 7-19; Slifko

22   Decl. ¶¶ 7-11; Oppo. at 10-12.)  In reply, Plaintiffs contend that their evidence established that the

23   Chase MSP system had a uniform policy regardless of investor or individual borrower

24   circumstances.  The Court disagrees.  Plaintiffs' evidence only establishes that, as a general rule,

25   MSP ordered a first property inspection after forty-five (45) days of delinquency and every thirty

26   (30) days thereafter.  (Pifko Decl., Exhs. 2, 3, 11, 23; Reply at 2:10-14.)  Chase does not contest

27

28          [4] *See* Section III(C), *infra*, addressing Defendants' evidentiary objections to evidence
presented by Plaintiffs for the first time in reply, including Mr. Evans' email.

this general rule.  Instead, Chase presents evidence showing that individualized exceptions applied to the policy such that it cannot be construed as uniformly applied to all class members.  Thus, it is apparent that the proposed classes would include borrowers who were not subject to the general policy, or who were at least subject to sub-policies, such that the class members were not "subject to the same allegedly [unlawful] practice."  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 983 (9th Cir. 2011); *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272-72 (11th Cir. 2009) (the district court was "demonstrably incorrect" to certify a class that would include persons who were "also subject to other policies" because "issues involving the [allegedly common policy] *alone* are not common to the entire class") (emphasis supplied).

A review of the named Plaintiffs' mortgage accounts proves the point.  The named Plaintiffs' property inspection fee histories demonstrate that Chase did not operate under a uniform policy.[5]   With respect to plaintiff Ellis, her loan account originated with Washington Mutual.  (Dkt. No. 182-57, "Devine Decl.," ¶ 12.)  She first became delinquent on her payments in 2008, before the heritage intuitions migrated to the Chase MSP system.[6]  (*Id.* ¶ 19.)  The first inspection of her property was ordered by Washington Mutual's mortgage servicing platform.  (*Id.* ¶ 20.)  Throughout her loan's delinquency, Defendants ordered a total of twenty-five property inspections, of which only seven were assessed to her account.  (*Id.* ¶ 38.)  Moreover, two of the seven charged fees were later waived by Chase.  (*Id.*)  With respect to plaintiff Lazar, Chase did not order an initial property inspection until more than a year after his account first became delinquent because he requested a loan modification.  (*Id.*  ¶¶ 47-48.)  Likewise, only six inspections were ordered on the property securing plaintiff Schillinger's mortgage during his more than forty-three (43) months of delinquency.  (*Id.* ¶ 88.)  And, of those six inspections, only four

---

[5] The Court recognizes that this plaintiff-specific analysis is normally undertaken in connection with typicality under Rule 23(a)(3).  As the Supreme Court has recognized, however, the "commonality and typicality requirements of Rule 23(a) tend to merge."  *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, n. 13 (1982).  This is especially true here where certification is inappropriate for the fundamental reason that common questions do not exist even among the named Plaintiffs.

[6] Although Washington Mutual sold her loan to private investors, Washington Mutual continued to act as the servicer of her mortgage until Chase purchased Washington Mutual. (Devine Decl. ¶¶ 17-18.)

United States District Court
Northern District of California

United States District Court
Northern District of California

1    were assessed to his loan account.  (*Id*.)  Thus, the named Plaintiffs illustrate that Chase did not

2    have a policy that was implemented uniformly *regardless of individual borrower circumstances* as

3    Plaintiffs contend.  Contrary to Plaintiffs' assertions, the evidence shows the Chase MSP system

4    ordered property inspections discriminately, not uniformly.

5         In support of certification, Plaintiffs principally rely on a case from the Southern District of

6    Iowa involving property inspections ordered and charged by Wells Fargo.  *See Huyer v. Wells*

7    *Fargo & Co.*, 295 F.R.D. 332 (S.D. Iowa 2013).  There, the court found that the "common

8    question of whether [Wells Fargo's property inspection] policy constitutes a RICO and/or a UCL

9    violation is certainly amenable to a common answer, which will drive the resolution of this

10   litigation."  *Id.* at 338.  This question, as framed by the court, necessarily assumed a common

11   policy by Wells Fargo.  Indeed, the *Huyer* court found the Supreme Court's analysis in *Dukes*

12   "inapplicable to and/or distinguishable from this case," because, in that court's view, *Huyer* was

13   more similar to post-*Dukes* cases involving "a company-wide [policy] that was applied uniformly"

14   to all class members.  *Id.* (quoting *Bouaphakeo v. Tyson Foods, Inc.*, 2011 WL 3793962, at *3-4

15   (N.D. Iowa Aug. 25, 2011) (internal quotations omitted)).  Not so here.  For the reasons discussed

16   above, Plaintiffs failed to establish that Chase applied a policy uniformly to all class members.

