Robert D. Wick (*pro hac vice* / rwick@cov.com)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
Telephone: (202) 662-6000
Facsimile: (202) 662-6291

David M. Jolley (SBN 191164 / djolley@cov.com)
COVINGTON & BURLING LLP
One Front Street
San Francisco, CA 94111
Telephone: (415) 591-6000
Facsimile: (415) 591-6091

*Attorneys for Defendants JPMorgan*
*Chase & Co. and JPMorgan Chase Bank, N.A.,*
*individually and as successor by merger to*
*Chase Home Finance LLC*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| DIANA ELLIS, JAMES SCHILLINGER, and RONALD LAZAR, individually, and on behalf of other members of the public similarly situated,<br><br>     Plaintiffs,<br><br>     v.<br><br>JPMORGAN CHASE & CO., a Delaware corporation, JPMORGAN CHASE BANK, N.A., a national association, for itself and as successor by merger to Chase Home Finance, LLC, and CHASE HOME FINANCE LLC, a Delaware limited liability company,<br><br>     Defendants. | Civil Case No.: 4:12-cv-03897-YGR<br><br>[Related to Case Nos. C-12-00664-YGR, C-12-3892-YGR]<br><br>**DEFENDANTS NOTICE OF MOTION, MOTION FOR SUMMARY JUDGMENT, AND MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Hearing Date: June 7, 2016<br>Time:       2:00 PM<br>Judge:     Hon. Yvonne Gonzales Rogers<br>Courtroom:  1, 4th Floor |

REDACTED VERSION SOUGHT TO BE SEALED

# TABLE OF CONTENTS

INTRODUCTION AND STATEMENT OF ISSUES .................................................................. 1

BACKGROUND ...................................................................................................................... 2

    A.    Chase's Property Inspection Practices. .................................................................. 2

    B.    Plaintiffs' Mortgage Agreements And Property Inspection Charges. ................... 3

PROCEDURAL STANDARD .................................................................................................. 4

ARGUMENT ............................................................................................................................ 4

I.    SUMMARY JUDGMENT IS WARRANTED ON PLAINTIFFS' UNJUST
    ENRICHMENT CLAIMS. ........................................................................................... 4

    A.    The Unjust Enrichment Claims Are Barred by the Existence of Written
        Contracts. ............................................................................................................... 5

    B.    Chase Was Not "Unjustly Enriched" By Payments That Merely Reimbursed
        It For Out-Of-Pocket Expenditures. ...................................................................... 7

    C.    Plaintiffs Cannot Recover In Unjust Enrichment For Charges They Did
        Not Pay. .................................................................................................................. 7

    D.    Plaintiffs' Inspection Charges Were Not "Unjust" Because They Were
        Authorized By Plaintiffs' Mortgage Agreements. ................................................. 8

        1.    Inspecting the property securing delinquent mortgage loans is
            "reasonable or appropriate" as a matter of law. ........................................ 8

        2.    Plaintiffs' specific inspection charges were especially reasonable. .......... 11

II.    SUMMARY JUDGMENT IS WARRANTED ON PLAINTIFFS' FRAUD
     AND UCL CLAIMS. ................................................................................................. 13

III.    SUMMARY JUDGMENT IS WARRANTED ON ELLIS'S ROSENTHAL ACT
      CLAIM. ....................................................................................................................... 16

IV.    FEDERAL BANKING LAW PREEMPTS PLAINTIFFS' CLAIMS. ........................... 17

    A.    Plaintiffs' Claims Are Preempted By The National Bank Act. ........................... 17

        1.    The National Bank Act "Ordinarily" Preempts State Law. ..................... 18

        2.    Plaintiffs' Challenge To Chase's Disclosure Practices Is Preempted. ....... 19

        3.    Plaintiffs' Challenge To Chase's Servicing Practices Is Preempted. ........ 20

ii

DEFENDANTS' NOTICE OF MOTION, MOTION FOR SUMMARY JUDGMENT, AND MEMORANDUM OF POINTS AND AUTHORITIES
Civil Case No.:  4:12-cv-03897-YGR

B.      Ellis's and Lazar's Claims Are Preempted By The Home Owners' Loan Act..... 22

CONCLUSION......................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abels v. Bank of Am.*,
   2011 WL 1362074 (N.D. Cal. Apr. 11, 2011) ...................................................................16

*Aguayo v. U.S. Bank*,
   653 F.3d 912 (9th Cir. 2011) ...........................................................................................23

*Akopyan v. Wells Fargo Home Mortg.*,
   215 Cal. App. 4th 120 (2013) ...............................................................................20, 21, 25

*Alliance Mortg. Co. v. Rothwell*,
   10 Cal. 4th 1226 (1995) ..............................................................................................15, 16

*Am. Movie Classics v. Rainbow Media Holdings*,
   508 F. App'x 826 (10th Cir. 2013) ......................................................................................7

*Babb v. Wachovia Mortg., FSB*,
   2013 WL 3985001 (C.D. Cal. July 26, 2013) ...................................................................23

*Bank of Am. v. City & Cnty. of San Francisco*,
   309 F.3d 551 (9th Cir. 2002) ......................................................................................18, 20

*Barnett Bank of Marion Cnty., N.A. v. Nelson*,
   517 U.S. 25 (1996) .....................................................................................................18, 21

*Benner v. Bank of Am., N.A.*,
   917 F. Supp. 2d 338 (E.D. Pa. 2013) ............................................................................9, 16

*Bennett v. Visa U.S.A. Inc.*,
   198 S.W.3d 747 (Tenn. App. 2006) ...............................................................................7, 8

*Black v. Black*,
   166 S.W.3d 699 (Tenn. 2005) ...........................................................................................15

*Bopp v. Wells Fargo Bank, N.A.*,
   740 F. Supp. 2d 12 (D.D.C. 2010) ....................................................................................24

*Brazil v. Dole Food Co., Inc.*,
   2013 WL 5312418 (N.D. Cal. Sept. 23, 2013) .................................................................15

*Brown v. Wells Fargo Bank, N.A.*,
   869 F. Supp. 2d 51 (D.D.C. 2012) ....................................................................................24

*Cadlo v. Owens-Illinois, Inc.*,
   125 Cal. App. 4th 513 (2004) ...........................................................................................15

*Campos v. Wells Fargo Bank, N.A.*,
   2015 WL 5145520 (C.D. Cal. Aug. 31, 2015)......................................................................25

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)...................................................................................................................4

*Chaires v. Chevy Chase Bank, F.S.B.*,
   748 A.2d 34 (Md. Ct. Spec. App. 2000)...............................................................................23

*Cirino v. Bank of America, N.A.*,
   2014 WL 9894432 (C.D. Cal. Oct. 1, 2014)..........................................................................19

*Contreras v. Master Fin., Inc.*,
   2010 WL 4608300 (D. Nev. Nov. 4, 2010).............................................................................6

*Fidelity Fed. S& L. v. de la Cuesta*,
   458 U.S. 141 (1982).............................................................................................................19, 22

*Freeman Indus., LLC v. Eastman Chemical Co.*,
   172 S.W.3d 512 (Tenn. 2005)...............................................................................................7, 8

*Galvin v. EMC Mortgage Corp.*,
   2014 WL 4980905 (D.N.H. Oct. 3, 2014) ......................................................................9, 10, 11

*Granite Partners, L.P. v. Bear, Stearns & Co.*,
   17 F. Supp. 2d 275 (S.D.N.Y. 1998)......................................................................................6

*Gutierrez v. Wells Fargo Bank, NA*,
   704 F.3d 712 (9th Cir. 2012).............................................................................................19, 21

*Hael v. Wash. Mut. Bank, F.A.*,
   277 F. Supp. 2d 933 (S.D. Ind. 2003)...................................................................................23

*Hill v. Nationstar Morg. LLC*,
   2015 WL 4478061 (S.D. Fla. July 2015)................................................................................5

*Hughes v. Equity Plus Fin.*,
   2010 WL 2836828 (S.D. Cal. July 19, 2010) .......................................................................24

*In re Countrywide Fin. Corp.*,
   601 F. Supp. 2d 1201 (S.D. Cal. 2009)..................................................................................24

*Jaqua v. Nike, Inc.*,
   865 P.2d 442 (Or. App. 1993)................................................................................................7

*Kelley v. Mortg. Elec. Registration Sys., Inc.*,
   642 F. Supp. 2d 1048 (N.D. Cal. 2009).................................................................................24

*Kheder v. Seterus, Inc.*,
   2013 WL 1286020 (Mich. Ct. App. Mar. 28, 2013)................................................................9

*Lomely v. JP Morgan Chase Bank, Nat'l Ass'n*,
  2012 WL 4123403 (N.D. Cal. Sept. 17, 2012) .................................................................6

*Majchrowski v. Norwest Mortg., Inc.*,
  6 F. Supp. 2d 946 (N.D. Ill. 1998) ..............................................................................9

*Mann v. Chase Manhattan Mortg. Corp.*,
  2002 WL 32157516 (D.R.I. Mar. 7, 2002) ...........................................................9, 11

*Mannello v. Residential Credit Solutions, Inc.*,
  2016 WL 94236 (C.D. Cal. Jan. 7, 2016) .................................................................16

*Marquez v. Wells Fargo Bank*,
  2013 WL 5141689 (N.D. Cal. Sept. 13, 2013) .........................................................25

*Martinez v. Wells Fargo Home Mortgage, Inc.*,
  598 F.3d 549 (9th Cir. 2010) .............................................................................19, 20

*McCauley v. Home Loan Inv. Bank, F.S.B.*,
  710 F.3d 551 (4th Cir. 2013) ...........................................................................22, 23

*McKenzie v. Wells Fargo Bank, N.A.*,
  931 F. Supp. 2d 1029 (N.D. Cal. 2013) ...................................................................10

*Mendez v. Bank of Am. Home Loans Servicing, LP*,
  840 F. Supp. 2d 639 (E.D.N.Y. 2012) .......................................................................9

*Miller v. Yokohama Tire Corp.*,
  358 F.3d 616 (9th Cir. 2004) .................................................................................14

*Molosky v. Wash. Mut., Inc.*,
  664 F.3d 109 (6th Cir. 2011) ...........................................................................22, 23

*Monroe Retail, Ind. v. RBS Citizens, N.A.*,
  589 F.3d 274 (6th Cir. 2009) .................................................................................18

