1  Robert D. Wick (*pro hac vice* / rwick@cov.com)
   COVINGTON & BURLING LLP
2  One CityCenter
   850 Tenth Street NW
3  Washington, DC 20001
   Telephone: (202) 662-6000
4  Facsimile: (202) 662-6291

5  David M. Jolley (SBN 191164 /djolley@cov.com)
   COVINGTON & BURLING LLP
6  One Front Street
   San Francisco, CA 94111
7  Telephone: (415) 591-6000
   Facsimile: (415) 591-6091

8
9  *Attorneys for Defendants JPMorgan*
   *Chase & Co. and JPMorgan Chase Bank, N.A.,*
   *individually and as successor by merger to*
10 *Chase Home Finance LLC*

11

12             UNITED STATES DISTRICT COURT

13        FOR THE NORTHERN DISTRICT OF CALIFORNIA

14                  OAKLAND DIVISION

15

16 | DIANA ELLIS, JAMES SCHILLINGER, | Civil Case No.: 4:12-cv-03897-YGR |
   and RONALD LAZAR, individually, and
17 on behalf of other members of the public | [Related to Case Nos. C-12-00664-YGR, C-
   similarly situated, | 12-3892-YGR]
18
19        Plaintiffs, | **DECLARATION OF JACK EVANS IN**
                       | **SUPPORT OF DEFENDANTS'**
                v.     | **OPPOSITION TO PLAINTIFFS'**
20                     | **MOTION FOR CLASS**
   J.P. MORGAN CHASE & CO., a Delaware | **CERTIFICATION**
21 corporation, J.P. MORGAN CHASE
   BANK, N.A., a national association, for | Hearing Date: September 1, 2015
22 itself and as successor by merger to Chase | Time:          2:00 PM
   Home Finance, LLC, and CHASE HOME | Courtroom:    1, 4th Floor
23 FINANCE LLC, a Delaware limited
   liability company,
24
          Defendants.
25

26

27          REDACTED VERSION SOUGHT TO BE SEALED
28

1    I, Jack Evans, declare as follows:

2       1.      I am a vice president in the property preservation department of JPMorgan Chase

3    Bank, N.A. ("Chase"), a position I have held for approximately five years. I have worked in

4    Chase's property preservation department for more than ten years. This declaration is based on

5    my personal knowledge and experience at Chase and my review of Chase business records.

6       2.      I was designated as Chase's corporate representative for purposes of Fed. R. Civ.

7    P. 30(b)(6) to testify about, among other things, Chase's policies, procedures, and practices for

8    ordering and reviewing property inspections performed after a borrower defaults on his or her

9    mortgage repayment obligations. I am competent to testify on the matters stated herein.

10      3.      Chase is a national bank that services mortgage loans originated by Chase (or one

11   of Chase's heritage institutions) or by other lenders.

12      4.      When a borrower defaults on a mortgage repayment obligation, the lender's

13   ability to recover the loan balance may depend on the value of the property that serves as

14   collateral for the loan. As a result, when a borrower falls behind on his or her mortgage

15   obligations, Chase will often take steps to evaluate and preserve the value of the property.

16      5.      Property inspections are one such step. Chase orders property inspections to

17   verify the occupancy status and condition of the property or to identify repairs, maintenance

18   work, or other measures that are necessary to protect the value of the property. Chase does not

19   profit from property inspections and often loses money on them. Chase has no reason to order

20   property inspections other than to carry out its responsibilities to protect the value of the loan

21   collateral.

22   **How Chase orders property inspections**

23      6.      Before 2006, Chase used a variety of software platforms to service its mortgage

24   loans. In 2006, however, Chase began moving to the Mortgage Servicing Package ("MSP")

25   developed by Fidelity National Information Systems to service most of its loans.

26      7.      Chase's MSP system relies on individual loan-level data inputted by Chase's

27   customer service representatives to make decisions about the loans it services.

