**SLIFKO SUPPLEMENTAL DECLARATION**

# EXHIBIT A

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

| | |
|---|---|
| 1 | Robert D. Wick (*pro hac vice* / rwick@cov.com) |
|   | COVINGTON & BURLING LLP |
| 2 | One CityCenter |
|   | 850 Tenth Street NW |
| 3 | Washington, DC 20001 |
|   | Telephone: (202) 662-6000 |
| 4 | Facsimile: (202) 662-6291 |

David M. Jolley (SBN 191164 /djolley@cov.com)
COVINGTON & BURLING LLP
One Front Street
San Francisco, CA 94111
Telephone: (415) 591-6000
Facsimile: (415) 591-6091

*Attorneys for Defendants JPMorgan Chase & Co. and JPMorgan Chase Bank, N.A., individually and as successor by merger to Chase Home Finance LLC*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| DIANA ELLIS, JAMES SCHILLINGER, and RONALD LAZAR, individually, and on behalf of other members of the public similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> J.P. MORGAN CHASE & CO., a Delaware corporation, J.P. MORGAN CHASE BANK, N.A., a national association, for itself and as successor by merger to Chase Home Finance, LLC, and CHASE HOME FINANCE LLC, a Delaware limited liability company, <br><br> Defendants. | Civil Case No.: 4:12-cv-03897-YGR <br><br> [Related to Case Nos. C-12-00664-YGR, C-12-3892-YGR] <br><br> **DECLARATION OF DEIDRE SLIFKO IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** <br><br> Hearing Date: September 1, 2015 <br> Time: 2:00 PM <br> Courtroom: 1, 4th Floor |

I, Deidre Slifko, declare as follows:

1. I am an Executive Director at JPMorgan Chase Bank, N.A. ("Chase"). I have worked at Chase for 24 years. This declaration is based on my personal knowledge, my review of Chase's business records, and my experience over the course of my time at Chase.

2. I was designated as Chase's corporate representative for purposes of Fed. R. Civ. P. 30(b)(6) to testify about, among other things, Chase's policies, procedures, and practices for charging or assessing borrowers fees for property inspections performed after a borrower defaults on his or her mortgage repayment obligations. I am competent to testify on the matters stated herein.

3. When Chase orders a property inspection on a property that secures a mortgage loan, Chase advances the cost of that inspection to the vendor that conducts the inspection. At that point, Chase has three options for allocating the cost of the inspection. First, Chase can seek reimbursement from the borrower whose conduct triggered a need to conduct a property inspection; these fees are known as "borrower-recoverable" fees. Second, Chase can seek reimbursement from the investor on the loan. Third, Chase can absorb the cost of the inspection itself.

4. Chase's determination of who should bear the cost of a property inspection takes into account the borrower's mortgage agreement, applicable law, investor guidelines, and Chase's own judgment. In this declaration, I summarize the Chase policies and procedures that may cause a borrower to be charged a property inspection fee.

5. Chase uses an invoice processing system to assist it in determining when borrowers will be charged for default-related property inspections.

6. Prior to 2009, Chase did not have a single, centralized written policy for charging borrowers for property inspection fees that applied across all lines of business. There were, however, non-centralized written policies and materials that governed that question at the various heritage institutions (Chase, Washington Mutual, and EMC). Although I am unable to describe the contents of those pre-2009 policies, I am aware that such policies existed and that they varied from heritage institution to heritage institution.

7. Beginning in 2009, Chase began consolidating its various policies and procedures for charging default-related fees, including property inspection fees, into a set of "fee matrices" and additional business-wide rules that determined who should bear the cost of property inspections. These fee matrices and business rules are used to program Chase's invoice processing system, which in turn applies rules that often determine whether a borrower will be charged the cost of a property inspection.

8. One fee matrix—which is currently referred to as the "90.91 Default Fee Matrix"—is used to determine whether a borrower should be assessed the cost of a property inspection. The first iteration of the 90.91 Default Fee Matrix was prepared in 2009. A true and correct copy of the August 19, 2009 version of the 90.91 Default Fee Matrix that relates to property inspection fees is attached hereto as Exhibit A; I understand portions of this exhibit have been highlighted by counsel. The 90.91 Default Fee Matrix has been revised numerous times since 2009. Each change in the 90.91 Default Fee Matrix has led to a corresponding change in the code used to program Chase's invoice processing system.

9. The changes to the 90.91 Default Fee Matrix are illustrated by comparing Exhibit A to the June 2013 version of the relevant portion of the 90.91 Default Fee Matrix, a true and correct copy of which is attached hereto as Exhibit B; I understand portions of this exhibit have been highlighted by counsel. Exhibit B identifies, among other things, ordering codes that indicate the type of inspection being ordered, the maximum fee that can be charged to a borrower or a third party, and the states in which fees are charged to borrowers or third parties.

10. An indication in the 90.91 Default Fee Matrix that borrowers may be charged for costs of property inspections does not necessarily mean that any given borrower in fact was charged. Rather, there are exceptions to the rules set forth in the matrix that apply to certain categories of borrowers such as ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Each of these categories of borrowers was exempt from property inspection charges. In addition, as I testified at pages 71-72 of my deposition transcript, there may be additional specific loan-level situations that may cause a borrower not to be charged an inspection fee. Furthermore, the fact that a borrower was initially

charged a property inspection fee does not necessarily mean that the fee was paid or that it remains on the borrower's account. Instead, based on the circumstances of the borrower's loan, Chase may have subsequently waived or reclassified the fee.

