Robert D. Wick (*pro hac vice* / rwick@cov.com)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
Telephone: (202) 662-6000
Facsimile: (202) 662-6291

David M. Jolley (SBN 191164 /djolley@cov.com)
COVINGTON & BURLING LLP
One Front Street
San Francisco, CA 94111
Telephone: (415) 591-6000
Facsimile: (415) 591-6091

*Attorneys for Defendants JPMorgan*
*Chase & Co. and JPMorgan Chase Bank, N.A.,*
*individually and as successor by merger to*
*Chase Home Finance LLC*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| DIANA ELLIS, JAMES SCHILLINGER, and RONALD LAZAR, individually, and on behalf of other members of the public similarly situated,<br><br>　　　Plaintiffs,<br><br>　　v.<br><br>J.P. MORGAN CHASE & CO., a Delaware corporation, J.P. MORGAN CHASE BANK, N.A., a national association, for itself and as successor by merger to Chase Home Finance, LLC, and CHASE HOME FINANCE LLC, a Delaware limited liability company,<br><br>　　　Defendants. | Civil Case No.: 4:12-cv-03897-YGR<br><br>[Related to Case Nos. C-12-00664-YGR, C-12-3892-YGR]<br><br>**DECLARATION OF JOSEPH G. DEVINE, JR., IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Hearing Date:  September 1, 2015<br>Time:　　　　　2:00 PM<br>Courtroom:　　1, 4th Floor |

1

2      I, Joseph G. Devine, Jr., declare as follows:

3          1.       I am an authorized signer with JPMorgan Chase Bank, N.A. ("Chase").  My

4      responsibilities include regularly providing research and support assistance for claims and

5      litigation involving Chase.  I have performed these responsibilities for Chase since September of

6      2013.

7          2.       This declaration is based upon my personal knowledge, my review of Chase's

8      business records, and the knowledge I have acquired in the course of my duties with Chase.  I

9      am competent to testify on the matters stated herein.

10         3.       Chase is a national banking association that services mortgage loans originated

11     by Chase (or one of Chase's heritage institutions) or by other lenders.

12         4.       My responsibilities include regularly accessing Chase's mortgage servicing

13     records and investigating account records and transaction histories.  I am familiar with the

14     manner in which mortgage-related account records are maintained.

15         5.       In the ordinary course of its regularly conducted business, Chase maintains

16     account records related to each mortgage loan.  These records are made on or about the time of

17     the events reflected in each record.  These records reflect the date and amounts of payments by

18     borrowers, Chase's communications with a borrower, whether a property inspection was

19     ordered on a borrower's property, and whether the borrower was charged for that property

20     inspection, and whether the borrower paid that property inspection.  Chase relies on these

21     electronic records in the ordinary course of managing and servicing borrower's mortgages.

22     These records are created by Chase and/or its vendors pursuant to standards and requirements

23     established by Chase.

24         6.       The exhibits to this declaration are all true and correct business records created

25     and maintained in the course of regularly conducted business activity and as part of Chase's

26     regular practice of maintaining such records, unless otherwise noted.  I understand that portions

27     of these exhibits have been highlighted by counsel.

28

**General information about Plaintiffs' account records.**

7. I understand that this lawsuit alleges claims based on certain property inspection charges that were assessed the accounts of Plaintiffs Diana Ellis, Ronald Lazar, and James Schillinger. Based on the information in the electronic account records maintained by Chase, each of these borrowers has a mortgage loan that is serviced by Chase.

8. I have personally reviewed Chase's account records for the mortgage loans of Ms. Ellis, Mr. Lazar, and Mr. Schillinger. My statements in this declaration are based upon my personal review of these records.

9. Ms. Ellis, Mr. Lazar, and Mr. Schillinger each executed a security instrument, or deed of trust, in connection with their loans. A true and correct copy of the Deed of Trust for the property securing Ms. Ellis's mortgage loan is attached hereto as Exhibit A. A true and correct copy of the Deed of Trust for the property security Mr. Lazar's mortgage loan is attached hereto as Exhibit B. A true and correct copy of the Deed of Trust for the property securing Mr. Schillinger's mortgage loan is attached hereto as Exhibit C. I understand that portions of these exhibits have been highlighted by counsel.

10. Chase maintains activity logs for each borrower's mortgage loan which reflect, among other things, when Chase attempted to contact the borrower and, if a communication was successful, the substance of that communication. A true and correct copy of the Activity Logs for Ms. Ellis's account is attached hereto as Exhibit D. A true and correct copy of the Activity Logs for Mr. Lazar's account is attached hereto as Exhibit E. A true and correct copy of the Activity Logs for Mr. Schillinger's account is attached hereto as Exhibit F. I understand that portions of these exhibits have been highlighted by counsel.

11. In instances where Chase retains a property inspection vendor to inspect a borrower's property, the vendor prepares records reflecting the date when Chase ordered an inspection, the date when an inspection was performed, and the cost of the inspection charged to Chase. The vendor provides these invoice records to Chase at Chase's request. A true and correct copy of the property inspection invoice records Chase received from its vendor for Ms.

Ellis's loan is attached hereto as Exhibit G.  A true and correct copy of the property inspection invoice records Chase received from its vendor for Mr. Lazar's loan is attached hereto as Exhibit H.    A true and correct copy of excerpts of the property inspection invoice records Chase received from its vendor for Mr. Schillinger's loan is attached hereto as Exhibit I.  I understand that portions of these exhibits have been highlighted by counsel.

**Diana Ellis**

12.     On or about March 12, 2007, Ms. Ellis obtained a mortgage loan from Washington Mutual Bank, FA ("Washington Mutual").  *See* Ex. A, at JPMCELLIS0001464.

13.     Section 9 of Ms. Ellis's Deed of Trust provides that if Ms. Ellis defaults on her repayment obligations:

> then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property.

Ex. A, at JPMCELLIS0001471.  Section 9 goes on to provide that "[a]lthough Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so."  Any amounts paid to take action under Section 9 "shall become additional debt of Borrower secured by this Security Instrument."  *Id.*

14.     Section 14 of Ms. Ellis's Deed of Trust provides:

> Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees.  In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee.  Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

Ex. A, at JPMCELLIS0001473.