17   *Huyer* is therefore inapposite.

18        For the foregoing reasons, the Court finds that Plaintiffs have not established that a

19   common question applies to all class members.  Plaintiffs' motion therefore fails under Rule

20   23(a)(2).  Plaintiffs' motion for class certification is **DENIED**.

21        **C. Evidentiary Objections**

22        The parties filed two sets of evidentiary objections in conjunction with Plaintiffs' motion

23   for class certification.  First, Plaintiffs filed a document entitled "Evidentiary Objections to

24   Evidence Submitted with Opposition to Class Certification," appended to their twenty-page reply.

25   (Dkt. No. 197-1.)  Plaintiffs' objections were not filed in compliance with Local Rule 7-3(c),

26   which provides that "[a]ny evidentiary and procedural objections to the opposition must be

27   contained in the reply brief or memorandum."   Plaintiffs filed their objections as a separate

28   document outside of their reply brief.  On that basis, the objections are **DENIED.**  Accordingly,

11

United States District Court
Northern District of California

1  Defendants' unopposed motion for leave to respond to Plaintiffs' evidentiary objections (Dkt. No.

2  201) is **DENIED AS MOOT**.

3     Second, and in compliance with Local Rule 7-3(d)(1), Defendants filed objections to

4  Plaintiffs' reply evidence.  (Dkt. No. 202.)  Defendants object to the supplemental declaration of

5  Mark Pifko and its attendant exhibits (Supp. Pifko Decl., Exhs. 33-43) as improperly presented for

6  the first time in reply.  *See Quesada v. Banc of America Inv. Serv's, Inc.*, 2013 WL 623288, at *4

7  (N.D.Cal. Feb. 19, 2013) (plaintiffs bear the burden of demonstrating "by a preponderance of the

8  evidence" that the requirements of Rule 23 are satisfied); *Flash Memory Antitrust Litig.*, 2010 WL

9  2332081, at *15 (declining to look at new reply evidence because "such evidence should have

10  been proffered with Plaintiffs' moving papers," as it is plaintiffs' initial burden to demonstrate the

11  existence of a certifiable class).  In making the instant decision, however, the Court does not rely

12  on the evidence to which Defendants object.  To the extent the Court examined Mr. Evans' email

13  (Supp. Pifko Decl., Exh. 33), *supra*, the Court finds it does not support Plaintiffs' position.

14  Defendants' evidentiary objections to Plaintiffs' reply evidence are therefore **DENIED AS MOOT**.

15    **IV.**  **PLAINTIFFS' MOTION TO STRIKE DEFENSE DECLARATIONS**

16     Defendants relied on a number of witness declarations in opposition to Plaintiffs' motion

17  for class certification, attaching the declarations thereto as exhibits.  Plaintiffs now move to strike

18  certain declarations on two grounds.  First, with respect to the declaration of Joseph G. Devine, Jr.,

19  Plaintiffs contend the Court should exercise its authority under Rule 37 to strike Mr. Devine's

20  declaration because he was not previously disclosed as a witness.[7]  Second, Plaintiffs ask the

21  Court to invoke the sham affidavit rule to strike specific paragraphs in Deidre Slifko's declaration

22  as inconsistent with her prior deposition testimony.[8]  The Court considers Plaintiffs' arguments in

23

24     [7] Plaintiffs additionally move to strike the declarations of Gary Miller and Tonya Petrides
under Rule 37.  Defendants offered these declarations in connection with the predominance

25  inquiry under Rule 23(b)(3).  The Court does not reach the predominance inquiry and, therefore,
relied on neither the Miller nor Petrides declarations in making its decision.  Consequently,

26  Plaintiffs' motion to strike the Miller and Petrides declarations is **DENIED AS MOOT**.

27     [8] Plaintiffs also move to strike the testimony of Mr. Evans as a sham.  Specifically,
Plaintiffs attacked his testimony on the term "Quality Right Party Contact."  The Court does not

28  reach this issue in making the instant decision.  Thus, Plaintiffs' motion to strike portions of the
Evans declaration is **DENIED AS MOOT**.

turn.

### A. Devine Declaration: Previously Undisclosed Witness

Rule 37(c)(1) provides in pertinent part: "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed.R.Civ.P. 37(c)(1); *Hoffman v. Constr. Protective Serv., Inc.*, 541 F.3d 1175, 1179 (9th Cir. 2008). Factors used to determine whether the evidence should be allowed include: (i) whether a party has been "surprise[d]," and their ability to "cure the surprise," (ii) whether "allowing the evidence would disrupt the trial," (iii) "the importance of the evidence," and (iv) "the nondisclosing party's explanation for its failure to disclose the evidence." *San Francisco Baykeeper v. W. Bay Sanitary Dist.*, 791 F.Supp.2d 719, 733 (N.D.Cal. 2011) (internal quotations omitted). The burden is on the party facing a motion to strike to show that the failure was substantially justified or is harmless. *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106-07 (9th Cir. 2001).