*Morris v. BMW of North America, LLC*,
  2007 WL 3342612 (N.D. Cal. Nov. 7, 2007) ..........................................................14

*NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*,
  513 U.S. 251 (1995) ..............................................................................................19

*Nguyen v. JP Morgan Chase Bank, N.A.*,
  2013 WL 2146606 (N.D. Cal. May 15, 2013) .........................................................25

*O'Donnell v. Bank of Am.*,
  504 F. App'x 566 (9th Cir. 2013) ...........................................................................20

*Omrazeti v. Aurora Bank FSB*,
  2013 WL 3242520 (W.D. Tex. June 25, 2013) .........................................................6

vi

DEFENDANTS' NOTICE OF MOTION, MOTION FOR SUMMARY JUDGMENT, AND MEMORANDUM OF POINTS AND AUTHORITIES
Civil Case No.:  4:12-cv-03897-YGR

*Or. Pub. Emps.' Ret. Bd. v. Simat, Helliesen & Eichner*,
  83 P.3d 350 (Or. Ct. App. 2004)..................................................................................15

*Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*,
  96 F.3d 1151 (9th Cir. 1996) .......................................................................................5

*Parks v. MBNA Am. Bank, N.A.*,
  54 Cal. 4th 376 (2012) ...............................................................................................19

*Peterson v. Cellco P'ship*,
  164 Cal. App. 4th 1583 (2008) .....................................................................................7

*Prestige Homes Real Estate Co. v. Hanson*,
  951 P.2d 193 (Or. App. 1997)........................................................................................5

*Robinson v. Bank of Am., N.A.*,
  525 F. App'x 580 (9th Cir. 2013) ...............................................................................19

*Rose v. Chase Bank USA, N.A.*,
  513 F.3d 1032 (9th Cir. 2008) ...............................................................................18, 19

*Shilke v. Wachovia Mortg., FSB*,
  820 F. Supp. 2d 825 (N.D. Ill. 2011) ..........................................................................20

*Shipwash v. United Airlines, Inc.*,
  28 F. Supp. 3d 740 (E.D. Tenn. 2014) .........................................................................5

*Silvas v. E*Trade Mortg. Corp.*,
  514 F.3d 1001 (9th Cir. 2008) ..........................................................................22, 23, 24

*Sipe v. Countrywide Bank*,
  2010 WL 2773253 (E.D. Cal. July 13, 2010) ............................................................16

*Smallwood v. Sovereign Bank, F.S.B.*,
  2012 WL 243744 (N.D. W. Va. Jan. 25, 2012) ..........................................................24

*Smith v. Wells Fargo Bank, N.A.*,
  __ F. Supp. 3d. __, 2016 WL 370697 (D. Conn. 2016).............................................19

*Sosa v. DIRECTV, Inc.*,
  437 F.3d 923 (9th Cir. 2006) ......................................................................................14

*Sousa ex rel. Will of Sousa v. Unilab Corp. Class II (Non-Exempt) Members Group
  Benefit Plan*,
  252 F. Supp. 2d 1046 (E.D. Cal. 2002)........................................................................4

*Stitt v. Citibank*,
  2015 WL 9177662 (N.D. Cal. Dec. 17, 2015) ..............................................................9

*Thomas v. OneWest Bank, FSB*,
  2011 WL 867880, at *3-5 (D. Or. Mar. 10, 2011)............................................24

*Tinsley v. OneWest Bank, FSB*,
  4 F. Supp. 3d 805 (S.D. W. Va. 2014).............................................................24

*Tran v. Select Portfolio Servicing, Inc.*,
  2015 WL 1739370 (N.D. Cal. Apr. 14, 2015) ...............................................16

*Valverde v. Wells Fargo Bank, N.A.*,
  2011 WL 3740836 (N.D. Cal. Aug. 26, 2011) ...............................................23

*Vega v. Ocwen Fin. Corp.*,
  2015 WL 1383241 (C.D. Cal. Mar. 24, 2015) ......................................... *passim*

*Vega v. Ocwen Fin. Corp.*,
  2015 WL 3441930 (C.D. Cal. May 28, 2015) .................................................10

*Walker v. Countrywide Home Loans, Inc.*,
  98 Cal. App. 4th 1158 (2002) .......................................................9, 10, 13, 14

*Watters v. Wachovia Bank, N.A.*,
  550 U.S. 1 (2007).........................................................................................18

*Wells Fargo Bank N.A. v. Boutris*,
  419 F.3d 949 (9th Cir. 2005) .........................................................................19

*Westways World Travel, Inc. v. AMR Corp.*,
  265 F. App'x 472 (9th Cir. 2008) ..................................................................15

*Williams v. Wells Fargo Bank, N.A.*,
  2014 WL 1568857 (C.D. Cal. Jan. 27, 2014) ...............................................23

**Statutes**

12 U.S.C. § 24(Seventh) ....................................................................................20

12 U.S.C. § 25b....................................................................................................18

12 U.S.C. § 371....................................................................................................20

12 U.S.C. § 1465..................................................................................................22

Pub. L. 111-203, § 1043......................................................................................22

Pub. L. 111-203, § 1048......................................................................................23

Cal. Bus. & Prof. Code § 17204 .........................................................................15

Cal. Civ. Code § 1788.20.....................................................................................17

1

Cal. Civ. Code § 1788.30 .................................................................................................16, 17

2

**Regulations**

3

12 C.F.R. § 7.4002 .................................................................................................................20

4

12 C.F.R. § 34.4 ...................................................................................................19, 20, 21

5

12 C.F.R. § 545.2 ...................................................................................................................22

6

12 C.F.R. § 560.2 .................................................................................................22, 23, 24

7

8

OCC, *Dodd-Frank Act Implementation*,
   76 Fed. Reg. 43,549 (July 21, 2011) .............................................................................20, 22

9

**Other administrative materials**

10

11

OCC Interpretive Letter 646,
   1994 WL 269165, at * 2-3 (Apr. 12, 1994) .....................................................................20

12

OCC Interpretive Letter 1069,
   2006 WL 4590639, at *1 (Aug. 21, 2006) ......................................................................20

13

**Other authorities**

14

15

Restatement (Third) of Restitution § 2 ...................................................................................5

16

Restatement (Third) of Restitution § 62 .................................................................................7

17

18

19

20

21

22

23

24

25

26

27

28

1

## NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

2      Please take notice that on June 7, 2016, at 2 p.m., in the above-captioned court located at 1301

3   Clay Street, Oakland, California, 94612, Defendants (collectively referred to as "Chase") will move the

4   Court under Federal Rule of Civil Procedure 56 for the entry of summary judgment in their favor.

5      Chase requests the Court enter summary judgment in Chase's favor on all remaining claims

6   asserted against it:  Plaintiffs' claims for unjust enrichment and fraud (Counts Five and Six) and Plaintiff

7   Ellis's additional claims for violations of the UCL and the Rosenthal Act (Counts One and Four).

8              ## INTRODUCTION AND STATEMENT OF ISSUES

9      Now that the Court has denied class certification, the scope of Plaintiffs' remaining claims is

10  narrow.  Plaintiffs are three individual borrowers who were delinquent on their mortgage loans for a

11  total of 173 months.  During those 173 months, Chase conducted 45 inspections of the properties that

12  secured Plaintiffs' loans to ensure that the loan collateral was adequately protected.  Plaintiffs were

13  charged for only 24 of those inspections, and they paid just six of the 24 charges for a total of $63.15 in

14  payments.  Plaintiffs seek recovery of these payments on fraud and unjust enrichment theories, and also

15  seek unspecified relief with respect to $224 in inspection charges they did not pay.  In addition, the lone

16  California plaintiff in this action—Diana Ellis—asserts related claims under California's Unfair

17  Competition Law ("UCL") and the Rosenthal Unfair Debt Collection Practices Act.

18     Chase is entitled to summary judgment on all of these claims for an overarching reason:  all of

19  the charges at issue were authorized by Plaintiffs' loan agreements.  Specifically, Sections 9 and 14 of

20  Plaintiffs' mortgage deeds of trust provide that, in the event of a default on the mortgage loan, Plaintiffs

21  may be charged for the reasonable costs of property inspections conducted "for the purpose of protecting

22  [the] Lender's interest in the [mortgaged] Property."  (*See* Defs.' Statement of Undisputed Material

23  Facts ("Fact(s)") 5-6.)  All 24 inspections charged to Plaintiffs are encompassed by that language:

24  Plaintiffs were charged only for the actual costs of property inspections that were undertaken for the

25  purpose of protecting against potential risks to the mortgaged properties.  Because these charges were

26  contractually authorized, Plaintiffs' claims all fail as a matter of law.  *See, e.g.*, *Vega v. Ocwen Fin.*

27  *Corp.*, 2015 WL 1383241, at *3 (C.D. Cal. Mar. 24, 2015) (dismissing virtually identical claims).

28

1    Plaintiffs' claims also fail on additional grounds.  The unjust enrichment claims fail because

2 (i) they are barred by the existence of written contracts that govern the charges at issue, (ii) two of the

3 three Plaintiffs have never paid a single inspection charge, and (iii) the $63.15 in charges that were

4 actually paid did not "enrich" Chase but instead merely reimbursed it for the sums it paid its inspection

5 vendors.  The fraud and UCL claims fail because Chase made no misrepresentation—much less a

6 knowing or intentional misrepresentation—that caused any injury to Plaintiffs.  Finally, the Rosenthal

7 Act claim is barred by, among other reasons, the fact that Chase made no actionable "debt collection"

8 efforts within the meaning of the Rosenthal Act.

9    Federal banking law provides yet another reason why Plaintiffs' claims fail as a matter of law.

10 The National Bank Act and the Home Owners' Loan Act grant Chase broad authority to service

11 Plaintiffs' mortgage loans, to charge fees for its servicing activities, and to determine how to disclose

12 those fees.  Under controlling Ninth Circuit precedent, Plaintiffs' attempt to subject Chase to state-law

13 liability based on the way it exercised this federal banking authority is preempted by federal law.

**BACKGROUND**

**A.      Chase's Property Inspection Practices.**

16    When a borrower becomes delinquent on his or her mortgage loan, the lender's ability to recover

17 the loan balance may depend on the value of the property securing the loan.  (JOLLEY0025-27.)