28

8.      I understand that Plaintiffs' brief in support of their class certification motion states that Chase has "a practice of ordering and charging delinquent borrowers for inspections through a completely automated process, which, by its crude programming, fails to take into account the 'circumstances relating to a particular loan' and whether the circumstances warrant multiple inspections" and that Chase "asses[ed] property inspection fees solely based on a homeowner's continuing delinquency."  Class Cert. Mem. at 6, 18.  I understand that the brief further states that "[d]uring the entire Class Period"—in other words, from January 2003 to May 2013—Chase's MSP servicing system was programmed to order an initial inspection once a borrower was 45 days delinquent on their loan "without any other consideration" and to order additional inspections every 30 to 35 days that a loan remained delinquent "without any other consideration."  Class Cert. Mem. at 7.  According to the brief, "[t]his practice applied to all loans serviced by [Chase], regardless of the investor or lender." *Id*.

9.      These statements are not accurate.  Chase uses its MSP system to order inspections of the property that serves as collateral for loans serviced on MSP (which account for a large majority of the mortgage loans serviced by Chase).  The MSP system is programmed to take into account a variety of factors based on the circumstances of each borrower in determining whether to order a property inspection.  Some of these factors include the investor who owns the loan, whether the borrower is delinquent on his or her loan, the occupancy status or condition of the property, whether the loan is in foreclosure, and where the property is located.  I mentioned some of these considerations at pages 35-39 and 90-94 of my deposition testimony.  I elaborate on them further below.

10.      The presence of certain account codes or other information in a borrowers' loan file can either trigger a property inspection or prevent a property inspection.  For example, one significant factor in determining whether a property inspection will be ordered is the identity of the investor or entity that owns, guarantees, or insures the mortgage loan.  As of March 31, 2015, approximately ▮ percent of Chase-serviced first-lien mortgages were Fannie Mae loans; approximately ▮ percent were Freddie Mac loans; approximately ▮ percent were insured by the Department of Housing and Urban Development (HUD); and the remaining roughly ▮

1   percent were Chase-owned or private investor-owned loans.  Those percentages would have

2   differed over the course of the class period but they provide a rough indication of the

3   composition of Chase's servicing portfolio.  Fannie Mae, Freddie Mac, and HUD/FHA each

4   have their own set of servicing guidelines that apply to the loans in which they have an interest,

5   and private investors may impose servicing requirements that differ from those of Fannie Mae,

6   Freddie Mac, or HUD.

7          11.     Different investors have different requirements for ordering property inspections.

8   Chase's MSP system is programmed to account for these investor-by-investor differences.  For

9   example, when the data in Chase's MSP system indicates that a mortgaged property covered by

10  HUD insurance ███████████████████████████████████████████████

11  ████████████████████████████████████████████████████████████

12  ████████████████████████████████████████████████████████████

13  ██████████████████████████████████████████████████

14  ████████████████████████████████████████████████████████████

15  ██████████████████████████████████.

16         12.     Another factor that Chase's MSP system considers in determining whether a

17  property inspection should be ordered is the results of previous property inspections.  For

18  example, if an inspection indicated that a property was vacant, abandoned, or tenant-occupied, a

19  code would be entered in the borrower's loan file.  The presence of that code would trigger

20  additional property inspections as required by each investors' servicing guidelines.  This

21  practice has been in place since at least 2011 and accounts for substantial numbers of property

22  inspections.

23         13.     Another factor that Chase's MSP system is programmed to consider in

24  determining whether a property inspection should be ordered is the borrower's payment history.

25  For example, when a borrower defaults on his or her payment obligations, the MSP system is

26  programmed to identify the date of the default and to order an inspection within the time period

27  specified in the relevant investor's servicing guidelines (unless another code exists in the

28  borrower's loan file indicating that no inspection should be ordered).  Another example involves

1    █████████ . ████████████████████████

2    ████████████████████████████████

3    ████████████████████████████ . ███

4    █████████████████████ code will be removed,

5 allowing inspections to take place.

6     14.    Another factor that determines whether property inspections will be ordered is

7 whether foreclosure proceedings have commenced on a property.  Properties for which the

8 foreclosure process has begun are at an increased risk that the collateral value will deteriorate

9 because, for example, the borrower no longer has the same stake in protecting the property from

10 deterioration or damage.  When the foreclosure process begins with respect to a property, a

11 foreclosure code is added to a borrower's loan file. ████████████████████

12 ████████████████████████████████████

13 ████████████████████████ This process has been in

14 place for several years and accounts for substantial numbers of property inspections.