11.   Property inspection fees initially charged to a borrower may also be waived in connection with loan modifications or repayment plans. To determine whether outstanding fees on a borrower's account will be waived in connection with a loan modification, Chase uses a "Corporate Advance Fee Treatment" matrix (sometimes referred to as the "90.90 Fee Matrix"). The 2012 Corporate Advance Fee Treatment matrix, a true and correct copy of which is attached hereto as Exhibit C (which I understand has had highlighting added by counsel), illustrates the circumstances in which Chase may waive property inspection fees when borrowers modify their loans. This matrix takes into account the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ associated with a property inspection order.

12.   To my knowledge, it has always been Chase's policy to ensure that property inspection fees were not charged to borrowers unless the fee was for services actually provided, was authorized by the loan instrument, was not prohibited by law, and was not charged more frequently than permitted by applicable investor guidelines, including guidelines promulgated Fannie Mae, Freddie Mac, or HUD where applicable. In fact, in programming its invoice processing system, Chase seeks to insure that borrowers are charged only for property inspections that are reasonable or appropriate to protect the lender's interest in the property.

13.   Attached as Exhibit D is a true and correct version of a May 31, 2013 version of Chase's PO10.60 policy. This policy was created to aggregate in a single location all the rules and legal obligations Chase followed with respect to charging borrowers for default-related fees, including property inspection fees. An earlier version of this policy was created in 2011. The May 31, 2013 version of the PO10.60 policy is essentially a centralized compilation of the policies that Chase was following earlier, with certain updates and revisions. This policy has undergone further updates and revisions since May 31, 2013.

1    14.    I understand that Plaintiffs' expert witnesses have cited a June 15, 2012 email I
2  wrote as evidence that Chase did not have a written policy or procedure with regard to charging
3  borrowers for property inspection fees.  A true and correct copy of this email is attached hereto
4  as Exhibit E.  As I state in the email, in June 2012, Chase did not have a single consolidated,
5  centralized written policy that explicitly incorporated Fannie Mae guidance regarding when
6  borrowers should be charged default-related or other servicing fees.  However, at the time,
7  individual departments in Chase were responsible for maintaining policies to ensure that such
8  fees were charged only in circumstances permitted by investor guidelines.  As I explained at
9  page 192 of my deposition transcript when I was asked about this email, "the absence of an
10 aggregated policy that exists today doesn't mean that we were not compliant" with Fannie Mae
11 servicing guideline or other potentially applicable guidelines.  I further explained at pages 192-
12 194 of my deposition transcript my understanding of how Chase complied with Section 203.04
13 of the Fannie Mae servicing guidelines.  The draft policy that I refer to in my June 15, 2012
14 eventually became the policy reflected in Exhibit D.

15   15.    I also understand that Plaintiffs have cited pages 90-95 of my deposition
16 testimony for the proposition that Chase "did not take into account occupancy, the condition of
17 the property, or any other factors pertinent to the particular property (including contact with the
18 homeowner) in assessing inspection fees."  Class Cert. Mem. at 8.  This is not correct and
19 mischaracterizes my testimony.  As I testified at pages 90-95 of my deposition transcript, those
20 factors would have been taken into consideration in determining whether a property inspection
21 should be ordered on a property.

22   16.    Each time a property inspection is ordered, Chase's invoice system generates an
23 ordering code (which is sometimes referred to as a "invoice management line item code") that
24 identifies the type of inspection that was ordered.  That code will correspond to a line item in the
25 90.91 Default Fee Matrix. Whether borrowers were charged for property inspections depended
26 in part on the ordering code identifying the type of property inspection ordered, the identity of
27 the original loan servicer (Chase, Washington Mutual, EMC), and the state where the property
28 was located.  For example, if an inspection was ordered on a property that was in foreclosure

1  proceedings, was multi-unit, or had been determined to be vacant, that property inspection
2  presumptively (but not necessarily, depending on state law or other policies within Chase)
3  would be charged to a borrower pursuant to Chase's 90.91 Default Fee Matrix. *See, e.g.*, Ex. A
4  at JPMCELLIS0205321-1 to -2; Ex. B at JPMCELLIS0377122-1 to -2, -5, -9.

5      17.     There are also instances in which the ordering code associated with a property
6  inspection order will prevent a property inspection charge to borrowers. For example,
7  borrowers will not be charged ████████████████████████████████████████
8  ████████████████████████████████████████
9  ████████████████████████████████████████.
10 *See, e.g.*, Ex. B at JPMCELLIS0377122-1, -5. ████████████████████
11 ████████████████████████████████████████
12 ████████████████████. *See, e.g.*, Ex. A at JPMCELLIS0205321-1 to -5; Ex. B at
13 JPMCELLIS0377122-1 to -2; -5 to -6.

14     18.     I also understand from counsel that Plaintiffs have claimed that Chase
15 "implemented a uniform practice of ordering property inspections when homeowners were a
16 certain number of days late and charging homeowners for the inspections." Class Cert. Mem. at
17 1; *see also id.* at 13 (asserting that Chase's property inspection ordering system was "uniformly
18 applied to Plaintiffs and all class members"). Again, this is not correct. The proposed class
19 period includes loans serviced by Chase, Washington Mutual, and EMC, which—until 2008—
20 were three separate entities, each with different rules for charging borrowers for property
21 inspections. It was not until 2009 that Chase began consolidating its property inspection fee-
22 charging practices into a single centralized set of policies. But even the centralized policies that
23 were developed after 2009 took account of state-specific laws, loan status, what investor owned
24 or guaranteed the loan, and the ordering code associated with a property inspection order.
25 Moreover, the post-2009 policies changed over time, based on changes in state laws and
26 business decisions. *Compare* Ex. A *with* Ex. B.

27
28

1  I declare under penalty of perjury under the laws of the United States that the foregoing
2  is true and correct.
3  Executed on July 3, 2015 in Columbus, Ohio.

By: ___/s/ Deidre Slifko___
DEIDRE SLIFKO