15.     Section 16 of Ms. Ellis's Deed of Trust provides that, "[a]s used in this Security Instrument … the word 'may' gives sole discretion without any obligation to take any action." Ex. A, at JPMCELLIS0001474.

16.     On her March 2007 Mortgage Loan Application, Ms. Ellis stated that she made $22,500 per month in base employment income.  A true and correct copy of the Mortgage Loan Application is attached hereto as Exhibit J; I understand that portions of this exhibit have been highlighted by counsel.  *See* Ex. J, at JPMCELLIS0001380.  Washington Mutual loaned Ms. Ellis $1.25 million.  *See* Ex. A, at JPMCELLIS0001465.

17.     Ms. Ellis's mortgage loan was pooled together with other mortgage loans, securitized, and sold to private investors.  A true and correct copy of the Pooling and Servicing Agreement applicable to Ms. Ellis's loan is attached hereto as Exhibit K.

18.     Under the terms of the Pooling and Servicing Agreement, Washington Mutual Bank, f/k/a Washington Mutual Bank, FA retained the right to service the mortgage on behalf of the investors that owned Ms. Ellis's mortgage.  The Pooling and Servicing Agreement identifies the terms and conditions under which Washington Mutual Bank—and later Chase—agreed to service Ms. Ellis's loan.

19.     Ms. Ellis missed her mortgage payment on June 1, 2008, and thus was delinquent on her mortgage repayment obligations as of that date.  A true and correct copy of the Breach Letter, dated July 21, 2008, sent to Ms. Ellis, is attached hereto as Exhibit L; I understand that portions of this exhibit have been highlighted by counsel.   Although Ms. Ellis attempted to make a payment thereafter, that payment was returned for insufficient funds on June 24, 2008. *See* Ex. D, at JPMCELLIS0056572.  On July 8, 2008, when Washington Mutual Bank serviced her loan, a property inspection was ordered to verify the occupancy status and condition of Ms. Ellis's property.  *See* Ex. G, at JPMCELLIS0515581.

20.     A property inspection vendor inspected Ms. Ellis's property on July 11, 2008, and the results of that property inspection were transmitted to Washington Mutual Bank's mortgage servicing platform.  *Id.*  That vendor charged Washington Mutual Bank $8.90 to

conduct that inspection.  *Id.*  On July 15, 2008, Washington Mutual charged Ms. Ellis $8.90 for the inspection.  A true and correct copy of the Fee Activity Ledger for Ms. Ellis's account is attached hereto as Exhibit M; I understand that portions of this exhibit have been highlighted by counsel.  *See* Ex. M, at JPMCELLIS0002709.  Ms. Ellis paid this property inspection fee to Washington Mutual Bank on July 22, 2008.  *See id.* at JPMCELLIS0002710.

21.     On September 25, 2008, Chase acquired certain assets and liabilities of Washington Mutual Bank, f/k/a Washington Mutual Bank, FA from the Federal Deposit Insurance Corporation, as Receiver for Washington Mutual Bank.  The terms of the transaction can be found at http://www.fdic.gov/about/freedom/Washington_Mutual_P_and_A.pdf.  Chase acquired the right to service Ms. Ellis's mortgage loan as a result of this transaction.

22.     Although Ms. Ellis made some payments after July 2008, she began missing payments again that fall.   At the point that she missed her November 1, 2008 payment, she was considered delinquent.  A true and correct copy of the Breach Letter, dated December 30, 2008, sent to Ms. Ellis, is attached hereto as Exhibit N; I understand that portions of this exhibit have been highlighted by counsel.  Ms. Ellis made no attempt to make a mortgage payment between November 1, 2008, and December 8, 2008.  *See* Ex. D, at JPMCELLIS00056569-70.  On December 8, 2008, Chase ordered a property inspection to verify the occupancy status and condition of Ms. Ellis's property.  *See* Ex. G, at JPMCELLIS0515581.

23.     A property inspection vendor inspected Ms. Ellis's property on December 19, 2008, and the results of that inspection were transmitted to Chase's mortgage servicing platform.  *See id.*  The vendor charged Chase $10.85 to conduct this inspection.  *See id.*  On December 22, 2008, Chase charged Ms. Ellis $10.85 for this inspection.  *See* Ex. M, at JPMCELLIS0002710.  Ms. Ellis paid this property inspection fee on July 7, 2011.  *See id.* at JPMCELLIS0002713.

24.     Between December 8, 2008, and January 14, 2009, Ms. Ellis did not make a mortgage payment.  *See* Ex. D, at JPMCELLIS0056568-69.  On January 14, 2009, Chase ordered a property inspection to verify the occupancy status and condition of Ms. Ellis's

property.  *See* Ex. G, at JPMCELLIS0515580.  However, on January 20, 2009, Ms. Ellis attempted to make a mortgage payment.  *See* Ex. D, at JPMCELLIS0056567.  The next day, on January 21, 2009, Chase cancelled the property inspection it had ordered on January 20.  *See* Ex. G, at JPMCELLIS0515580.  Ms. Ellis was never charged for this cancelled inspection.  *See* Ex. M, at JPMCELLIS0002711.

25.     Ms. Ellis's January 20, 2009 mortgage payment was returned for insufficient funds.  *See* Ex. D, at JPMCELLIS0056566.  She attempted to make another payment on January 30, 2009, and that too was returned for insufficient funds.  *See id.* at JPMCELLIS0056563.  On February 9, 2009, Chase ordered a property inspection to verify the occupancy status and condition of Ms. Ellis's property.  *See* Ex. G, at JPMCELLIS0515580.

26.     A property inspection vendor inspected Ms. Ellis's property on February 18, 2009, and the results of that inspection were transmitted to Chase's mortgage servicing platform.  *See* Ex. G, at JPMCELLIS0515580.  The vendor charged Chase $10.85 to conduct this inspection.  *See id.*  On February 23, 2009, Chase charged Ms. Ellis $10.85 for this inspection.  *See* Ex. M, at JPMCELLIS0002712.  Ms. Ellis paid this property inspection fee on July 7, 2011.  *See id.* at JPMCELLIS0002713.