Here, it is undisputed that Chase did not disclose Mr. Devine during the discovery period. Plaintiffs argue that Defendants' failure to do so caused Plaintiffs prejudice because they first learned of Mr. Devine when Defendants filed their opposition. Plaintiffs claim that they could have "deposed [Mr. Devine], explored and/or investigated [his] substance with other witnesses and documents, and prepared rebuttal evidence if necessary." (Mtn. Strike at 8:1-3.) Plaintiffs further claim that Chase's belated disclosure cannot be harmless because discovery had closed and briefing on the class certification motion was substantially complete when they learned of Mr. Devine.

Given the nature of the Devine declaration, the Court agrees with Chase that the failure to disclose Mr. Devine previously was both substantially justified and harmless. As to the first issue, Chase merely substituted one witness for an equivalent witness out of convenience to a previously disclosed witness. *See San Francisco Baykeeper*, 791 F.Supp.2d at 733-35 (refusing to strike the testimony of three undisclosed witnesses when two other witnesses were disclosed on the same subject matter). In 2012, Chase disclosed Jeffrey Nack pursuant to Rule 26 as a witness with

13

United States District Court
Northern District of California

information regarding Chase's "business records relating to Plaintiffs' mortgages, including account histories, customer service notices, and correspondence between Chase Defendants and Plaintiffs." (Dkt. No. 223-1, "Albertstone Decl.," Exh. 1 at 2.) Due to scheduling reasons, Mr. Nack was unable to submit a declaration in time to oppose Plaintiffs' certification motion. However, Mr. Nack submitted a declaration in opposition to the motion to strike opining that he reviewed Mr. Devine's declaration and that he expects he would have provided the same testimony had his schedule allowed. (Dkt. No. 204-4 ¶¶ 4-5.)

Plaintiffs argue that convenience does not satisfy the Rule 37 standard that Defendants be substantially justified in offering Mr. Devine's testimony in place of Mr. Nack's.[9] Plaintiffs rely on an extra-circuit district court decision for the proposition that courts regularly exclude declarations of "substitute" witnesses like Mr. Devine. *Certain Underwriters at Lloyds v. SSDD, LLC*, 301 F.R.D. 391 (E.D. Mo. 2014). In *Underwriters*, the court granted a motion in limine to exclude the testimony of a newly disclosed witness at trial, with specific reference to the fact that the witness was disclosed only seven weeks before trial. *Id*. at 395. Unlike here, the substitute witness in *Underwriters* was no substitute at all. The undisclosed witness in *Underwriters* was an additional person responsible for preparing a document at issue in the litigation who may have had additional knowledge of how the document was prepared. Thus, *Underwriters* is not persuasive. Mr. Devine acted as a true substitute for Mr. Nack by authenticating and summarizing Chase's business records. The Court finds Defendants were substantially justified in offering the Devine declaration for that limited purpose. *See San Francisco Baykeeper*, 791 F.Supp.2d at 733-35.

As to harmlessness, the Devine declaration does nothing more than authenticate and summarize Plaintiffs' loan records that were all produced in discovery.[10] *See De la Torre v. CashCall, Inc.*, 56 F.Supp.3d 1073, 1094 (N.D. Cal. 2014) (finding no "prejudice," *i.e.* harm,

---

[9] Plaintiffs also suggest that defense counsel made the substitution because they realized last minute that Mr. Nack could not testify as to the same matters as Mr. Devine. This not only ignores – without any justification – Mr. Nack's declaration that he could have provided the same testimony and remains able to do so at trial, but also launches unwarranted character attacks on defense counsel. The Court will not entertain this unsubstantiated accusation.

[10] Plaintiffs admit that all but one of these documents were produced timely by Chase. One publically available document was not previously produced.

14

where the declaration "function[ed] largely to authenticate documents Plaintiffs already have, rather than to provide any opinion on the underlying issues")*, overturned on other grounds by* 56 F.Supp.3d 1105 (N.D. Cal. 2014).  Moreover, Plaintiffs hardly can claim any surprise that Chase would present loan records of the named Plaintiffs in opposition to the certification motion.  Nor did Plaintiffs take any steps to cure any surprise.  Plaintiffs could have, but chose not to, request more time to file their reply and seek to obtain discovery from Mr. Devine in the interim.  Instead, Plaintiffs waited more than three weeks to move to strike.  No attempt was made to cure any alleged prejudice to Plaintiffs.