18 Furthermore, delinquency increases the risk that the mortgaged property will decline in value:

19 delinquent borrowers may abandon the property or may lack the means or the motivation to maintain

20 and preserve the property.  (JOLLEY0025; JOLLEY0171-73, Evans Decl. ¶ 14.)  For example,

21 borrowers who anticipate a foreclosure sale may have no incentive to continue maintaining a property.

22 (JOLLEY0025; Evans Decl. ¶ 14.)

23    To assess and manage the risks associated with delinquency, Chase periodically inspects the

24 property that secures delinquent mortgage loans.  (Evans Decl. ¶¶ 9-11, 15, 25.)  If an inspection

25 indicates that a property has been abandoned or needs maintenance, Chase takes appropriate steps to

26 protect the property.  (JOLLEY0025; Evans Decl. ¶¶ 12, 14, 17, 42-43; EVANS0021-23.)  Furthermore,

27 even if an initial inspection indicates that a property is occupied and in good condition, Chase often

28 conducts follow-up inspections to make sure that circumstances at the property have not worsened over

2

1   time.  (Evans Decl. ¶ 42; JOLLEY0027-31; 65-67; 176-77; 106-107.)  For instance, even if a mortgage

2   servicer has confirmed that a property continues to be occupied after a delinquency, prudent practice

3   requires services to conduct periodic follow-up inspections if, among other things, the property is tenant-

4   occupied, foreclosure proceedings have begun, there are reports of damage at the property, the borrower

5   makes no commitment to resolve the delinquency, or the borrower breaches a repayment promise.

6   (JOLLEY0029-30; 90-91; 171, 173-74, 176, 178-83.)

7       Like all major mortgage servicers, Chase uses software systems to manage the process of

8   ordering, reviewing, and charging borrowers for property inspections.  (Evans Decl. ¶ 9; Slifko Decl.

9   ¶ 7; JOLLEY0141-46; 202-03.)  Chase's systems are programmed to account for a variety of factors,

10  including the circumstances of the borrower and the property and the particular guidelines of the

11  relevant investor in the loan (*e.g.*, Fannie Mae, Freddie Mac, or a private investor).  (Evans Decl. ¶¶ 6-

12  19, 25, 28, 31-40, 42-43; EVANS0019-20; Slifko Decl. ¶¶ 6-11, 16-18; JOLLEY0141-47, 155-64; 202-

13  19.)  Although Chase relies on third-party vendors to conduct property inspections, all inspection results

14  are transmitted to Chase's mortgage servicing system and used in determining whether measures must

15  be taken to maintain or secure the property.  (Facts 29, 53, 64.)

16      **B.      Plaintiffs' Mortgage Agreements And Property Inspection Charges.**

17      Plaintiffs Diana Ellis, Ronald Lazar, and James Schillinger each entered into a mortgage loan

18  agreement with Chase or a Chase predecessor.  (Facts 1-3, 84, 87-88.)  All three loan agreements

19  provide that in the event of a delinquency, the borrower will be responsible for the reasonable costs of

20  any property inspections undertaken for the purpose of protecting the lender's interest in the mortgaged

21  property:

22          **9.  Protection of Lender's Interest in the Property and Rights Under
            this Security Instrument.**  If . . . Borrower fails to perform the covenants
23          and agreements contained in this Security Instrument . . . then <u>Lender may
            do and pay for whatever is reasonable or appropriate to protect Lender's</u>
24          <u>interest in the Property</u> and rights under this Security Instrument,
            including protecting and/or assessing the value of the Property, and
25          securing and/or repairing the Property. . . . <u>Any amounts disbursed by
            Lender under this Section 9 shall become additional debt of Borrower</u>
26          <u>secured by this Security Instrument.</u>
27              *  *  *

28

**14. Loan Charges.** <u>Lender may charge Borrower fees</u> for services performed in connection with Borrower's default <u>for the purpose of protecting Lender's interest in the Property</u> and rights under this Security Instrument, <u>including,</u> but not limited to, attorneys' fees, <u>property inspection</u> and valuation <u>fees.</u>

(Facts 5-6 (emphasis added).)

All three Plaintiffs defaulted on their mortgage loans.  (Facts 13, 33, 55.)  Collectively, they remained in default for at least 173 months.  (Facts 13, 33, 55.)  Plaintiffs' properties were inspected 45 times over the course of those 173 months; 24 of those inspections were charged to their loan accounts; and 18 of those 24 charges were never paid by plaintiffs.  (Facts 14-16, 18-20, 34-36, 38, 56-57, 59.)

In all 23 instances in which Chase charged Plaintiffs for property inspections, it charged only the actual amount it paid a vendor to conduct the inspection; it never added a "profit markup."  (Facts 17, 37, 58.)  Plaintiffs nevertheless allege that Chase is liable in fraud, unjust enrichment, and under the UCL and the Rosenthal Act for seeking reimbursement of the sums it paid its vendors to conduct the 23 inspections.

## PROCEDURAL STANDARD

To withstand summary judgment, Plaintiffs must "go beyond the pleadings and . . . designate specific facts showing that there is a genuine issue for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  "[W]here the case turns on a mixed question of fact and law and the only dispute relates to the legal significance of the undisputed facts, the controversy for trial collapses into a question of law suitable for disposition on summary judgment."  *Sousa ex rel. Will of Sousa v. Unilab Corp. Class II (Non-Exempt) Members Group Benefit Plan*, 252 F. Supp. 2d 1046, 1049 (E.D. Cal. 2002).

## ARGUMENT

### I.   SUMMARY JUDGMENT IS WARRANTED ON PLAINTIFFS' UNJUST ENRICHMENT CLAIMS.

Plaintiffs allege that Chase unjustly enriched itself by charging them for delinquency-related property inspections without any contractual right to do so.  (First Am. Compl. ("FAC") ¶¶ 96, 146, 152, 162.)  Indeed, Plaintiffs have consistently asserted that their unjust enrichment claims rest on the premise that Chase charged them for property inspections "in violation of the reasonable or appropriate

1   language" in their loan agreements, *i.e.*, the language requiring them to pay for inspections that are

2   "reasonable or appropriate" for purposes of protecting the lender's interest in the property.  (Sept. 1,

3   2015 Oral Arg. Tr. at 10:15-18 (Doc. 217)); *see also* Doc. 172-3 at 17 ("The seminal issue in this case is

4   whether Defendants' practices violate the . . . Uniform Mortgage Contract" executed by Plaintiffs).)

5   These claims fail as a matter of law for the following reasons.

6       **A.    The Unjust Enrichment Claims Are Barred by the Existence of Written Contracts.**

7           As a threshold matter, Plaintiffs' unjust enrichment claims are barred because their mortgage

8   agreements expressly address the question of when they may be charged for delinquency-related

9   property inspections:  Chase may charge Plaintiffs for the reasonable costs of inspections that are

10  conducted to protect the lender's interest in the property.  (Facts 4-6.)

11          It is hornbook law that a party to a contract cannot use an unjust enrichment theory to vary its

12  rights and obligations under the contract.  *See* Restatement (Third) of Restitution & Unjust Enrichment

13  § 2(2); *id.* § 2 cmt. c.  All three Plaintiffs' states of residence have each adopted that proposition.[1]  Thus,

14  if Plaintiffs believe that Chase charged them for property inspections "in violation of the reasonable or

15  appropriate language" in their loan agreements (Sept. 1, 2015 Oral Arg. Tr. at 10:15-18), they are free to

16  assert a breach of contract claim, but they have no right to sue for unjust enrichment. *See, e.g.*, *Hill v.*

17  *Nationstar Morg. LLC*, 2015 WL 4478061, at *2-3 (S.D. Fla. July 2015) (dismissing similar unjust

18  enrichment claim because "the alleged enrichment was the alleged overcharging of property inspection

19  fees pursuant to the terms of the mortgage contract").

20          Plaintiffs counter that they have no contractual relationship with Chase because Chase is merely

21  their mortgage servicer and not their lender, but that argument is specious.  Plaintiffs' mortgage

22  agreements expressly contemplate that lenders may rely on a "Loan Servicer" to collect payments and

23  "perform[] other mortgage loan servicing obligations under the Note, this Security Instrument, and

24  Applicable Law."  (DEVINE0012, 30, 68.)  Furthermore, Chase and its predecessor Washington Mutual

25

26  _____

    [1]      *See Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1167 (9th Cir. 1996); *Prestige*

27  *Homes Real Estate Co. v. Hanson*, 951 P.2d 193, 195 (Or. App. 1997); *Shipwash v. United Airlines,*
    *Inc.*, 28 F. Supp. 3d 740, 756-57 (E.D. Tenn. 2014).

28

1    were the original lenders on Plaintiffs' loans (Facts 84, 87-88), and Section 20 of their loan agreements

2    provides that even if the loans are sold, Chase may continue to service the loan unless the sale

3    agreement provides otherwise.[2]   That is precisely what happened:  when Plaintiffs' loans were sold and

4    securitized, Chase remained Plaintiffs' servicer.  (Facts 85-86, 89.)  Under these circumstances, courts

5    have repeatedly dismissed unjust enrichment claims asserted against loan servicers.  *See Omrazeti v.*

6    *Aurora Bank FSB*, 2013 WL 3242520, at *19 (W.D. Tex. June 25, 2013) (dismissing unjust enrichment

7    claim against servicer when the claim "ar[ose] out of the very same subject matter governed by the

8    Notes and Deeds of Trust"); *Lomely v. JP Morgan Chase Bank, Nat'l Ass'n*, 2012 WL 4123403, at *5

9    (N.D. Cal. Sept. 17, 2012) ("[T]he governing contractual documents [including the original Deed of

10   Trust] define the parties' rights and obligations, thus precluding recovery for unjust enrichment.");

11   *Contreras v. Master Fin., Inc.*, 2010 WL 4608300, at *4 (D. Nev. Nov. 4, 2010) ("[T]he loan servicers'

12   . . . rights . . . arise from the mortgage note, deed of trust, and subsequent transfers of rights related to

13   these documents to which [borrower] is a party."); *see also Granite Partners, L.P. v. Bear, Stearns &*

14   *Co.*, 17 F. Supp. 2d 275, 311 (S.D.N.Y. 1998) (unjust enrichment claims barred "whether the contract is

15   one between parties to the lawsuit, or where one party to the lawsuit is not a party to the contract").

16          This Court's motion-to-dismiss ruling (Doc. 31) supports Chase's argument.  When that ruling

17   issued, Plaintiffs were pursuing a profit mark-up theory.  (*See, e.g.*, Doc. 11 at 25; Compl. ¶¶ 133-36.)