15     15.    Location of a property is another factor that affects whether property inspections

16 are ordered.  For example, from approximately 2007 through 2010, there were HUD "hot zones"

17 in areas that HUD considered to involve an increased risk of loss of value of the loan collateral.

18 During that period, HUD required inspections of properties in "hot zones"—which included the

19 Chicago area—as frequently as twice a week once the servicer learned the property had been

20 abandoned.  Chase complied with those HUD requirements.  In addition, certain municipalities

21 have (and had) laws that require property inspections to be conducted as frequently as every

22 week on properties securing loans that are in default or foreclosure proceedings.  A property

23 located in such a municipality will have a code in the account file that may trigger property

24 inspections more frequently than borrowers whose properties are located in municipalities that

25 do not have such laws.

26     16.    Other factors that determine whether property inspections will be ordered include

27 the degree of contact with the borrower and whether the borrower has made a commitment to

28 resolve the delinquency.  For example, when Chase's collections department makes contact with

a delinquent borrower and the borrower makes a promise to send a payment, Chase's procedures require the collections representative to enter an account code reflecting this communication with the borrower.  Entry of this account code will prevent the ordering of an inspection.    This procedure has been in place for several years.

17.    Property inspections may also be ordered on a manual or "custom" basis in certain instances.  For example, if a borrower contacts Chase to express concern about the condition of the property—such as a concern about something like toxic mold—the customer service representative can request a property inspection, and my department will order the inspection.

18.    Even after property inspections have been ordered, Chase's MSP system is programmed to cancel such inspections if certain events occur between the date the inspection is ordered and the date the inspection is scheduled to take place.  For example, if a borrower cures the delinquency after an inspection is ordered, Chase's MSP system is programmed to cancel the inspection and to prevent the borrower from being charged for the cancelled inspection.

19.    In programming its MSP system, Chase has always attempted to ensure that property inspections are ordered only if an inspection would be consistent with the mortgage agreement and applicable investor or insurer guidelines or state or local law.

20.    I am informed that Plaintiffs have stated in their brief that Chase has violated Fannie Mae and Freddie Mac mortgage servicing guidelines by ordering property inspections even though "quality right party contact" has been achieved.  I disagree.  First, there are numerous instances—such as when the property is abandoned, tenant-occupied, in foreclosure proceedings, or has maintenance issues—in which Fannie Mae's and Freddie Mac's servicing guidelines require a servicer to conduct a property inspection even if it has achieved quality right party contact with a borrower.  These situations account for large numbers of property inspections.  Second, Fannie Mae and Freddie Mac did not require servicers to consider whether "quality right party contact" had been achieved until 2011.  As I explain in paragraph 39 below, Chase changed the programming used to order property inspections to account for this "quality right party contact" guidance.

21. I understand that Plaintiffs have argued that Chase violated Fannie Mae and Freddie Mac Servicing Guidelines by requiring a payment promise from a delinquent borrower before stopping inspections of the borrower's property. I disagree.

22. I have reviewed the Fannie Mae and Freddie Mac servicing guidelines discussions of the term "quality right party contact." A copy of the definition of "quality right party contact" used by Fannie Mae from October 2011 through November 2014 is attached hereto as Exhibit A; I understand portions of this exhibit have been highlighted by counsel. A copy of the definition of "quality right party contact" used by Freddie Mac effective June 13, 2012 is attached hereto as Exhibit B; I understand portions of this exhibit have been highlighted by counsel.

23. Both guides state that quality right party contact requires a "commitment from the borrower to either resolve the Delinquency through traditional methods (paying the total delinquent amount) or engaging in an alternative to foreclosure solution." *See* Exs. A, B. This is consistent with my deposition testimony in which I stated that Chase generally will not order a property inspection "if the borrower has made some form of promise to make payment" or "a payment promise of some sort." Evans Dep. Tr. 89:21-91:16. In referring to "a payment promise of some sort" or "some form of promise to make payment," I was stating my understanding that Fannie Mae and Freddie Mac require some type of "commitment to resolve the delinquency" as a basis for suspending inspections.