27.     Ms. Ellis did not make a mortgage payment between February 9, 2009, and March 17, 2009.  *See* Ex. D, at JPMCELLIS0056559-64.  (Ms. Ellis's attempt to make a mortgage payment on March 11, 2009, was returned for insufficient funds.  *See id.* at JPMCELLIS0056560.)  On March 17, 2009, Chase ordered a property inspection to verify the occupancy status and condition of Ms. Ellis's property.  *See* Ex. G, at JPMCELLIS0515580.

28.     A property inspection vendor inspected Ms. Ellis's property on March 28, 2009, and the results of that inspection were transmitted to Chase's mortgage servicing platform.  *See id.*  That vendor charged Chase $10.85 to conduct this inspection.  *Id.*  On March 31, 2009, Chase charged Ms. Ellis $10.85 for this inspection.  *See* Ex. M, at JPMCELLIS0002712.  Ms. Ellis paid this property inspection fee on July 7, 2011.  *See id.* at JPMCELLIS0002713.

29.     Ms. Ellis did not make a mortgage payment between March 17, 2009, and April 23, 2009.  *See* Ex. D, at JPMCELLIS0056555-59.  (Ms. Ellis's attempt to make a mortgage payment on April 9, 2009, was returned for insufficient funds.  *See id.* at JPMCELLIS0056558.)  In addition, by April 2009, Chase had learned that Ms. Ellis was $26,713.21 delinquent on her property taxes.  *See id.* at JPMCELLIS0056558-59.  Chase subsequently advanced funds to cover the tax delinquency.  *See id.* at JPMCELLIS0056556-57.  On April 23, 2009, Chase ordered a property inspection to verify the occupancy status and condition of Ms. Ellis's property.  *See* Ex. G, at JPMCELLIS0515580.

30.     A property inspection vendor inspected Ms. Ellis's property on April 24, 2009, and the results of that inspection were transmitted to Chase's mortgage servicing platform.  *See id.*  The vendor charged Chase $10.85 to conduct this inspection.  *See id.*  On April 28, 2009, Chase charged Ms. Ellis $10.85 for this inspection.  *See* Ex. M, at JPMCELLIS0002712.  Ms. Ellis paid this property inspection fee on July 7, 2011.  *See id.* at JPMCELLIS0002713.

31.     On May 7, 2009, Ms. Ellis was approved for a trial loan modification, and Chase and Ms. Ellis began communicating about the possibility of a permanent loan modification.  *See* Ex. D, at JPMCELLIS0056553 (trial modification terms); *id.* at JPMCELLIS0056552 (letter sent stating that modification application was being processed).   Between May 2009 and February 2010, during the time it was considering Ms. Ellis for a loan modification, Chase did not conduct inspections of her property to assess its occupancy status and condition.  *See* Ex. G, at JPMCELLIS0515579-80.

32.     On January 27, 2010, Chase made an appointment for a broker's price opinion ("BPO"),  *see* Ex. D, at JPMCELLIS0056541-42, an opinion about the value of Ms. Ellis's property based on, among other things, an interior inspection of the property.  However, Ms. Ellis cancelled that appointment on February 5, 2010, *see id.* at JPMCELLIS0056540-41, and she did not respond to several attempts to contact her.  *See id.* at JPMCELLIS0056539-40.  Without a BPO, Chase could not move forward on the modification.  *Id.* at JPMCELLIS0056539.  In addition, on February 19, 2010, Ms. Ellis's request for a permanent

loan modification was denied.  *See* Ex. D, at JPMCELLIS0056536-37.  On February 19, 2010, Chase ordered a property inspection to verify the occupancy status and condition of Ms. Ellis's property.  *See* Ex. G, at JPMCELLIS0515579.

33.    A property inspection vendor inspected Ms. Ellis's property on February 26, 2010, and the results of that property inspection were transmitted to Chase's mortgage servicing platform.  *See id.*  The vendor charged Chase $10.85 to conduct this inspection.  *See id.*  On March 1, 2010, Chase charged Ms. Ellis $10.85 for this inspection.  *See* Ex. M, at JPMCELLIS0002712.  Ms. Ellis paid this property inspection fee on July 7, 2011.  *See id.* at JPMCELLIS0002713.

34.    Ms. Ellis remained delinquent between February 19, 2010, and June 16, 2010.  A true and correct copy of the Breach Letter, dated June 16, 2010, sent to Ms. Ellis, is attached hereto as Exhibit O; I understand that portions of this exhibit have been highlighted by counsel. *See* Ex. O, at JPMCELLIS0002112.  Between March 1, 2010 and June 15, 2010, Chase ordered—and a property inspection vendor conducted—three inspections to verify the occupancy status and condition of Ms. Ellis's property.   *See* Ex. G, at JPMCELLIS0515578-79.  Chase was charged $10.85 for one of these inspections and $14 for each of the other two, but Ms. Ellis was not charged for these inspections.  *See* Ex. M, at JPMCELLIS0002713.

35.    As of July 30, 2010, Ms. Ellis had not made a mortgage payment since May 1, 2009.   A true and correct copy of the Breach Letter, dated July 30, 2010, sent to Ms. Ellis, is attached hereto as Exhibit P; I understand that portions of this exhibit have been highlighted by counsel.  *See* Ex. P, at JPMCELLIS0002121.  On July 16, 2010, Chase ordered a property inspection to verify the occupancy status and condition of Ms. Ellis's property.   *See* Ex. G, at JPMCELLIS0515578.  A property inspection vendor inspected Ms. Ellis's property on July 20, 2010, and the results of that property inspection were transmitted to Chase's mortgage servicing platform.  *See id.*  The vendor charged Chase $14 to conduct this inspection.  *See id.*  Although Chase initially charged Ms. Ellis $14 for this inspection on July 26, 2010, *see* Ex. Q, at JPMCELLIS0104646, Chase later waived this charge in connection with Ms. Ellis's 2013 loan

modification.  *See* Ex. R, at JPMCELLIS0515542.  A true and correct copy of the Corporate

Advance History relating to Ms. Ellis's account is attached hereto as Exhibit Q.  A true and

correct copy of the Fees and Costs Analysis Good through December 31, 2012 relating to Ms.