In addition, Plaintiffs never sought to depose Mr. Nack or any other witness concerning these documents, suggesting that Plaintiffs would also not have deposed Mr. Devine even if given the opportunity.  *See Davenport v. Charter Communications, LLC*, 302 F.R.D. 520, 528 (E.D. Mo. 2014) (declining to strike declarations submitted by defendants in opposition to class certification when "Plaintiffs never sought to depose the [previously disclosed witness]" and "the Court doubt[ed] whether Plaintiffs would have deposed any of the new declarants even if they were identified earlier").  Finally, Plaintiffs' protestation that the Devine declaration contains "unfounded statements" and "unsupported inferences" is itself unsupported.  (MTS Reply at 3:1-24.)[11]  The Court is satisfied that the substitution of Mr. Devine was harmless.

Accordingly, Plaintiffs' motion to strike the declaration of Mr. Devine is **DENIED**.

## B.  Slifko Declaration: Sham Affidavit Rule

The sham affidavit rule precludes a party from creating an issue of fact by affidavit contradicting her testimony.  *Van Asdale v. Int'l Game Technology*, 577 F.3d 989, 998 (9th Cir. 2009) (citing *Kennedy v. Allied Mutual Ins. Co.*, 952 F.2d 262, 266-67 (9th Cir. 1991)).  Contradictory testimony is not automatically disposed of, but rather "the district court must make a factual determination that the contradiction was actually a 'sham.'"  *Id*.  Moreover, "the inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit."  *Id*. at 998-99.  An affidavit is not a sham where it

---

[11] Regardless, the Court does not rely on the paragraphs Plaintiffs cite as "unfounded" and "unsupported."  (*See* Devine Decl. ¶¶ 9-11, 21-22.)

United States District Court
Northern District of California

merely "elaborate[es] upon, explain[s], or clarify[ies] prior testimony." *Messick v. Horizon Industries, Inc.*, 62 F.3d 1227, 1231 (9th Cir. 1995). The rule is a narrow one that is most often invoked at summary judgment to prevent parties from manufacturing factual disputes. *Van Asdale*, 577 F.3d at 998. Courts should apply the rule "with caution." *Id.*

Plaintiffs cite *In re ConAgra Foods, Inc.*, 90 F.Supp.3d 919 (C.D. Cal. 2015), for the proposition that, although the rule is typically invoked on summary judgment, the sham affidavit rule has been used to strike declarations at the class certification stage. In *ConAgra*, Judge Morrow did entertain motions to strike declarations submitted in support of class certification as shams, but ultimately declined to strike them. *Id.* Here, as in *ConAgra*, the Court is unable to find that Ms. Slifko's deposition testimony regarding the differences in the policies of the heritage institutions[12] clearly and unambiguously contradicts her declaration. In her deposition, Ms. Slifko testified that she was not "familiar with what the procedures and policies were before 2008." (Albertstone Decl., Exh. 5 at 194.) Ms. Slifko now testifies that the heritage institutions "each [had] different rules for charging borrowers for property inspections." (Slifko Decl. ¶ 18.) These two statements are not clearly and unambiguously in conflict with one another. *See Van Asdale*, 577 F.3d at 998. It is entirely plausible that Ms. Slifko is aware that each heritage institution had separate policies without knowing their specific contents. The Court therefore declines to strike paragraph 18 in Ms. Slifko's declaration. Plaintiffs' motion on this ground is **DENIED**.[13]

## V.    CONCLUSION

For the foregoing reasons, the Court **DENIES** Plaintiffs' motion for class certification and **DENIES** Plaintiffs' motion to strike.

---

[12] This is the only portion of the challenged testimony on which the Court relies in making the instant decision. Plaintiffs' motion with respect to Ms. Slifko is otherwise **DENIED AS MOOT**.

[13] Even in the absence of paragraph 18 in Ms. Slifko's declaration, the Court's commonality analysis would remain unchanged for at least two reasons. First, Mr. Evans corroborates Ms. Slifko's testimony that the heritage institutions had separate policies for ordering property inspections prior to 2009. (Evans Decl. ¶ 33.) Second, and most importantly, Defendants do not have the burden on class certification to show the absence of a uniform policy. Plaintiffs must establish a common question, which can be accomplished by the presence of a common policy applied uniformly to all class members. Plaintiffs failed to do so regardless of Defendants' evidence of variations among the heritage institutions' policies.

United States District Court
Northern District of California

1          This Order terminates Docket Nos. 169, 191, 201.

2          **IT IS SO ORDERED**.

3   Dated: December 17, 2015

4

5                                                    _____
                                                     YVONNE GONZALEZ ROGERS
6                                                    UNITED STATES DISTRICT COURT JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28