18   The Court therefore found that it was "premature for the Court to take a position on whether this action

19   derives from the subject matter of the agreements such that a claim for unjust enrichment is

20   unavailable," and cited a case permitting an unjust enrichment claim "where banks collected and

21   retained excessive [i.e., marked-up] fees." (Doc. 31 at 35.)  Discovery now has shown that Plaintiffs

22   were not charged a profit markup (Facts 17, 37, 58), and Plaintiffs thus have fallen back to the theory

23   that Chase "violat[ed] . . . the reasonable or appropriate language in the contracts."  (Sept. 1, 2015 Oral

24

25   [2]      *See* Fact 11 ("If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than

26   the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the
     Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser

27   unless otherwise provided by the Note purchaser.").

28

Arg. Tr. at 10:15-18.)  Because this claim "derives from the subject matter of the [mortgage] agreements" (Doc. 31 at 35), no unjust enrichment claim is available.

**B.    Chase Was Not "Unjustly Enriched" By Payments That Merely Reimbursed It For Out-Of-Pocket Expenditures.**

Plaintiffs' unjust enrichment claims also fail because Chase was not unjustly enriched by inspection charges that merely reimbursed it for the sums it paid its inspection vendors.  For an unjust enrichment claim to succeed, it is not enough for a plaintiff to allege "a benefit that results in the unjust enrichment of the recipient when viewed in isolation."  Restatement (Third) of Restitution & Unjust Enrichment § 62.  "The baseline from which unjust enrichment is measured, in other words, is not the moment before the challenged payment but a point preceding other transactions between [the parties]." *Id.* § 62 cmt. b.  Whether Chase was "enriched" must therefore be viewed from the perspective of the positions the parties would occupy *if Plaintiffs had not defaulted on their loans and Chase had thus incurred no property inspection costs*.  From that perspective, Chase has not been enriched in the slightest; rather, the charges it assessed to Plaintiffs at best will restore it to the position it occupied ex ante.  (Facts 72-73.)  Plaintiffs' unjust enrichment claims therefore fail.  *See* Restatement (Third) of Restitution & Unjust Enrichment § 62 & cmt. b; *Bennett v. Visa U.S.A. Inc.*, 198 S.W.3d 747, 756 (Tenn. App. 2006) (holding that enrichment is not "unjust" if the defendant "has given any consideration *to any person* for the benefits received from the plaintiff" (emphasis added) (internal quotation marks omitted)); *Am. Movie Classics v. Rainbow Media Holdings*, 508 F. App'x 826, 833 (10th Cir. 2013) (defendant's payment to third party of money sought by plaintiff precludes unjust enrichment claim).

**C.    Plaintiffs Cannot Recover In Unjust Enrichment For Charges They Did Not Pay.**

Although unjust enrichment claims require that the plaintiff confer a "benefit" on the defendant,[3] Lazar and Schillinger conferred no benefit on Chase because they did not pay a single inspection charge. (Facts 67-68.)  Admittedly, a government program paid certain charges on the Schillinger loan (Fact 69),

---

[3]      *See Peterson v. Cellco P'ship*, 164 Cal. App. 4th 1583, 1593 (2008); *Jaqua v. Nike, Inc.*, 865 P.2d 442, 445 (Or. App. 1993); *Freeman Indus., LLC v. Eastman Chemical Co.*, 172 S.W.3d 512, 525 (Tenn. 2005).

but the government's payment cannot sustain Schillinger's unjust enrichment claim under the governing law of Tennessee.  (Facts 69-71.)  Rather, Tennessee law requires a benefit "conferred upon the defendant *by the plaintiff*," *Bennett*, 198 S.W.3d at 755 (emphasis added), and bars Schillinger from recovering money that was never his in the first place, *see Freeman Indus.*, 172 S.W.3d at 525 ("[T]he underlying principle of the doctrine of unjust enrichment is that party who receives a benefit . . . must compensate *the provider of the benefit*." (emphasis added)).

### D.   Plaintiffs' Inspection Charges Were Not "Unjust" Because They Were Authorized By Plaintiffs' Mortgage Agreements.

Finally, and most fundamentally, Plaintiffs' unjust enrichment claims fail because their loan agreements expressly require them to pay any reasonable property inspection charges in the event of a delinquency.  Each inspection charged to Plaintiffs meets this contractual standard, and consequently Chase could not have been "unjustly" enriched.

### 1.   Inspecting the property securing delinquent mortgage loans is "reasonable or appropriate" as a matter of law.

Plaintiffs' loan agreements clearly define property inspection charges as charges that are "reasonable or appropriate" in the event of a delinquency.  Specifically, Section 9 of those agreements states that, if a delinquency occurs, Chase may "do and pay for whatever is reasonable or appropriate" to protect the value of the mortgaged property, and that "[a]ny amounts disbursed by Lender under this Section 9 shall become additional debt of borrower."  (Fact 5.)  Section 14 goes on to provide that Chase "may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, *including, but not limited to, . . . property inspection . . . fees*."  (Fact 6 (emphasis added)).  Section 14 thus "unequivocally states that property inspection fees are fees accrued 'for the purpose of protecting Lender's interest in the Property.'"  *Vega*, 2015 WL 1383241, at *3.  "When Paragraphs 9 and 14 are read together, it appears that [Plaintiffs'] mortgage *defines* property inspections as reasonable acts."  *Id.* at *4.

Relying on this contractual language, courts have repeatedly held "that mortgages including this paragraph 14 make property inspection fees reasonable in all circumstances" and "permit[] defendants to charge plaintiffs for property inspections without any reasonableness or appropriateness requirement."

*Stitt v. Citibank*, 2015 WL 9177662, at *5 n.6 (N.D. Cal. Dec. 17, 2015) (Gonzalez Rogers, J.) (citing *Vega*, 2015 WL 1383241, at *4 and *Benner v. Bank of Am., N.A.*, 917 F. Supp. 2d 338, 353 (E.D. Pa. 2013)).  For example, as the court in *Vega* explained in dismissing essentially identical claims, "the terms of the mortgage agreement do not mandate a reasonableness determination before [a servicer] can conduct a property inspection—the terms merely state that property inspections are reasonable and appropriate acts in the event of a default."  *Vega*, 2015 WL 1383241, at *4.  Similarly, in *Walker*, the California Court of Appeal held that the contractual language at issue "'unequivocally permits' [a bank] to charge [borrowers] with the reasonable cost of the property inspections," and thus upheld a mortgage servicer's right to charge a borrower for 13 property inspections conducted 30 days apart.  *Walker v. Countrywide Home Loans, Inc.*, 98 Cal. App. 4th 1158, 1177 (2002).  Other courts likewise have held that mortgage agreements give servicers a clear contractual right to charge borrowers for periodic inspections of the property that secures delinquent mortgage loans.  *See Galvin v. EMC Mortgage Corp.*, 2014 WL 4980905, at *10-11 (D.N.H. Oct. 3, 2014) (26 inspections over three-year period not unreasonable); *Kheder v. Seterus, Inc.*, 2013 WL 1286020, at *4-6 (Mich. Ct. App. Mar. 28, 2013) (more than three inspections in three-month period not unreasonable); *see also Mendez v. Bank of Am. Home Loans Servicing, LP*, 840 F. Supp. 2d 639, 656-57 (E.D.N.Y. 2012) (mortgage agreement authorized property inspection fees); *Benner*, 917 F. Supp. 2d at 353-54 (servicer did not violate the FDCPA by charging for monthly property inspections); *Mann v. Chase Manhattan Mortg. Corp.*, 2002 WL 32157516, at *5 (D.R.I. Mar. 7, 2002) (mortgage agreement authorized property inspection fees); *Majchrowski v. Norwest Mortg., Inc.*, 6 F. Supp. 2d 946, 964-67 (N.D. Ill. 1998) (same).

Plaintiffs cannot identify anything unique or objectionable about their property inspections that distinguishes this case from *Vega*, *Walker*, and *Galvin*.  To the contrary, all of Plaintiffs' inspections occurred while they were delinquent; all occurred at reasonable intervals; and all were conducted "for the purpose of protecting Lender's interest in the Property," as expressly permitted by Section 14.  (Facts 6, 12-29, 31-53, 55-64.)  Indeed, Chase had no other reason to conduct the inspections:  it earns no profit and often loses money on property inspections.  (Facts 67-68, 72-73.)  Chase also was far more discriminating than the servicers whose charges were sustained in the cases discussed above.  Whereas those servicers "automatically" charged their customers for "monthly" inspections, *see, e.g., Galvin*,

2014 WL 4980905, at *10-11; *see also Walker*, 98 Cal. App. 4th at 1165, Chase conducted only 45 inspections during Plaintiffs' 173 months of delinquency and charged Plaintiffs for only 24 of those inspections.  (Facts 14-16, 18, 34, 36, 56-57; Evans Decl. ¶¶ 44-48; JOLLEY0041-46; 72-74.)  For all these reasons, the inspections charged to Plaintiffs are "reasonable or appropriate" as a matter of law.

Furthermore, although Plaintiffs have asserted that subsequent inspections are unreasonable if an initial inspection indicates that a property is occupied (Doc. 228-3 at 4-7), that is plainly incorrect.  Rather, as the *Walker* court observed, the fact that a property is occupied and in good condition at the time of an initial inspection provides no guarantee that it will remain so:

> The status and ability of a borrower unable to make monthly loan payments is uncertain and conceivably could change from month to month.  Such a borrower might be unable to maintain the property and is less likely to occupy the property than a borrower current on a loan.

*Walker*, 98 Cal. App. 4th at 1176.  In other words, "*Walker* specifically approved *automated* monthly property inspections 'even if an initial inspection reveals that the home continues to be occupied and maintained.'"  *Vega*, 2015 WL 1383241, at *10 (quoting *Walker*, 98 Cal. App. 4th at 1176); *see also Galvin*, 2014 WL 4980908, at *5 (servicers are "not required to blindly accept [a borrower]'s representations that he was living in the property even though he had not paid his mortgage in months, and unannounced visits were more likely than announced ones to reveal the actual condition of the property").  Schillinger's experience confirms the wisdom of such follow-up inspections:  he previously abandoned a property in Ohio and defaulted on that loan.  (Fact 65.)