24. I see that on page 91 of the deposition transcript, lines 20-22, I was asked whether a quality right party contact "just means that you've contacted—actually reached the borrower," and I answered "Correct." I did not understand the questioner to be asking me to give a precise statement of Fannie Mae or Freddie Mac's use of the term "quality right party contact." If the question is whether contacting the borrower alone constitutes a quality right party contact as Fannie Mae and Freddie Mac use the term, the answer is clearly no. Fannie Mae's definition of the term states that quality right party contact requires, among other things, that the borrower make a "commitment … to either resolve the delinquency through traditional methods (paying the total delinquency amount) or engaging in a foreclosure prevention

1    alternative." *See* Ex. A.  Freddie Mac's guidance requires a similar commitment to resolve the

2    delinquency.  See Ex. B.

3         25.     As far as I am aware, the manner in which Chase has ordered property

4    inspections has complied with investor guidelines, including guidelines issued by Fannie Mae

5    and Freddie Mac.  Indeed, Chase programmed its MSP system to order property inspections

6    when required by those guidelines.  I am not aware of any criticisms from Fannie Mae or

7    Freddie Mac that Chase inspects properties too frequently or that Chase improperly charges

8    borrowers for the costs of these inspections.  In addition, although I am not aware of any

9    documents that track or calculate the percentage of Chase's property inspection reimbursement

10   requests that Fannie Mae and Freddie Mac approve, it is my understanding that those enterprises

11   have reimbursed Chase for a high percentage of the property inspection fees for which Chase

12   has sought reimbursement within the applicable caps.

13        26.     I understand from counsel that Plaintiffs have cited two emails I wrote in April

14   2005 and March 2009 in support of the proposition that Chase was violating HUD guidelines for

15   much of the class period.  Copies of these e-mails and a related document are attached as

16   Exhibits C, D, and E to this declaration; I understand portions of Exhibit D have been

17   highlighted by counsel.

18        27.     I was not asked about these e-mails at my deposition.  Had I been asked about

19   them, I would have explained as follows:

20        28.

26                                                    That is consistent with my recollection.

1 ████████████████████████████████████████████████████

2 ████████████████████████████████████████████████

3 ████████████████████████████████████████████████████

4 ████████████████████████████████████████████████████████

5 ████████████████████████████████████████████████████████

6 ███████

29.     An issue arises as to what to do in those instances in which a HUD borrower claims that he or she is occupying the property but Chase has an inspection report indicating the opposite.  This situation is the exception and not the rule, in part because ████████████ ████████████████████████████████████████████ ███████████████████     In my view, the inspection report likely would be the better indicator of occupancy status in this situation, ███████████████████████████████ ████████████████████████████████████████████ ███████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████████

30.     HUD requirements apply only to government-insured loans.  As noted above, those loans make up approximately ███ of Chase's servicing portfolio.

**Changes and variations in Chase's inspection policies.**

31.     The criteria that Chase uses to order a property inspection have changed over time.  Chase periodically updates and revises the criteria it uses to program MSP with respect to ordering property inspections.  Many of these revisions are driven by changes in requirements for when (and how frequently) investors instruct Chase to inspect properties.

32.     Prior to roughly 2011, Chase did not have a single centralized policy regarding ordering property inspections that applied across all heritage portfolios and product lines. However, written policies governing property inspections have existed in various forms since my arrival in the property preservation department in 2004.  These polices existed both as

1  written policy documents and also in the form of coding instructions and written summaries and

2  descriptions of the coding instructions that were used to program software systems that managed

3  the ordering of property inspections.

4       33.    Attached hereto as Exhibit F is a true and correct copy of the 2013 version of

5  Chase's Property Inspection and Preservation Policy; I understand portions of this exhibit have

6  been highlighted by counsel.  Although this policy was revised on August 26, 2013, prior

7  versions of this policy have been in place since at least 2011.  Before that date, property

8  inspection policies varied by heritage institution.  For example, Chase acquired the mortgage

9  servicing portfolios of EMC and Washington Mutual in 2008.  At that time, EMC and

10  Washington Mutual had their own written policies and coding instructions with respect to

11  ordering property inspections.  Moreover, the EMC and Washington Mutual portfolios were not

12  even migrated to Chase's MSP system for purposes of ordering property inspections until

13  roughly 2009.