Ellis's is attached hereto as Exhibit R.  I understand that portions of these exhibits have been

highlighted by counsel.

36.     On August 20, 2010, Chase ordered another property inspection to verify the

occupancy status and condition of Ms. Ellis's property, as Ms. Ellis was still in default.  *See* Ex.

G, at JPMCELLIS0515578.  A property inspection vendor inspected Ms. Ellis's property on

August 25, 2010, and the results of that property inspection were transmitted to Chase's

mortgage servicing platform.  *See id.*  The vendor charged Chase $14 to conduct this inspection.

*See id.*  Although Chase initially charged Ms. Ellis $14 for the cost of the August 30, 2010

inspection, *see* Ex. Q, at JPMCELLIS0104646, Chase later waived this charge in connection

with Ms. Ellis's 2013 loan modification.  *See* Ex. R, at JPMCELLIS0515542.

37.     Ms. Ellis remained behind on mortgage payments between August 20, 2010, and

March 2013, at which time Chase agreed to modify her mortgage loan.  A true and correct copy

of the Loan Modification Agreement to Ms. Ellis's loan is attached hereto as Exhibit S; I

understand that portions of this exhibit have been highlighted by counsel.  From September

2010 through March 2013, Chase ordered—and a property inspection vendor conducted—15

inspections to verify the occupancy status and condition of Ms. Ellis's property.   *See* Ex. G, at

JPMCELLIS0515573-77.   Chase was charged $14 for each of these inspections, *see id.*, but

Ms. Ellis was not charged for these inspections.  *See* Ex. Q, at JPMCELLIS0104643-46.

38.     In total, after Chase acquired the rights to service Ms. Ellis's mortgage in

September 2008 and before Chase agreed to modify her mortgage loan in March 2013, there

were at least 67 months in which Ms. Ellis remained behind on her mortgage payments.  During

these months, Chase instructed a vendor to inspect Ms. Ellis's property to verify the occupancy

status and property condition 25 times.  *See supra* ¶¶ 22-37; Ex. G, at JPMCELLIS0515573-81.

However, Chase charged Ms. Ellis for only seven of these inspections, and two of these charges

were later waived.  No property inspection charges remain outstanding on Ms. Ellis's account.
*See supra* ¶¶ 20, 23, 26,  30, 33, 35, 36.

39.    Ms. Ellis's mortgage loan is not, and has never been owned, guaranteed, or insured by the Federal National Mortgage Association ("Fannie Mae"), the Federal Home Loan Mortgage Corporation ("Freddie Mac"), or the Department of Housing and Urban Development.

**Ronald Lazar**

40.    On May 3, 2004, Mr. Lazar obtained a mortgage loan from Washington Mutual Bank.  *See* Ex. B, at JPMCELLIS0000322.

41.    Section 9 of Mr. Lazar's Deed of Trust provides that if Mr. Lazar defaults on his repayment obligations:

> then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property.

*Id.* at JPMCELLIS0000329-30.  Section 9 goes on to provide that "[a]lthough Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so."  *Id.* at JPMCELLIS0000330.  Any amounts paid to take action under Section 9 "shall become additional debt of Borrower secured by this Security Instrument."  *Id.*

42.    Section 14 of Mr. Lazar's Deed of Trust provides:

> Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. . . . In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee.  Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

*Id.* at JPMCELLIS0000333.

43.    Section 16 of Mr. Lazar's Deed of Trust provides that, "[a]s used in this Security Instrument … the word 'may' gives sole discretion without any obligation to take any action."  *Id.* at JPMCELLIS0000334.

44.     Mr. Lazar's mortgage loan was sold to Fannie Mae, which guarantees his loan. The current version of the Fannie Mae Single-Family Servicing Guide can be found at http://www.fanniemae.com/singlefamily/index.

45.     Washington Mutual retained the right to service the mortgage loan on behalf of Fannie Mae.

46.     On September 25, 2008, Chase acquired certain assets and liabilities of Washington Mutual Bank, f/k/a Washington Mutual Bank, FA from the Federal Deposit Insurance Corporation, as Receiver for Washington Mutual Bank.  The terms of the transaction can be found at http://www.fdic.gov/about/freedom/Washington_Mutual_P_and_A.pdf.  Chase acquired the right to service Mr. Lazar's mortgage as a result of this transaction.

47.     Mr. Lazar was in default on his loan by at least January 22, 2009.  *See* Ex. E, at JPMCELLIS0056088-89.  Chase approved him for a special forbearance, *see id.* at JPMCELLIS0056087 (explaining forbearance terms); *id.* at JPMCELLIS0056086 (forbearance approved), and then extended that forbearance by several months, *see id.* at JPMCELLIS0056083-84.  Mr. Lazar subsequently asked Chase for another extension on the forbearance agreement or for a loan modification.   *See id.* at JPMCELLIS0056080 (communications regarding documents needed to evaluate forbearance request); JPMCELLIS0056075 (noting that Chase treated his request as one for either a forbearance extension or treatment under a home modification program (or "HMP")).  While this request was pending, Chase did not conduct inspections of his property.  *See* Ex. H, at JPMCELLIS0515537-38.

48.     By June 2010, Mr. Lazar's request for a loan modification had been denied.  Ex. E, at JPMCELLIS0056067.  By that point, Mr. Lazar had been considered delinquent on his payments as of July 1, 2009.   A true and correct copy of Mr. Lazar's Mortgage Loan Statement, dated October 14, 2010, is attached hereto as Exhibit T; I understand that portions of this exhibit have been highlighted by counsel.  *See* Ex. T, at JPMCELLIS0005789. On June 4, 2010, Chase

ordered an inspection to assess the occupancy status and condition of Mr. Lazar's property.  *See* Ex. H, at JPMCELLIS0515537.