Any alleged failure to comply with Fannie Mae's servicing guidelines would not alter these conclusions.  First, the Ellis and Schilling loans are not Fannie Mae loans.  (Facts 30-66.)  Second, even as to Fannie Mae loans, "[t]he law is clear—an alleged violation or breach of the Fannie Mae Servicing Guide does not give rise to any cause of action."  *Vega v. Ocwen Fin. Corp.*, 2015 WL 3441930, at *4 (C.D. Cal. May 28, 2015) (collecting cases); *see also McKenzie v. Wells Fargo Bank, N.A.*, 931 F. Supp. 2d 1029, 1044 (N.D. Cal. 2013) ("[F]ederal courts have uniformly concluded, to the extent that the . . . servicing guidelines can be read as creating enforceable contractual duties, that borrowers are neither parties nor third-party beneficiaries entitled to enforce the . . . servicing guidelines.").

10

DEFENDANTS' NOTICE OF MOTION, MOTION FOR SUMMARY JUDGMENT, AND MEMORANDUM OF POINTS AND AUTHORITIES
Civil Case No.:  4:12-cv-03897-YGR

2.      **Plaintiffs' specific inspection charges were especially reasonable.**

A charge-by-charge analysis of Plaintiffs' inspection charges reinforces the conclusion that those charges were "reasonable or appropriate" for purposes of protecting the lender's interest in Plaintiffs' properties.  Each of those charges falls easily within the range of charges that courts and the parties' experts have deemed appropriate.

Diana Ellis.  Although Ellis was delinquent on her loan for at least 67 months, Chase inspected her property only 26 times; it charged her loan account for only eight of those inspections; and two of the eight charges were later waived in connection with her loan modification.  (Facts 13, 16, 20.)  Ellis paid the six remaining inspection charges totaling $63.15.  (Facts 18-19.)

All six of these charges were reasonable, appropriate, and authorized by Ellis's loan agreements.  All six inspections occurred while Ellis was delinquent on her loan, and all occurred after Ellis either failed to respond to attempts to contact her or failed to make a commitment to cure the delinquency.  (Facts 12, 21-26.)  Furthermore, two of these inspections were ordered after Ellis bounced two consecutive payment checks (Facts 23-24), and a third was ordered after Chase was forced to advance at least $26,713 in past-due property taxes to avoid a tax lien on Ellis's property (Fact 25).

Under these circumstances, it is beyond genuine dispute that the charges at issue are reasonable.  (JOLLEY0039-42; 82-84.)  Indeed, there is no dispute about that question among the parties' experts: Chase's expert opined that Ellis's charges were reasonable (JOLLEY0039-42; 82-84), whereas plaintiff's expert declined to offer any opinion on those charges (JOLLEY0184).[4]  Moreover, even on facts that are far more favorable to the borrower than those at issue here, courts have held that inspection charges are reasonable.  *See, e.g.*, *Galvin*, 2014 WL 4980905, at *4-5 (26 inspections over three-year period not unreasonable even though borrower was "'constantly' in contact with [bank]" and "had informed [bank] that he was living in the property"); *Mann*, 2002 WL 32157516, at *5 (23 inspections charged to mortgagor were "necessary to protect the value of the Property").

---

[4]      Moreover, Plaintiff's expert acknowledged that inspections generally are reasonable where, as here, a borrower "is not cooperating" or breaks payment promises.  (JOLLEY0178, 182-83.)

11

DEFENDANTS' NOTICE OF MOTION, MOTION FOR SUMMARY JUDGMENT, AND MEMORANDUM OF POINTS AND AUTHORITIES
Civil Case No.:  4:12-cv-03897-YGR

1    <u>Ronald Lazar</u>.  Although Lazar was delinquent for at least 63 months, Chase charged him for

2    only 12 property inspections, and none of those charges was ever paid.  (Facts 33, 36, 38.)

3        The first two inspections—those conducted in June and September 2010—were reasonable

4    because they were conducted after (i) Lazar had gone more than a year without making a mortgage

5    payment, (ii) his request for a loan modification had been denied, and (iii) he had made no commitment

6    to resolve the delinquency.  (Facts 39-40.)  These circumstances present heightened risks of

7    abandonment or deterioration of mortgaged property that make inspections especially reasonable.

8    (JOLLEY0042-44; 85-86; 178.)

9        The remaining ten inspections—those occurring in 2011 and 2012—were reasonable as well.

10   (Facts 41, 43, 45-52.)  Two of these inspections were ordered after Lazar failed to respond to attempts to

11   contact him and after Chase discovered that his phone had been disconnected.  (Facts 41, 43.)  The other

12   eight occurred while the property was in active foreclosure proceedings.  (Facts 44-52.)  Finally, all ten

13   inspections found that the main building on Lazar's two-dwelling property—a building that Lazar

14   testified he was attempting to rent to a tenant—was vacant.  (Facts 42-43, 45-52; JOLLEY0167-68; 49;

15   112.)  Both sides' experts agree that heightened risks of loss exist—and inspections are reasonable and

16   appropriate—when the property that secures a delinquent loan is vacant, rented to a third party, or in

17   active foreclosure proceedings, or when the borrower fails to respond to the servicer's attempts to make

18   contact.  (JOLLEY0042-44; 85-88; 172-74, 176, 178-81; 106-07.)[5]

19       <u>James Schillinger</u>.  During the 43 months in which Schillinger was delinquent, Chase inspected

20   his property six times and charged his loan account for four of those inspections.  (Facts 55, 57.)  None

21   of these charges was paid by Schillinger.  (Facts 59.)

22

23   _____

24   [5]    Although Fannie Mae guidelines are irrelevant here, *supra* at 10, the inspections described above
     are consistent with those guidelines.  Fannie Mae guidelines require inspections when a borrower is not
25   in communication with the servicer or fails to make a commitment to bring the mortgage current.
     (JOLLEY0001-08, 09-16, 17-18.)  They also require monthly inspections when a property is vacant,
26   tenant-occupied, or in foreclosure proceedings.  (JOLLEY009-16; 106-07 ("monthly property
     inspections are ... required by Fannie Mae ... when ... the loan is in foreclosure"); JOLLEY0087.)
27   Finally, the guidelines permit such inspections to "be recovered from the borrower."  (JOLLEY0019.)

28

DEFENDANTS' NOTICE OF MOTION, MOTION FOR SUMMARY JUDGMENT, AND MEMORANDUM OF POINTS AND AUTHORITIES
Civil Case No.:  4:12-cv-03897-YGR

1

Two of the four inspection charges occurred after Schillinger reported that he was not occupying

2

his home because it was "unlivable at the moment" due to a water leak.  (Facts 60-61.)  The parties'

3

experts agree that inspections are reasonable where, as in Schillinger's case, the borrower is delinquent

4

and the servicer learns that the property has been damaged or vacated.  (JOLLEY0171, 176; 44-48; 88-

5

89.)

6

The two remaining charges likewise were reasonable and appropriate.  Chase inspected

7

Schillinger's property in February 2012 after Schillinger had gone more than 30 days without making a

8

payment required by a repayment plan.  (Fact 62.)  Both sides' experts agree that inspections are

9

reasonable when a borrower defaults on a repayment plan.  (JOLLEY0047-48; 89; 182-83.)  Chase

10

inspected the property again in February 2013, after (i) Schillinger's temporary forbearance agreement

11

expired, (ii) his request for a loan modification was denied, and (iii) he made no commitment to bring

12

his loan current.  (Facts 63.)  Again, property inspections are reasonable and appropriate under these

13

circumstances.  (JOLLEY0178; 45-48; 90.)

14

## II.   SUMMARY JUDGMENT IS WARRANTED ON PLAINTIFFS' FRAUD AND UCL CLAIMS.

15

Plaintiffs assert two types of fraud and UCL claims:  non-disclosure claims and

16

misrepresentation claims.  Plaintiffs' non-disclosure claims allege that, although Chase disclosed

17

inspection charges on monthly loan statements and other notices, those disclosures were not sufficiently

18

clear or itemized as to "the nature of the charges and fees assessed."  (FAC ¶ 163.)  As discussed in Part

19

IV.A.2, however, controlling Ninth Circuit precedent holds that all such non-disclosure claims are

20

preempted by federal banking law.

21

Plaintiffs' misrepresentation claims assert that Chase committed common law fraud and violated

22

the "fraudulent" prong of the UCL by implicitly representing that it had the contractual authority to

23

impose inspection charges on Plaintiffs when in fact it lacked that authority.[6]  (*See* FAC ¶¶ 101, 164-65

24

25

---

26

[6]     Ellis's UCL claim focuses on the "fraudulent" prong of the UCL.  (FAC ¶¶ 100-101.)  Any attempt to assert claims under the UCL's "unlawful" or "unfair" prongs necessarily fails.  *See, e.g.*, *supra* at 8-13; *Walker*, 98 Cal. App. 4th at 1171-78 (finding that periodic property inspections made pursuant to a similar mortgage agreement did not violate any prong of the UCL); *Vega*, 2015 WL

27

28

(continued…)

13

1    ("Defendants further conceal their scheme by telling borrowers, in statements and other documents, that

2    such fees are 'allowed by [borrowers'] Note and Security Instrument.'" (alteration in original)); Dkt. No.

3    169-1 ("Defendants' monthly mortgage statements misrepresented to homeowners that the fees were

4    valid charges.").)   These claims fail as a matter of law for several reasons.

5          *First*, all of Plaintiffs' inspections charges were authorized by their loan agreements, *see supra* 8-

6    13, and consequently there were no fraudulent statements that could support a fraud or UCL claim.  *See*

7    *Walker*, 98 Cal. App. 4th at 1178 (rejecting similar claims when mortgage agreements authorized fees).

8          *Second*, Plaintiffs' claims merely assert that Chase committed misrepresentations of *law*, *i.e.*, it

9    supposedly misrepresented its contractual authority to impose the charges at issue.  "It is well

10   established, however, that misrepresentations of the law are not actionable as fraud . . . ."  *Sosa v.*

11   *DIRECTV, Inc.*, 437 F.3d 923, 940 (9th Cir. 2006); *accord Miller v. Yokohama Tire Corp.*, 358 F.3d

12   616, 621 (9th Cir. 2004).  Similarly, an alleged misrepresentation of contractual authority cannot support

13   a UCL claim.  *See Vega*, 2015 WL 1383241, at *4, 10-11.  In *Vega*, the same lawyers that represent

14   Plaintiffs here "trie[d] to spin a breach of contract claim into a fraud case" by arguing that the defendant

15   had misrepresented its contractual authority to impose property inspection charges.  *Id*. at *4.  The court

16   rejected that claim as a matter of law, reasoning that:

17                  [Plaintiff's] theory of wrongdoing is a dispute over the contractual
18                  language in the mortgage agreement and fully resolved by the agreed-upon
                    contract between the parties.  The Court will not allow [Plaintiff] to
19                  artfully plead this contract dispute as a fraud case.