14       34.    Although I know that EMC and Washington Mutual had property inspection

15  policies in the pre-2009 time period, I am not able to describe their specific contents.  Similarly,

16  although I know that Chase had written policies regarding property inspections dating back to

17  my arrival in property preservation in 2004, I cannot describe the specific contents of the early

18  policies from memory and have not been able to find copies of them.

19       35.    Although I cannot describe the specific contents of outdated property inspection

20  policies, throughout my tenure in Chase's property preservation department, Chase's written

21  policies regarding ordering property inspections have emphasized complying with loan

22  agreements, applicable law, and investor guidelines, including Fannie Mae and Freddie Mac

23  guidelines where applicable.

24       36.    I understand that Plaintiffs' brief in support of their class certification motion

25  states that Chase "implemented a uniform practice of ordering property inspections when

26  homeowners were a certain number of days late and charging homeowners for the inspections"

27  and that Chase's property inspection ordering system was "uniformly applied to Plaintiffs and

28  all class members."  Class Cert. Mem. at 1, 13.  I disagree.  As explained above, inspection

1   policies varied by heritage organization in at least some respects through 2011.  Moreover, even

2   within the heritage Chase organization, Chase did not have a consolidated property inspection

3   ordering system until Chase moved to the MSP system in 2006.  Moreover, in MSP, the criteria

4   Chase used to order a property inspection depended on the requirements of each particular

5   investor, and those investors often had different criteria for when property inspections could be

6   ordered.

7          37.     The 2013 version of Chase's Property Inspection and Preservation Policy reflects

8   how the guidelines used to order a property inspection change depending on the identity of the

9   investor or the insurer.  It provides different criteria for ordering inspections depending on

10  whether Fannie Mae Guidelines, Freddie Mac Guidelines, HUD guidelines, or other investor

11  criteria apply to a given loan.  *See* Exhibit F at 2-4.  These and other investor-by-investor

12  differences were captured in Chase's ordering system.

13         38.     Individual investors also changed their property inspection ordering criteria over

14  time, and Chase responded to these changes by making changes to its MSP ordering system.

15         39.     For example, before 2011, Fannie Mae required a servicer to inspect the property

16  if, among other things, the borrower could not be contacted, if the borrower had a disregard for

17  the mortgage obligation, if the borrower failed to keep promises he or she made with respect to

18  bringing the mortgage current, or if the borrower failed to work with the servicer to develop a

19  repayment plan.  A copy of the Fannie Mae servicing guide section imposing this obligation is

20  attached hereto as pages 4-5 of Exhibit G; I understand portions of this exhibit have been

21  highlighted by counsel.  After 2011, Fannie Mae required a servicer to inspect the property

22  unless the servicer had established "Quality Right Party Contact," meaning that the servicer had

23  (among other things) obtained a commitment from the borrower to resolve the delinquency or

24  engaged in a foreclosure prevention alternative.  A copy of the Fannie Mae servicing guide

25  section imposing this obligation is attached hereto as pages 4-5 of Exhibit H; I understand

26  portions of this exhibit have been highlighted by counsel.  As a result of this change, by 2011,

27  Chase had implemented coding systems on MSP that blocked inspections on Fannie Mae loans

28  if the borrower indicated that they were going to make a payment.  In addition, as noted above,

1    inspections were blocked if the borrower had been approved for a foreclosure alternative or a

2    loan modification or was otherwise engaged in a loss mitigation plan.

3         40.    I explained at my deposition some of the mechanics of how we follow and

4    implement the various investor guidelines.  As I explained at pages 102, 110-12, and 116-17 of

5    my deposition transcript, Chase has a number of different templates that it uses to order or stop

6    inspections.  These templates differentiate between investors, and Chase uses them to

7    implement different inspection practices as required by different investor guidelines.  I

8    understand from Chase's counsel that Plaintiffs may be reading pages 39 and 40 of my

9    deposition testimony as support for the conclusion that Chase does not alter its practices by

10   investor, but that is not correct.  On pages 39 and 40, I was asked about the frequency and

11   timing of when Chase conducts initial inspections and follow-up inspections, which generally

12   does not vary by investor.  However, whether Chase actually conducts an initial inspection or

13   follow-up inspections does vary by investor.