49.     A property inspection vendor inspected Mr. Lazar's property on June 19, 2010, and the results of that property inspection were transmitted to Chase's mortgage servicing platform.  *Id.*  The vendor charged Chase $14 for this inspection.  *Id.*  On June 29, 2010, Chase charged Mr. Lazar $14 for the cost of this inspection.  A copy of the Corporate Advance History relating to Mr. Lazar's account is attached hereto as Exhibit U; I understand that portions of this exhibit have been highlighted by counsel.  *See* Ex. U, at JPMCELLIS0104656.  Mr. Lazar has not paid this property inspection fee.  *See* Ex. U.

50.     Mr. Lazar remained delinquent as of July 1, 2009.  *See* Ex. T, at JPMCELLIS0005789.  On September 3, 2010, Chase ordered an inspection to assess the occupancy status and condition of Mr. Lazar's property.  *See* Ex. H, at JPMCELLIS0515537.

51.     A property inspection vendor inspected Mr. Lazar's property on September 11, 2010, and the results of that property inspection were transmitted to Chase's mortgage servicing platform.  *See id.*  The vendor charged Chase $14 to conduct this inspection.  *See id.*  On September 14, 2010, Chase charged Mr. Lazar $14 for this inspection.  *See* Ex. U, at JPMCELLIS0104656.  Mr. Lazar has not paid this property inspection fee.  *See* Ex. U.

52.     Mr. Lazar continued to be delinquent on his July 1, 2009, mortgage payment.  *See* Ex. T, at JPMCELLIS0005789.  On October 12, 2010, Chase ordered a property inspection on Mr. Lazar's property.  *See* Ex. H, at JPMCELLIS0515537.  That same day, however, Mr. Lazar contacted Chase and told Chase that he would make a payment.  *See* Ex. E, at JPMCELLIS0056050-51.  Accordingly, on October 12, 2010, Chase cancelled the property inspection it had ordered earlier that day.  *See id.* at JPMCELLIS0056051; Ex. H, at JPMCELLIS0515537.  Mr. Lazar was not charged for the cancelled inspection.  *See* Ex. U, at JPMCELLIS0104656.

53.     Mr. Lazar made a $7,152.85 payment on his mortgage loan on October 7, 2010.  Exhibit V attached hereto is a copy of a document produced by Mr. Lazar in the above-

captioned case bearing the Bates number of LAZAR_000006.  That $7,152.85 payment did not cover the two $14 property inspection fees Mr. Lazar was charged in July and September 2010. A true and correct copy of the Breach Letter sent to Mr. Lazar on June 2, 2011, is attached hereto as Exhibit W; I understand that portions of this exhibit have been highlighted by counsel. *See* Ex. W, at JPMCELLIS006110 ($28.00 in corporate advances remaining on Mr. Lazar's account on June 2, 2011).  Instead, Mr. Lazar's payment was first applied to his unpaid principal (which at the time of his payment was $3,038.38 ), then to his unpaid interest (which at the time of this payment was $3,818.18), then to his outstanding late fees of $215.00, and then the remaining $81.29 was applied to escrow.  A true and correct copy of Mr. Lazar's Payment History from 2008-2011 is attached hereto as Exhibit X; I understand that portions of this exhibit have been highlighted by counsel.  *See* Ex. X, at JPMCELLIS0055982-83. Nevertheless, between October 2010 and June 2011, Chase did not treat Mr. Lazar as delinquent or inspect his property due to his failure to pay those property inspection fees.  *See* Ex. W, at JPMCELLIS0006110 (considering Mr. Lazar delinquent as of May 1, 2011, even though corporate advances had not been paid since September 2010).

54.     Mr. Lazar failed to make his May 1, 2011 mortgage payment, and he was sent a Breach Letter on June 2, 2011.  *See* Ex. W.  The Breach Letter identified all amounts Mr. Lazar owed in connection with his mortgage, including $28.00 in unpaid corporate advances, which represented Mr. Lazar's unpaid property inspection fees.  *See id.* at JPMCELLIS0006110.

55.     Chase made several unsuccessful attempts to speak with Mr. Lazar in May and June 2011.  *See* Ex. E, at JPMCELLIS0056269-71 (detailing Chase's calls to Mr. Lazar's number that did  not result in a conversation with Mr. Lazar).  On June 16, 2011, Chase ordered an inspection to assess the occupancy status and condition of Mr. Lazar's property.  *See* Ex. H, at JPMCELLIS0515537.

56.     A property inspection vendor inspected Mr. Lazar's property on June 20, 2011, and the results of that property inspection were transmitted to Chase's mortgage servicing platform.  *See id.*  The inspection revealed, among other things, that the main building on the

property was vacant but that the property was in a secure condition.  *See id.*  I understand that the property that secured Mr. Lazar's mortgage loan consisted of two buildings, one of which was a rental property that Mr. Lazar testified that he sometimes had trouble renting.  The vendor charged Chase $14 to conduct this inspection.  *See id.*  On June 25, 2011, Chase charged Mr. Lazar $14 for this inspection.  *See* Ex. U, at JPMCELLIS0104655.  Mr. Lazar has not paid this property inspection fee.  *See id.* at JPMCELLIS0104651-55.

57.     Mr. Lazar did not make any mortgage payments between June 16, 2011, and July 21, 2011.  *See* Ex. Y.[1]  After attempting to contact Mr. Lazar on July 19, 2011, a Chase customer service representative noted that Mr. Lazar's phone had been disconnected.  *See* Ex. E, at JPMCELLIS0056266.  On July 21, 2011, Chase ordered an inspection to assess the occupancy status and condition of Mr. Lazar's property.  *See* Ex. H, at JPMCELLIS0515536.

58.     A property inspection vendor inspected Mr. Lazar's property on July 24, 2011, and the results of that property inspection were transmitted to Chase's mortgage servicing platform.  *See id.*  The inspection revealed, among other things, that the main building on the property was vacant but that the property was in a secure condition.  *See id.*  The vendor charged Chase $14 for this inspection.  *See id.*  On August 23, 2011, Chase charged Mr. Lazar $14 for this inspection.  *See* Ex. U, at JPMCELLIS0104655.  Mr. Lazar has not paid this property inspection fee.  *See id.* at JPMCELLIS0104651-55.