20   *Id.* at *5; *see also id.* at *10 (dismissing UCL claim and reasoning that "[t]here is simply no deception

21   because [defendant] failed to concede a breach of contract"); *Walker*, 98 Cal. App. 4th at 1171-78

22   (dismissing similar UCL claim).

23

24

25   1383241, at *8-11 (reaching same result); *see also Morris v. BMW of N. Am., LLC*, 2007 WL 3342612,

26   at *8 (N.D. Cal. Nov. 7, 2007) ("[T]he unfairness prong [of the UCL] must be tethered to some
     legislative policy, otherwise the courts will roam across the landscape of consumer transactions picking

27   and choosing which they like and which they dislike.").

28

1    *Third*, Plaintiffs cannot show that Chase *intentionally* misrepresented its contractual authority to

2    impose the charges at issue or *knew* its alleged misrepresentations were false, as they must to sustain

3    their fraud claims.  *See, e.g.*, *Alliance Mortg. Co. v. Rothwell*, 10 Cal. 4th 1226, 1239 (1995); *Or. Pub.*

4    *Emps.' Ret. Bd. v. Simat, Helliesen & Eichner*, 83 P.3d 350, 359 (Or. Ct. App. 2004); *Black v. Black*,

5    166 S.W.3d 699, 705 (Tenn. 2005).  Chase never knowingly or intentionally imposed any charges on

6    Plaintiffs that it had no right to impose.  (Fact 74.)  Furthermore, Chase had a reasonable, good-faith

7    basis for asserting that the charges assessed to Plaintiffs were authorized by Plaintiffs' loan documents.

8    *See supra* at 8-13.  Thus, at best for Plaintiffs, Chase simply made a good-faith mistake with respect to

9    the scope of its contractual authority to charge them for property inspections—and that is not enough to

10   support a fraud claim.  *See Westways World Travel, Inc. v. AMR Corp.*, 265 F. App'x 472, 474 (9th Cir.

11   2008) (rejecting fraud claim based on evidence that defendant "communicated its interpretation of the

12   contracts to [plaintiffs] and demanded payment pursuant to this interpretation").

13   *Fourth*, Ellis's claims fail because she cannot show that she relied on Chase's alleged

14   misrepresentations.  Although Chase communicated its so-called "misrepresentations" through monthly

15   loan statements showing the amounts due on Ellis's loan account (*e.g.*, FAC ¶ 60), Ellis admitted at her

16   deposition that she had no memory of paying an inspection charge as a result of reviewing a loan

17   statement.  (Facts 75-76.)  Furthermore, when asked specifically about the July 2011 statement cited in

18   her complaint, Ellis had no memory of making a payment in response to that statement.  (Facts 76.)

19   Ellis's inability to testify that she paid an inspection fee in response to an alleged misrepresentation

20   precludes her from satisfying either the reliance element of a fraud claim, *see Cadlo v. Owens-Illinois,*

21   *Inc.*, 125 Cal. App. 4th 513, 519 (2004), or the standing and causation requirements of her UCL claim,

22   *see* Cal. Bus. & Prof. Code § 17204 (plaintiff must have "lost money or property *as a result of*" the

23   challenged conduct (emphasis added)); *Brazil v. Dole Food Co., Inc.*, 2013 WL 5312418, at *9 (N.D.

24   Cal. Sept. 23, 2013) (plaintiff lacked UCL standing when he made no allegation that "he either viewed

25   or relied on" alleged misrepresentation).

26   *Finally*, Plaintiffs cannot base their fraud claims on inspection charges that they did not actually

27   pay.  Oregon, Tennessee, and California all require proof of detrimental reliance and injury to sustain a

28   fraud claim.  *See Simat*, 83 P.3d at 359; *Black*, 166 S.W.3d at 705; *Cadlo*, 125 Cal. App. 4th at 519;

1    *Alliance*, 10 Cal. 4th at 1240.  Since Lazar and Schillinger never paid an inspection charge (Facts 77-

2    78), all of their fraud claims should be dismissed.

3    **III.    SUMMARY JUDGMENT IS WARRANTED ON ELLIS'S ROSENTHAL ACT CLAIM.**

4            Ellis's Rosenthal Act claim alleges that Chase engaged in unlawful debt collection efforts by

5    sending her loan statements reflecting her property inspection charges.  (*See* FAC ¶¶ 60, 142.)  This

6    claim fails for each of the following reasons.

7            *First*, all of Ellis's inspection charges were authorized by her mortgage agreement and therefore

8    cannot be the basis for a claim of unlawful debt collection efforts.  *See supra* at 8-13; *Vega*, 2015 WL

9    1383241, at *13-14; *Benner*, 917 F. Supp. 2d at 354.

10           *Second*, as several courts have held, the Rosenthal Act does not apply to loan servicers or

11   mortgage loans.  *See Mannello v. Residential Credit Solutions, Inc.*, 2016 WL 94236, at *4-5 (C.D. Cal.

12   Jan. 7, 2016); *Abels v. Bank of Am.*, 2011 WL 1362074, at *4 (N.D. Cal. Apr. 11, 2011); *Sipe v.

13   Countrywide Bank*, 2010 WL 2773253, at *17 (E.D. Cal. July 13, 2010).

14           *Third*, no debt collection efforts occurred within the Rosenthal Act's one-year statute of

15   limitations.  *See* Cal. Civ. Code § 1788.30(f).  Among the loan statements to Ellis that referenced

16   property inspection charges, only one—the July 2011 statement—was sent within a year of the filing of

17   the original complaint.  (Fact 79.)  By that time, however, Ellis's debt under her promissory note—

18   including the property inspection charges reflected in the July 2011 statement[7]—had been discharged in

19   bankruptcy.  (Fact 80.)  Thus, the July 2011 statement was not a debt collection effort covered by the

20   Rosenthal Act, but rather an attempt to "enforce a security interest under a deed of trust" by seeking

21   payment from Ellis in lieu of initiating foreclosure proceedings.  *Tran v. Select Portfolio Servicing, Inc.*,

22   2015 WL 1739370, at *2 (N.D. Cal. Apr. 14, 2015).  Indeed, the July 2011 statement explicitly states:

23   "[I]f you received a bankruptcy discharge, this statement is for informational purposes only *and is not

24   an attempt to collect a debt*."  (Fact 81 (emphasis added).)

25

26   _____
     [7]      This statement included charges for five outstanding property inspections that were assessed to
27   Ellis between December 2008 and February 2010.  (Facts 22-26; Devine Decl. ¶¶ 23, 26, 28, 30, 33.)

28

16

DEFENDANTS' NOTICE OF MOTION, MOTION FOR SUMMARY JUDGMENT, AND MEMORANDUM OF POINTS AND AUTHORITIES
Civil Case No.:  4:12-cv-03897-YGR

*Fourth*, Ellis cannot prove that Chase "willingly and knowingly" violated the Rosenthal Act, as she must to sustain her statutory damages claim. Cal. Civ. Code § 1788.30(b). As explained above, Chase had a good-faith basis for imposing the charges at issue, and there is no evidence that Chase "knowingly" attempted to collect an improper charge. *Supra* at 15.

*Finally*, Ellis's claim is barred because she falsified her loan application. The Rosenthal Act prohibits borrowers from recovering if they commit an "intentional violation" of the Act that "is pertinent or relevant to any claim or action brought against the debt collector." *See* Cal. Civ. Code § 1788.30(g). One such violation occurs when, "in connection with any request or application for consumer credit," a borrower "knowingly submit[s] false or inaccurate information . . . bearing upon such person's credit worthiness, credit standing, or credit capacity." *Id.* § 1788.20.

Here, Ellis misrepresented her income on her loan application and thus obtained a loan she could not afford. (Facts 82-83.) Specifically, her tax returns report that she and her husband earned a combined employment income of ███ in 2007, but her loan application lists her *monthly* employment income at that time as $22,500.[8] (*Id.*) Ellis would not have qualified for her $1.25 million mortgage loan—and Chase would not have incurred any inspection costs when she defaulted on that loan—if not for this ███-fold misstatement of her income. *See* JOLLEY0050-51. Ellis's falsification of her loan application is therefore "pertinent or relevant" to the charges at issue: she never would have defaulted or incurred default-related inspection charges if not for the falsification.

## IV.   FEDERAL BANKING LAW PREEMPTS PLAINTIFFS' CLAIMS.

### A.   Plaintiffs' Claims Are Preempted By The National Bank Act.

As a national bank chartered under the National Bank Act ("NBA"), Chase has a grant of federal authority to service mortgage loans, to charge fees for its servicing activities, and to determine how those fees will be disclosed. Plaintiffs nevertheless seek to subject Chase to state-law liability based on

---

[8]   Ellis also made material misrepresentations in connection with her loan modification, telling Chase that she had suffered a hardship because ███ (JOLLEY0219.) But Ellis's ███ occurred in ███ (JOLLEY0123-26, 133-137), and her ███ occurred in ███ (JOLLEY0123-126, 133-35, 138)—years before Ellis's 2007 mortgage loan and her 2009 loan modification request.

the way it exercised its federal banking authority.  According to Plaintiffs, state law (i) prohibits Chase from charging borrowers for property inspections based on automated software determinations as opposed to manual reviews of the circumstances of individual property inspections (Doc. 172-3 at 1), (ii) bars Chase from *ever* charging for inspections of occupied properties (Doc. 228-3 at 4-7), and (iii) forces Chase to disclose inspection charges in a particular way on monthly loan statements (Doc. 172-3 at 2).  The NBA preempts all such claims.