14   **How Chase uses property inspections**

15        41.    When Chase's MSP system orders a property inspection, the order is transmitted

16   to a third-party inspection vendor.  Inspection vendors then dispatch property inspectors to

17   determine whether a property is occupied and to assess the condition of the property.  After a

18   property inspection has been conducted, the inspector completes a property inspection report.

19   Inspection reports are stored in an online portal on the inspection vendors' website and are

20   always accessible to Chase.  The results of each property inspection are transmitted to Chase's

21   MSP system, which takes account of the results of the inspection and uses that information to

22   assist Chase in making additional servicing decisions.

23        42.    I am informed that the Plaintiffs have cited pages 40 and 77-80 of my deposition

24   testimony for the proposition that "subsequent property inspections were not ordered on the

25   basis of the substantive findings of previous reports."  Class Cert. Mem. at 7.  That is not an

26   accurate characterization of my testimony or the facts.  Rather, if an inspection results in a

27   finding of vacancy, abandonment, or a maintenance issue, the borrower's account will be coded

28   in a manner that triggers appropriate follow-up action, potentially including additional

inspections and/or preservation efforts.  A finding that a property is occupied and in good condition does not, however, guarantee that there will be no future inspections because occupancy status and condition of a property may change over time.  A property that is occupied and in good condition at the time of a given inspection will not necessarily remain so.

43.     I understand that Plaintiffs have stated in their brief that, "aside from limited 'audits', [Chase's] employees never reviewed the results of the property inspections."  Class Cert. Mem. at 7.  It is true that Chase employees do not manually review the results of each and every property inspection, but the statement is otherwise incorrect.  Chase's vendors review each property inspection report that generates actionable information, such as a finding of vacancy or a maintenance issue.  In addition, Chase's employees have access to the reports and may review them, for example, in connection with preservation efforts.  Finally, as described above, Chase's MSP system receives, incorporates, and acts on the useful information generated by a property inspection report, such as a finding of vacancy or abandonment.

**How Chase pays for property inspections**

44.     After a property inspection is completed, Chase advances the cost of the property inspection to the vendor.  Depending on rules developed by other departments within Chase, Chase will either seek to recover the cost of the inspection from the borrower or the investor or will absorb the cost of the inspection itself.

45.     In cases in which Chase seeks to recover the cost of the inspection from a borrower, since at least 2004, Chase has charged the borrower only for the actual cost of the inspection, i.e., the amount that Chase paid the inspection vendor.  As I testified at pages 153-158 of my deposition, in 2004 Chase may have added a $2 surcharge to certain property inspections, but since 2004 no such markups have occurred.

46.     Although some of the inspection costs that Chase incurs are charged to borrowers, borrowers often do not pay these charges or do so only after a long delay.  As long as a borrower is delinquent on his or her mortgage, Chase will allocate any payments made by the borrower to principal, interest, and late fees currently due on the loan before allocating any

1  funds to property inspection fees.  As a result, property inspection charges will not be paid
2  unless and until the borrower becomes current on the loan, which in many cases never happens.

3        47.     Inspection costs that are not recovered from borrowers are potentially
4  recoverable from investors, but again, often this does not occur or occurs only after a long delay.
5  For example, Fannie Mae and Freddie Mac historically imposed caps on the amount of
6  reimbursement they would provide their servicers for property inspections.  In addition,
7  pursuant to Fannie and Freddie's procedures, Chase would seek reimbursement from those
8  institutions only after a loan modification or collateral liquidation event such as a foreclosure or
9  short sale.

10        48.     Chase has no incentive to conduct unnecessary property inspections because at
11 best it will recover only the actual cost of the inspection after a potentially lengthy delay, and at
12 worst it will have to absorb the cost of the inspection itself.

13

14        I declare under penalty of perjury under the laws of the United States that the foregoing
15 is true and correct.
16        Executed on July ℓ, 2015 in Columbus, Ohio.

17

18                                    By: _____
19                                          JACK EVANS

20

21

22

23

24

25

26

27

28