59.     Mr. Lazar did not make any mortgage payments after July 21, 2011, *see* Ex. Y, and his loan was placed in active foreclosure status on August 1, 2011.  *See* Ex. E, at JPMCELLIS0056261.  Mr. Lazar's loan remained in active foreclosure status until April 20, 2012, when Chase halted foreclosure proceedings as a result of the filing of a lawsuit against Chase.  *See id.* at JPMCELLIS0056171.

---

[1]     Attached hereto as Exhibit Y is a copy of a document produced by Mr. Lazar in the above-captioned case bearing the Bates number of LAZAR_000051; I understand that portions of this exhibit have been highlighted by counsel.  This document is dated April 2012.  It states that Mr. Lazar had failed to make any payment since May 2011; I have confirmed the accuracy of this information from Chase's records.

60.     On August 24, 2011, while his loan was in active foreclosure status, Chase ordered an inspection to assess the occupancy status and condition of Mr. Lazar's property. *See* Ex. H, at JPMCELLIS0515536.  A property inspection vendor inspected Mr. Lazar's property on August 29, 2011, and the results of that property inspection were transmitted to Chase's mortgage servicing platform. *Id.*  The inspection revealed, among other things, that the main building on the property was vacant but that the property was in a secure condition. *Id.*  The vendor charged Chase $14 to conduct this inspection. *Id.*  On October 14, 2011, Chase charged Mr. Lazar $14 for this inspection. *See* Ex. U, at JPMCELLIS0104655.  Mr. Lazar has not paid this property inspection fee. *See id.* at JPMCELLIS0104651-55.

61.     On September 29, 2011, while his loan was in active foreclosure status, Chase ordered an inspection to assess the occupancy status and condition of Mr. Lazar's property. *See* Ex. H, at JPMCELLIS0515536.  A property inspection vendor inspected Mr. Lazar's property on October 7, 2011, and the results of that property inspection were transmitted to Chase's mortgage servicing platform. *Id.*  Those inspection results revealed, among other things, that the main building on the property was vacant but that the property was in a secure condition. *Id.*  The vendor charged Chase $14 to conduct this inspection. *Id.*  On November 2, 2011, Chase charged Mr. Lazar $14 for this inspection.  *See* Ex. U, at JPMCELLIS0104655.  Mr. Lazar has not paid this property inspection fee. *See id.* at JPMCELLIS0104651-55.

62.     On October 31, 2011, while his loan was in active foreclosure status, Chase ordered an inspection to assess the occupancy status and condition of Mr. Lazar's property. *See* Ex. H, at JPMCELLIS0515535.  A property inspection vendor inspected Mr. Lazar's property on November 12, 2011, and the results of that property inspection were transmitted to Chase's mortgage servicing platform. *Id.*  The inspection revealed, among other things, that the main building on the property was vacant but that the property was in a secure condition. *Id.*  The vendor charged Chase $14 to conduct this inspection. *Id.*  On December 8, 2011, Chase charged Mr. Lazar $14 for this inspection. *See* Ex. U, at JPMCELLIS0104655.  Mr. Lazar has not paid this property inspection fee. *See id.* at JPMCELLIS0104651-55.

63.     On November 29, 2011, while his loan was in active foreclosure status, Chase ordered an inspection to assess the occupancy status and condition of Mr. Lazar's property. *See* Ex. H, at JPMCELLIS0515535.  A property inspection vendor inspected Mr. Lazar's property on December 9, 2011, and the results of that property inspection were transmitted to Chase's mortgage servicing platform. *Id.*  The inspection revealed, among other things, that the main building on the property was vacant but that the property was in a secure condition. *Id.*  The vendor charged Chase $14 to conduct this inspection. *Id.*  On January 7, 2012, Chase charged Mr. Lazar $14 for this inspection.   *See* Ex. U, at JPMCELLIS0104655.  Mr. Lazar has not paid this property inspection fee.  *See id.* at JPMCELLIS0104651-55.

64.     On December 29, 2011, while his loan was in active foreclosure status, Chase ordered an inspection to assess the occupancy status and condition of Mr. Lazar's property. *See* Ex. H, at JPMCELLIS0515535.  A property inspection vendor inspected Mr. Lazar's property on January 8, 2012, and the results of that property inspection were transmitted to Chase's mortgage servicing platform. *Id.*  The inspection revealed, among other things, that the main building on the property was vacant but that the property was in a secure condition. *Id.*  The vendor charged Chase $14 to conduct this inspection. *Id.*  On January 26, 2012, Chase charged Mr. Lazar $14 for this inspection.   *See* Ex. U, at JPMCELLIS0104655.  Mr. Lazar has not paid this property inspection fee.  *See id.* at JPMCELLIS0104651-55.

65.     On January 30, 2012, while his loan was in active foreclosure status, Chase ordered an inspection to assess the occupancy status and condition of Mr. Lazar's property. *See* Ex. H, at JPMCELLIS0515534.  A property inspection vendor inspected Mr. Lazar's property on February 2, 2012, and the results of that inspection were transmitted to Chase's mortgage servicing platform. *Id.*  The inspection revealed, among other things, that the main building on the property was vacant but that the property was in a secure condition. *Id.*  The vendor charged Chase $14 to conduct this inspection. *Id.*  On February 11, 2012, Chase charged Mr. Lazar $14 for this inspection. *See* Ex. U, at JPMCELLIS0104655.  Mr. Lazar has not paid this property inspection fee. *See id.* at JPMCELLIS0104651-55.

66.     On February 28, 2012, while his loan was in active foreclosure status, Chase ordered an inspection to assess the occupancy status and condition of Mr. Lazar's property.  *See* Ex. H, at JPMCELLIS0515534.  A property inspection vendor inspected Mr. Lazar's property on March 1, 2012, and the results of that inspection were transmitted to Chase's mortgage servicing platform.  *Id.*  The inspection revealed, among other things, that the main building on the property was vacant but that the property was in a secure condition.  *Id.*  The vendor charged Chase $14 to conduct this inspection.  *Id.*  On March 10, 2012, Chase charged Mr. Lazar $14 for this inspection.  *See* Ex. U, at JPMCELLIS0104654.   Mr. Lazar has not paid this property inspection fee.  *See id.* at JPMCELLIS0104651-54.