### 1.    The National Bank Act "Ordinarily" Preempts State Law.

Federal courts have long recognized that the "history of significant federal presence" in the regulation of national banks gives the NBA a preemptive force that other federal laws do not enjoy. *Bank of Am. v. City & Cnty. of San Francisco*, 309 F.3d 551, 559 (9th Cir. 2002).  Unlike other federal statutes, the NBA "ordinarily pre-empts contrary state law." *Barnett Bank of Marion Cnty., N.A. v. Nelson*, 517 U.S. 25, 32 (1996); *see also Rose v. Chase Bank USA, N.A.*, 513 F.3d 1032, 1037 (9th Cir. 2008) (the "usual presumption against federal preemption of state law is inapplicable to federal banking regulation").  The preemptive force of the NBA "protect[s] national banks against intrusive regulation by the States," *Bank of Am.*, 309 F.3d at 561, and prevents the "[d]iverse and duplicative" regulation of national banks that would occur if their banking activities were subject to state law. *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 13-15 (2007).

Under the NBA, state laws may not "prevent or significantly interfere with [a] national bank's exercise" of its federal banking authority.[9] *Barnett Bank*, 517 U.S. at 33.  Moreover, "the level of 'interference' that gives rise to preemption under the NBA is not very high." *Monroe Retail, Ind. v. RBS Citizens, N.A.*, 589 F.3d 274, 283 (6th Cir. 2009).  Because Chase is chartered as a national bank and serviced all three Plaintiffs' mortgages (Facts 84-86), Plaintiffs' claims are subject to the NBA's preemptive force.

---

[9]     This remains true after the Dodd-Frank Act clarified the preemption standards applicable to national banks by providing that state laws are preempted if they "prevent[] or significantly interfere[] with the exercise by the national bank of its powers."  12 U.S.C. § 25b(b)(1)(B).

1

### 2.  Plaintiffs' Challenge To Chase's Disclosure Practices Is Preempted.

2

Plaintiffs allege that Chase committed fraud and violations of the UCL and Rosenthal Act by

3

failing to itemize property inspection charges on monthly loan statements.  (FAC ¶ 163.)  The Ninth

4

Circuit has held, however, that a "requirement to make particular disclosures falls squarely within the

5

purview of federal banking regulation and is expressly preempted."  *Gutierrez v. Wells Fargo Bank, NA*,

6

704 F.3d 712, 726 (9th Cir. 2012) (NBA and accompanying regulations preempt claims requiring banks

7

to disclose certain fee practices); *see also Martinez v. Wells Fargo Home Mortgage, Inc.*, 598 F.3d 549,

8

554, 557 (9th Cir. 2010) (NBA preempts claims relating to disclosure of costs of certain banking

9

services); *Rose*, 513 F.3d at 1038 (NBA preempts claims alleging inadequate disclosures of check

10

fees).[10]  Applying these principles, the court in *Cirino v. Bank of America, N.A.*, 2014 WL 9894432

11

(C.D. Cal. Oct. 1, 2014), recognized that the NBA preempts claims "that Defendants were affirmatively

12

required to make disclosures regarding their property inspection fees."  *Id.* at *9.  Other courts likewise

13

have held that the NBA preempts attempts to force national banks to provide itemized loan statements,

14

as Plaintiffs seek to do here.  *See Smith v. Wells Fargo Bank, N.A.*, __ F. Supp. 3d. __, 2016 WL

15

370697, at *10 (D. Conn. 2016) (dismissing state-law claim based on failure to provide itemized

16

disclosures).

17

12 C.F.R. § 34.4—a preemption regulation promulgated under the NBA by the Office of the

18

Comptroller of the Currency ("OCC")—confirms this conclusion.[11]  That regulation permits national

19

banks to exercise their federal banking authority "without regard to state law limitations concerning . . .

20

[d]isclosure and advertising, including laws requiring specific statements, information, or other content

21

---

22
23

[10]     *See also Robinson v. Bank of Am., N.A.*, 525 F. App'x 580, 582 (9th Cir. 2013) (attempt "to use California law to impose a specific disclosure obligation on [bank] whenever it discloses any fee" is preempted); *Parks v. MBNA Am. Bank, N.A.*, 54 Cal. 4th 376, 386-87 (2012) (state law requiring national bank to make specific disclosures on convenience checks is preempted).

24
25
26
27

[11]     OCC regulations that interpret and apply the NBA have the same preemptive force as the NBA itself.  *See, e.g.*, *Fidelity Fed. S& L. v. de la Cuesta*, 458 U.S. 141, 153 (1982) ("Federal regulations have no less preemptive effect than federal statues").  Congress has entrusted the OCC with "primary responsibility for surveillance of the 'business of banking' authorized by § 24 Seventh," *NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 256 (1995), and the OCC has "authority to displace contrary state regulation," *Wells Fargo Bank N.A. v. Boutris*, 419 F.3d 949, 962 (9th Cir. 2005).

28

1   to be included in . . . billing statements."  12 C.F.R. § 34.4(a)(9).  The Ninth Circuit has consistently

2   sustained and applied Section 34.4 in holding that state-law disclosure claims against national banks are

3   preempted.  *See Martinez*, 598 F.3d at 556-57; *O'Donnell v. Bank of Am.*, 504 F. App'x 566, 568 (9th

4   Cir. 2013); *see also* OCC, *Dodd-Frank Act Implementation*, 76 Fed. Reg. 43,549, 43,557 & n.51 (July

5   21, 2011) ("[S]tate-dictated disclosure requirements clearly present a significant interference" with a

6   national bank's federal banking authority).

### 3.   Plaintiffs' Challenge To Chase's Servicing Practices Is Preempted.

8          Plaintiffs' remaining claims are preempted as well.  The NBA grants Chase broad federal

9   authority to originate and service mortgage loans and to take steps to protect the value of the loan

10  collateral.  *See, e.g.*, 12 U.S.C. §§ 24(Seventh), 371; *Akopyan v. Wells Fargo Home Mortg.*, 215 Cal.

11  App. 4th 120, 152-53, 156 (2013) ("Servicing is considered a nonbanking activity that is 'a proper

12  incident to banking'" and "national banks are authorized to service loans of other lenders."); *Shilke v.*

13  *Wachovia Mortg., FSB*, 820 F. Supp. 2d 825, 834 (N.D. Ill. 2011) (bank's actions taken to "ensure that

14  its interest in the property was protected" are "a core part of a bank's lending activity").[12]  The NBA

15  also authorizes Chase to charge borrowers fees for its servicing activities.  *See Bank of Am.*, 309 F.3d at

16  562-63 (national banks have "authority to collect fees for provision of authorized services"); 12 C.F.R.

17  § 7.4002(a) (national banks may assess "non-interest charges and fees"); OCC Interpretive Letter 1069,

18  2006 WL 4590639, at *1 (Aug. 21, 2006) ("A bank's authority to provide products or services to its

19  customers necessarily encompasses the ability to charge a fee for the product or service.").

20         Plaintiffs nonetheless assert that Chase is liable under California statutes and the common law of

21  unjust enrichment unless it engages in a highly burdensome, manual review of each individual property

22  inspection before charging borrowers for the costs of such inspections.  (Doc. 172-3 at 1.)  Forcing

23  Chase to engage in onerous, individualized review practices—on pain of liability under state law—

24  would impose substantial costs and burdens on Chase's servicing activities.  (Facts 90-91.)

25

26  [12]      *See also* OCC Interpretive Letter 646, 1994 WL 269165, at *2-3 (Apr. 12, 1994) ("[S]ervicing of
    evidences of debt owned by other has long been part of the banking business," and "a bank may lend to
27  anyone and buy, sell, or service loans originated by any entity.").

28

Furthermore, "Congress has not expressly conditioned" Chase's exercise of its servicing and fee-charging powers upon compliance with state-law requirements to manually review individual inspections, and consequently "no such condition applies." *Barnett Bank*, 517 U.S. at 34.  Any other outcome would require Chase "to operate under diverse . . . schemes for loans it services in California and other states despite the uniform . . . terms of the mortgages it services," which is "inconsistent with the purpose of the NBA to prevent the states from imposing diverse and duplicative limitations and restrictions on its power to engage in the business of banking." *Akopyan*, 215 Cal. App. 4th at 158 (internal punctuation omitted).  Plaintiffs' claims are therefore preempted because they threaten to "prevent or significantly interfere with" Chase's exercise of its federal banking authority.  *Barnett Bank*, 517 U.S. at 33.

The same is true with respect to Plaintiffs' contention (at Doc. 228-3 at 4-7) that state law prohibits Chase from *ever* charging delinquent borrowers for property inspections when a property is occupied.  Although Plaintiffs assume that the sole purpose of a property inspection is to evaluate whether a property is occupied, they ignore their own expert's testimony that inspections also are conducted to identify maintenance or repairs that may be necessary.  (JOLLEY0171, 176; *see also* JOLLEY0090.)  Furthermore, prudent practice dictates that mortgage servicers inspect occupied properties if, for example, the property is tenant-occupied or in foreclosure proceedings, or if the borrower makes no commitment to resolve the delinquency or breaches a repayment promise.  (*See* JOLLEY0090-91; JOLLEY0171, 173-74, 176, 178-79, 182-83.)  To the extent that Plaintiffs seek to impose state-law liability on Chase whenever it seeks reimbursement for inspecting an occupied property, their claims are preempted because they threaten Chase's ability to exercise its federal banking powers.  *See, e.g.*, *Gutierrez*, 704 F.3d at 724-25.

12 C.F.R. § 34.4 reinforces these conclusions.  Under that regulation, "[a] national bank may make real estate loans . . . without regard to state law limitations concerning . . . servicing . . . of . . . mortgages."  12 C.F.R. § 34.4(a)(10).  As a result, state laws that "affect the ability of national banks to . . . manage loan-related assets, such as laws concerning the protection of collateral value, . . . risk mitigation . . . and . . . managing . . . extensions of credit and interests therein, would meaningfully

1    interfere with fundamental and substantial elements of the business of national banks and with their

2    responsibilities to manage that business and those risks."  76 Fed. Reg. at 43,557.

3        **B.      Ellis's and Lazar's Claims Are Preempted By The Home Owners' Loan Act.**

4            Because Ellis's and Lazar's mortgages were originated by a federal savings association,

5    Washington Mutual Bank (Facts 87-88), their claims also are preempted by the Home Owners' Loan

6    Act ("HOLA").  HOLA was enacted "to restore public confidence by creating a nationwide system of

7    federal savings and loan associations to be centrally regulated according to nationwide 'best practices.'"