67.     On March 29, 2012, while his loan was in active foreclosure status, Chase ordered an inspection to assess the occupancy status and condition of Mr. Lazar's property.  *See* Ex. H, at JPMCELLIS0515534.  A property inspection vendor inspected Mr. Lazar's property on April 5, 2012, and the results of that property inspection were transmitted to Chase's mortgage servicing platform.  *Id.*  Those inspection results revealed, among other things, that the main building on the property was vacant but that the property was in a secure condition.  *Id.* That vendor charged Chase $14 to conduct this inspection.  *Id.*  On April 25, 2012, Chase charged Mr. Lazar $14 for the cost of this inspection.  *See* Ex. U, at JPMCELLIS0104654.  Mr. Lazar has not paid this property inspection fee.  *See id.* at JPMCELLIS0104651-54.

68.     Mr. Lazar has remained delinquent on his mortgage obligations since May 2011. In 2014, Chase ordered a property inspection to verify the occupancy status and condition of Mr. Lazar's property; the property inspection vendor conducted that inspection on September 26, 2014, and the results were transmitted to Chase's mortgage servicing platform.  *See* Ex. E, at JPMCELLIS0056096.  Chase was charged $14 for this inspection, but Mr. Lazar was not charged for this inspection.  *See* Ex. U, at JPMCELLIS0104651.

69.     In total, after Chase acquired the rights to service Mr. Lazar's mortgage in September 2008, there were at least 63 months during which Mr. Lazar remained behind on his mortgage repayment obligations.  *See supra* ¶¶ 47-53 (Mr. Lazar delinquent from January 2009

to October 2010); *supra* ¶¶ 68 (Mr. Lazar delinquent from May 2011 into 2015).  During these

months, Chase instructed a vendor to inspect Mr. Lazar's property 13 times.  *See supra* ¶¶ 48,

50, 55, 57, 60-68.  Mr. Lazar has been charged for the cost of 12 of these inspections.  Chase

has not been paid for any of these inspections.  *See* Ex. U, at JPMCELLIS0104651-57.

70.     Mr. Lazar's mortgage loan is not, and has never been insured by the Department

of Housing and Urban Development.

**James Schillinger**

71.     On September 12, 2005, Mr. Schillinger obtained a mortgage loan from Chase.

*See* Ex. C, at JPMCELLIS0003313.

72.     Section 9 of Mr. Schillinger's Deed of Trust provides that if Mr. Schillinger

defaults on his repayment obligations:

> then Lender may do and pay for whatever is reasonable or
> appropriate to protect Lender's interest in the Property and rights
> under this Security Instrument, including protecting and/or
> assessing the value of the Property , and securing and/or repairing
> the Property.

*Id.* at JPMCELLIS0003319-20.  Section 9 goes on to provide that "[a]lthough Lender may take

action under this Section 9, Lender does not have to do so and is not under any duty or

obligation to do so."  *Id.*  Any amounts paid to take action under Section 9 "shall become

additional debt of Borrower secured by this Security Instrument."  *Id.*

73.     Section 14 of Mr. Schillinger's Deed of Trust provides:

> Lender may charge Borrower fees for services performed in
> connection with Borrower's default, for the purpose of protecting
> Lender's interest in the Property and rights under this Security
> Instrument, including, but not limited to, attorneys' fees, property
> inspection and valuation fees.  In regard to any other fees, the
> absence of express authority in this Security Instrument to charge
> a specific fee to Borrower shall not be construed as a prohibition
> on the charging of such fee.  Lender may not charge fees that are
> expressly prohibited by this Security Instrument or by Applicable
> Law.

*Id.* at JPMCELLIS0003322.

74.     Section 16 of Mr. Schillinger's Deed of Trust provides that, "[a]s used in this Security Instrument …. the word 'may' gives sole discretion without any obligation to take any action." *Id.* at JPMCELLIS0003323.

75.     Mr. Schillinger's mortgage loan was pooled together with other mortgage loans, securitized, and sold to private investors.  A true and correct copy of the Investor Screenshot relating to Mr. Schillinger's mortgage loan is attached hereto as Exhibit Z; I understand that portions of this exhibit have been highlighted by counsel.  A true and correct copy of the Pooling and Servicing Agreement applicable to Mr. Schillinger's loan is attached hereto as Exhibit AA; I understand that portions of this exhibit have been highlighted by counsel.

76.     Under the terms of this Pooling and Servicing Agreement, Chase retained the right to service the mortgage loan on behalf of the investors that owned Mr. Schillinger's mortgage.  *See* Ex. AA, at ALVAREZMARSAL_0000352.

77.     Mr. Schillinger was in default on his mortgage loan obligations in May 2011.  A true and correct copy of the June 6, 2011 letter to Mr. Schillinger is attached hereto as Exhibit BB; I understand that portions of this exhibit have been highlighted by counsel.  On June 20, 2011, Chase approved Mr. Schillinger for a temporary unemployment forbearance on his loan. *See* Ex. F, at JPMCELLIS0056328.  Pursuant to this agreement, Mr. Schillinger agreed to make monthly payments at a reduced amount.  *See id.*

78.     On September 20, 2011, while he was delinquent on his mortgage loan obligations, Mr. Schillinger called Chase and stated that his home was "unlivable at the moment" due to a water leak and that he had moved out into a hotel.  *See id.* at JPMCELLIS0056322.  That same day, Chase ordered a property inspection to assess the occupancy status and condition of Mr. Schillinger's property.  *See* Ex. I, at JPMCELLIS0515583.