8    *Silvas v. E*Trade Morg. Corp.*, 514 F.3d 1001, 1004 (9th Cir. 2008) (quoting *de la Cuesta*, 458 U.S. at

9    160-61).  HOLA also granted the Office of Thrift Supervision ("OTS") "broad authority to regulate

10   federal savings and loans" without regard to "existing state law" and to "promulgat[e] . . . regulations

11   superseding state law."  *de la Cuesta*, 458 U.S. at 162.  OTS responded by issuing sweeping regulations

12   "preemptive of any state law purporting to address the subject of the operations of a Federal savings

13   association."  12 C.F.R. § 545.2.  The intent of these regulations—which "have no less pre-emptive

14   effect than federal statutes," *de la Cuesta*, 458 U.S. at 153—was "to give federal savings associations

15   maximum flexibility to exercise their lending powers in accordance with a uniform federal scheme of

16   regulation."  12 C.F.R. § 560.2(a); *see also de la Cuesta*, 458 U.S. at 161 (HOLA-originated loans are

17   "governed by what [federal regulators]—not any particular State—deemed to be the 'best practices.'").

18           HOLA's preemptive force is even broader than the NBA because HOLA and its regulations

19   explicitly "occup[y] the entire field of lending regulation for federal savings associations."[13]  12 C.F.R.

20

21   _____

22   [13]       The Dodd-Frank Act's amendments to HOLA's preemption framework do not affect this
     conclusion.  Although Dodd-Frank changed the preemption framework to subject HOLA-originated
23   loans and NBA-originated loans to the same preemption framework, *see* 12 U.S.C. § 1465, these
     amendments apply on a prospective basis only.  *See McCauley v. Home Loan Inv. Bank, F.S.B.*, 710
24   F.3d 551, 554 n.2 (4th Cir. 2013) ("Because 12 C.F.R. § 560.2 was in effect when the loan contract was
     entered into, it governs here."); *Molosky v. Wash. Mut., Inc.*, 664 F.3d 109, 113 n.1 (6th Cir. 2011)
25   (reaching similar conclusion); OTS Integration, Final Rule 76 Fed. Reg. 43,549, 43,557 & n.52 (July 21,
     2011) (Dodd-Frank's preemption provisions "operative prospectively").  Dodd-Frank itself makes clear
26   that the revised HOLA preemption standards do not apply retroactively to loans entered into before
     Dodd-Frank's enactment on July 21, 2010 (which includes Ellis's and Schillinger's loan agreements),
27   *see* Pub. L. 111-203, § 1043, *or* to conduct occurring before Dodd-Frank's effective date of July 21,

28   (continued…)

1    § 560.2(a).  This "explicit full field preemption" represents "the pinnacle of federal preemption" and is

2    "a preemption approach so pervasive that Congress must have intended to leave *no room* for the states to

3    supplement it."  *Aguayo v. U.S. Bank*, 653 F.3d 912, 921 (9th Cir. 2011).  Courts thus apply "a

4    presumption *of* preemption" under HOLA.  *Id.*

5            Here, Ellis and Lazar's claims fall within at least two categories of claims that are *per se*

6    preempted by the HOLA preemption regulation:  laws affecting "[l]oan-related fees, including without

7    limitation ... servicing fees," and laws affecting "[s]ervicing . . . of . . . mortgages."  12 C.F.R.

8    § 560.2(b)(5), (10).  Plaintiffs' attempt to force Chase to "invest the resources necessary" to thoroughly

9    revamp its property inspection practices (Doc. 172-3 at 1) squarely implicates the "servicing . . . of

10   mortgages."  12 C.F.R. § 560.2(b)(10).  Plaintiffs' allegations that Chase "failed to use proper care or

11   comply with industry standards" with respect to its servicing practices "essentially seek to impose new

12   requirements on the lender, and are thus preempted by HOLA."  *Valverde v. Wells Fargo Bank, N.A.*,

13   2011 WL 3740836, at *5 (N.D. Cal. Aug. 26, 2011); *see also Williams v. Wells Fargo Bank, N.A.*, 2014

14   WL 1568857, at *12 (C.D. Cal. Jan. 27, 2014) ("[A]ny claim regarding the procedures used by [bank] in

15   servicing Plaintiffs' loan . . . are preempted."); *Babb v. Wachovia Mortg., FSB*, 2013 WL 3985001, at

16   *6-7 (C.D. Cal. July 26, 2013) (reaching similar result).  The same is true with respect to Plaintiffs'

17   related attempt to prohibit Chase from charging property inspection fees—a form of "servicing fees," 12

18   C.F.R. § 560.2(b)(5)— unless it individually and manually considers the circumstances of each

19   inspection.  *See Silvas*, 514 F.3d at 1006 ("Section 560.2(b)(5) specifically preempts state laws

20   purporting to impose requirements on loan related fees"); *Williams*, 2014 WL 1568857, at *12 ("[A]ny

21   claims regarding allegedly excessive fees are preempted by HOLA"); *Hael v. Wash. Mut. Bank, F.A.*,

22   277 F. Supp. 2d 933, 941-42 (S.D. Ind. 2003) (state-law claim challenging mortgage fees as "not bona

23   fide or reasonable" was preempted); *Chaires v. Chevy Chase Bank, F.S.B.*, 748 A.2d 34, 46 (Md. Ct.

24   Spec. App. 2000) (HOLA preempted challenge to property inspection fees).

---

26   2011 (which include all of the inspection charges paid by Ellis and the first four of Lazar's inspections),
27   *see* Pub. L. 111-203, § 1048; *see also McCauley*, 710 F.3d at 554 n.2; *Molosky*, 664 F.3d at 113 n.1.

1

       Plaintiffs also seek to impose state-law liability on Chase based on its "[d]isclosure and

2

advertising," another category of claims expressly preempted by Section 560.2(b).  12 C.F.R.

3

§ 560.2(b)(9).  Plaintiffs' attempt to require itemized inspection charges is a preempted attempt to

4

require specific disclosures.  *Id.*  Any and all claims that attempt to "requir[e] specific statements,

5

information, or other content to be included in . . . billing statements" for HOLA-originated loans are

6

preempted.  *Id.*; *see also Silvas*, 514 F.3d at 1006 (claims alleging "false information" on a bank's

7

website and advertising preempted); *Hughes v. Equity Plus Fin.*, 2010 WL 2836828, at *3 (S.D. Cal.

8

July 19, 2010) ("[I]ntentional misrepresentation and fraudulent concealment claims are preempted by

9

HOLA . . . because they directly concern and seek to regulate . . . disclosures . . . ."); *Bopp v. Wells*

10

*Fargo Bank, N.A.*, 740 F. Supp. 2d 12, 16-17 (D.D.C. 2010) (preempting claim challenging "the quality

11

and quantity of information disclosed").[14]

12

       Although 12 C.F.R. § 560.2(c) saves certain claims from HOLA preemption, that section does

13

not help Ellis or Lazar because Section 560.2(c) does not apply to claims—like those here—that fall

14

within the *per se* preemption provisions of Section 560.2(b).  *Silvas*, 514 F.3d at 1006 ("Because the . . .

15

claim, as applied, is a type of state law listed in paragraph (b)—in two separate sections—the

16

preemption analysis ends there.").

17

18

19

20

21

22

23

24

25

26

27

28

---

[14]     *See also, e.g.*, *Tinsley v. OneWest Bank, FSB*, 4 F. Supp. 3d 805, 826-27 (S.D. W. Va. 2014) (fraud and consumer protection claims "that Defendant failed to adequately *disclose* the $30 fee" are preempted); *Brown v. Wells Fargo Bank, N.A.*, 869 F. Supp. 2d 51, 62-63 (D.D.C. 2012) (preempting claims based on allegations that the defendant bank "failed to disclose or disclosed in a confus[ed] manner a wide range of information" about a loan); *Smallwood v. Sovereign Bank, F.S.B.*, 2012 WL 243744, at *10 (N.D. W. Va. Jan. 25, 2012) ("[P]laintiffs' claims of fraud and unfair and deceptive trade practices are preempted by HOLA and the OTS regulation."); *Thomas v. OneWest Bank, FSB*, 2011 WL 867880, at *3-5 (D. Or. Mar. 10, 2011) (claims that loan documents were "non-consumer friendly and difficult to understand" and that defendant "failed to adequately disclose the terms of the new loan" preempted by HOLA); *Kelley v. Mortg. Elec. Registration Sys., Inc.*, 642 F. Supp. 2d 1048, 1054 (N.D. Cal. 2009) (state-law claims that defendant bank made "false representations" were preempted by § 560.2(b)(9)); *In re Countrywide Fin. Corp.*, 601 F. Supp. 2d 1201, 1223 (S.D. Cal. 2009) (state-law claims preempted even when Plaintiffs "do not seek to impose 'specific disclosures with respect to Defendants' loan or advertising.'").

Finally, any assertion that HOLA preemption does not apply here because Chase is a national bank and not a federal savings association would be mistaken.  Ellis's and Lazar's mortgages were originated  by Washington Mutual Bank, a HOLA-chartered federal savings association.  (Facts 87-88.)  "[B]ecause the loan originated with WaMu, a federally-chartered savings bank, organized and operating under HOLA, courts have held that HOLA preempts all conduct relating to the loan" even when the loan is subsequently acquired or serviced by a national bank.  *Nguyen v. JP Morgan Chase Bank, N.A.*, 2013 WL 2146606, at *6 (N.D. Cal. May 15, 2013); *see also Campos v. Wells Fargo Bank, N.A.*, 2015 WL 5145520, at *5 (C.D. Cal. Aug. 31, 2015) ("[A] majority of district court cases have concluded that HOLA preemption continues to apply to conduct related to loans originated by a federally-chartered savings association even after those banks are merged into national banking associations."); *Marquez v. Wells Fargo Bank*, 2013 WL 5141689, at *4 (N.D. Cal. Sept. 13, 2013) (finding "no bar to applying HOLA preemption" when "plaintiffs contracted with a Federal Savings Bank"); *Akopyan*, 215 Cal. App. 4th at 260 ("[T]he OTS intended to occupy the field of lending regulation as to both federal thrifts *and their loans*." (emphasis added)).

## CONCLUSION

The Court should grant summary judgment for Defendants on all claims.


Date:  March 18, 2016                    COVINGTON & BURLING LLP

                                        By: ___/s/ David M. Jolley_____
                                            David M. Jolley
                                            Robert D. Wick
                                            Kathryn E. Cahoy

                                        Attorneys for Defendants