79.     A property inspection vendor inspected Mr. Schillinger's property on September 28, 2011, and the results of that inspection were transmitted to Chase's mortgage servicing platform.  *See id.*; *see also* Ex. F, at JPMCELLIS0056317.  The vendor charged Chase $14 to

conduct this inspection.  *See* Ex. I, at JPMCELLIS0515583.  On October 18, 2011, Chase charged Mr. Schillinger $14 for this inspection.   A true and correct copy of the Corporate Advance History relating to Mr. Schillinger's mortgage loan is attached hereto as Exhibit CC; I understand that portions of this exhibit have been highlighted by counsel.  *See* Ex. CC, at JPMCELLIS0104665.

80.     On September 28, 2011, while he remained delinquent on his mortgage obligations, Mr. Schillinger told Chase that he was still living at a hotel.   *See* Ex. F, at JPMCELLIS0056318.  Mr. Schillinger's account records do not indicate that he ever notified Chase that he had moved back into his house or that his house had become "livable."   *See* Ex. F, at JPMCELLIS0056311-18.  On October 20, 2011, Chase ordered a property inspection to assess the occupancy status and condition of Mr. Schillinger's property.  *See* Ex. I, at JPMCELLIS0515587.

81.     A property inspection vendor inspected Mr. Schillinger's property on October 23, 2011, and the results of that inspection were transmitted to Chase's mortgage servicing platform.  *See id.*; *see also* Ex. F, at JPMCELLIS0056307.  The vendor charged Chase $14 to conduct this inspection.  *See* Ex. I, at JPMCELLIS0515587.  On October 28, 2011, Chase charged Mr. Schillinger $14 for this inspection.   *See* Ex. CC, at JPMCELLIS0104665.

82.     On February 2, 2012, Mr. Schillinger had gone more than 30 days without making a payment under his temporary forbearance agreement.  A true and correct copy of Mr. Schillinger's Payment History from 2012-2014 is attached hereto as Exhibit DD.  *See* Ex. DD, at JPMCELLIS0056807 (no payment received in January 2012).  That same day, Chase ordered a property inspection to assess the occupancy status and condition of Mr. Schillinger's property. *See* Ex. I, at JPMCELLIS0515591.

83.     A property inspection vendor inspected Mr. Schillinger's property on February 13, 2012, and the results of that inspection were transmitted to Chase's mortgage servicing platform. *See id.*; *see also* Ex. F, at JPMCELLIS0056487.  The vendor charged Chase $14 to

conduct this inspection.  *See* Ex. I, at JPMCELLIS0515591.  On February 18, 2012, Chase charged Mr. Schillinger $14 for this inspection.  *See* Ex. CC, at JPMCELLIS0104665.

84.     Mr. Schillinger did not pay any of the property inspection fees he was assessed in 2011 and 2012.  *See* Ex. CC, at JPMCELLIS0104664-65.  On July 11, 2012, Chase sent a Reinstatement Quote to Tennessee's Hardest Hit program, a program for which Mr. Schillinger had applied and under which government funds are given to mortgage servicers to help borrowers facing hardship remain in their homes.  *See* Ex. F, at JPMCELLIS0056462, JPMCELLIS0056466.  This Reinstatement Quote included the $42 Mr. Schillinger owed for three property inspections.  *Id.* at JPMCELLIS0056466.  On August 10, 2012, Chase received the full reinstatement amount ($23,498.18) from the Hardest Hit program, *see id.* at JPMCELLIS0056461, and applied $42 of that to the unpaid property inspection fees, *see* Ex. CC, at JPMCELLIS0104659.

85.     On February 6, 2013, after his temporary forbearance agreement had terminated and while he remained behind on his mortgage obligations, Mr. Schillinger's request for a loan modification was denied.  *See* Ex. F, at JPMCELLIS0056417.  That same day, Chase ordered a property inspection to assess the occupancy status and condition of Mr. Schillinger's property.  *See* Ex. I, at JPMCELLIS0515595.

86.     A property inspection vendor inspected Mr. Schillinger's property on February 9, 2013, and the results of that inspection were transmitted to Chase's mortgage servicing platform.  *See id.*; *see also* Ex. F, JPMCELLIS0056416.  The vendor charged Chase $14 to conduct this inspection.  *See* Ex. I, at JPMCELLIS0515595.  On March 1, 2013, Chase charged Mr. Schillinger $14 for this inspection.  *See* Ex. CC, at JPMCELLIS0104659.  Mr. Schillinger has not paid this charge.  *See id.* at JPMCELLIS0104658-59.

87.     Mr. Schillinger remains delinquent on his repayment obligations.  A true and correct copy of the August 2013 statement indicating that Mr. Schillinger had not paid his monthly payment from September 2012 is attached hereto as Exhibit EE; I understand that portions of this exhibit have been highlighted by counsel.  In September 2014 and October

2014, Chase ordered, and a property inspection vendor conducted, property inspections to verify the occupancy status and condition of Mr. Schillinger's property.  *See* Ex. F, at JPMCELLIS0056352, JPMCELLIS0056356.   Chase was charged $14 for each of these inspections, but Mr. Schillinger was not charged for these inspections.  *See id.*; *see also* Ex. CC, at JPMCELLIS0104658.

88.    In total, there were at least 43 months in which Mr. Schillinger was behind on his mortgage obligations.  *See supra* ¶¶ 77, 84, 87.   During these months, Chase instructed a vendor to inspect Mr. Schillinger's property six times.  *See supra* ¶¶ 78, 80, 82, 85, 87.  Mr. Schillinger has been charged for the cost of four of these inspections, *see* Ex. CC, at JPMCELLIS0104659, JPMCELLIS0104665, but he has not paid any of these charges.  *See id.* at JPMCELLIS0104658-65.  Instead, government funds were used to pay three of the four inspections charged to Mr. Schillinger's account.  *See supra* ¶ 84.

89.    Mr. Schillinger's mortgage loan is not guaranteed, owned, or insured by Fannie Mae, Freddie Mac, or the Department of Housing and Urban Development.

I declare under penalty of perjury under the laws of the United States that the foregoing factual statements are true and correct.

Executed on  _July 9 2015_  in Kings County, New York.

By:  _____

Joseph G. Devine, Jr.
Title:  Authorized Signer
JPMorgan Chase Bank, N.A.