1
2
3
4
5
6
7
8

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

9   **DIANA ELLIS,** *et al.,*

10            Plaintiffs,

11       vs.

12   **J.P. MORGAN CHASE & CO.,** *et al.,*

13            Defendants.

14

Case No.: 12-cv-03897- YGR

**ORDER DENYING PLAINTIFFS' MOTION FOR ORDER OF ENTITLEMENT TO CATALYST FEE AWARD UNDER CAL. CODE CIV. P. § 1021.5**

Re: Dkt. No. 250

15      Now before the Court is a motion by plaintiffs Diana Ellis, James Schillinger, and Ronald

16   Lazar seeking an order entitling them to a catalyst fee award of attorneys' fees under Cal. Code Civ.

17   P. section 1021.5. (Dkt. No. 250.)[1]  Defendants J.P. Morgan Chase & Co., J.P. Morgan Chase Bank,

18   N.A., and Chase Home Finance, LLC's (collectively, "Chase") oppose.  Having carefully considered

19   the papers submitted and the pleadings in this action, and for the reasons set forth below, the Court

20   hereby **DENIES** plaintiffs' motion.

21   **I.      BACKGROUND**

22      Chase has acted as a home mortgage loan servicer for millions of borrowers nationwide.  In

23   that capacity, Chase is responsible for providing certain services to protect the mortgage lenders'

24   interests in the property securing the underlying loan.  Among those services are property

25   inspections, which Chase orders to inspect the property when a borrower goes into default.

26

27   ───────────────
   [1]  The Court resolves the administrative motions to seal documents submitted in connection
28   with the substantive motion through separate orders entered this date.

United States District Court
Northern District of California

### A.  The OCC Consent Order and National Mortgage Settlement

On April 13, 2011, Chase entered into a consent order with the Office of the Comptroller of the Currency ("OCC") to resolve an enforcement action OCC had taken against Chase and seven other mortgage servicers relating to their mortgage servicing and foreclosure operations.  (Dkt. No. 259-22, the "OCC Consent Order.")  The parties and the Court are familiar with the terms of the OCC Consent Order as the Court previously described it in detail in its order on Chase's first motion to dismiss.  (*See* Dkt. No. 31 at 11–13.)

Relevant here, the OCC Consent Order required Chase to implement a compliance program to ensure that mortgage servicing and foreclosure operations complied with all legal requirements, OCC supervisory guidance, and requirements of the OCC Consent Order.  The compliance program required Chase to adopt, *inter alia*:

> (a) appropriate written policies and procedures to conduct, oversee, and monitor mortgage servicing, Loss Mitigation, and foreclosure options;
> . . . .
> (h) process to ensure that all fees, expenses, and other charges imposed on the borrower are assessed in accordance with the terms of the underlying mortgage note, mortgage, or other customer authorization with respect to the imposition of fees, charges, and expenses, and in compliance with all applicable Legal Requirements and OCC supervisory guidance; [and]
> . . . .
> (k) measures to ensure that policies, procedures, and processes are updated on an ongoing basis as necessary to incorporate any changes in applicable Legal Requirements and OCC supervisory guidance.

(OCC Consent Order at 8–9.)

Approximately one year later, on March 12, 2012, Chase entered into a consent judgment, the National Mortgage Settlement, with the federal government, 49 States, and the District of Columbia.  (Dkt. No. 259-24, the "NMS.")  The entities filed a federal lawsuit arising out of the national mortgage crisis against Chase for violations of various state and federal laws in the servicing of home mortgage loans, including: unfair and deceptive acts and practices laws of the various States, the federal False Claims Act, and bankruptcy laws.  (*Id*. at 2–3.)  Pursuant to the NMS, Chase agreed to pay a monetary penalty of more than $1 billion.  (*Id*. at 4.)  Chase further committed to achieve certain servicing standards and reforms as part of the NMS.  (*Id*. at 94–135.)  The servicing standards

imposed by the NMS concerned, *inter alia*, the frequency with which property inspection fees may be charged to a delinquent borrower and the circumstances under which Chase could charge delinquent borrowers for reasonable and appropriate default-related fees under the terms of their agreements.  (*Id*. at 129–30.)  The NMS further specified that servicer guidelines would govern Chase's charging behavior: "No property inspection fee shall be imposed on a borrower any more frequently than the timeframes allowed under GSE or HUD guidelines," subject to a limited exception.  (*Id*. at 129.)  A federal judge entered the NMS as a judgment of that court on April 4, 2012.  (*Id*.)

According to Deidre Slifko, a twenty-five year employee of Chase and executive director familiar with the relevant policies, Chase began work on its internally designated "PO10.60 policy" in 2011 in part to implement the OCC Consent Order requirements.  (Dkt. No. 259-21, "Slifko Decl.," at ¶¶ 6–8.)  The first version of the PO10.60 policy was implemented on August 12, 2011.  (*Id*. at ¶ 8.)  Chase continued to revise the PO10.60 policy on an ongoing basis through 2013.  (*Id*.)  On May 13, 2013, Chase made certain additions to the PO10.60 policy, version 49 of that document, which incorporated language from the NMS.  (*Id*. ¶¶ 9–12.)

**B.   The Instant Litigation**

In February 2012, the day after the NMS was announced, plaintiffs filed this lawsuit.[2]  Their complaint contained allegations on behalf of a nationwide class challenging Chase's alleged assessment of delinquent borrowers for property inspections[3] Chase marked up from the cost it paid a third-party vendor for the service.  (Dkt. No. 1 ¶ 2.)  Plaintiffs included causes of action for violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), conspiracy to violate RICO,

---

[2]  On February 10, 2012, plaintiffs asserted their claims against Chase as part of related case, *Bias v. Wells Fargo*, 12-cv-664-YGR.  That case accused Chase as well as two other sets of bank defendants – CitiBank and Wells Fargo – of similar conduct in connection with servicing home mortgage loans.  On July 13, 2012, the Court severed the defendant banks and directed plaintiffs to file their claims against Chase in a separate action.  On July 24, 2012, plaintiffs filed this action against Chase only.  (*See* Dkt. No. 1.)

[3]  Plaintiffs' complaint and first amended complaint also alleged the same conduct with respect to Broker Price Opinions ("BPOs").  (*See* Dkt. Nos. 1, 97.)  Plaintiffs have since dropped their claims concerning BPOs entirely and do not argue they were the catalyst for any change related to Chase's BPO policies.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   fraud, and unjust enrichment.  (*See id.*)  While the complaint included allegations of purportedly

2   "unnecessary" fees, the gravamen of plaintiffs' original complaint was Chase's alleged mark-up

3   profit hidden in the property inspection fee amounts assessed to borrowers.

4        In August 2012, Chase moved to dismiss primarily on jurisdictional grounds in light of the

5   OCC Consent Order and federal preemption under the National Bank Act.  (Dkt. No. 6.)  In addition,

6   Chase moved on various pleading grounds.  (*Id.*)  On June 13, 2013, the Court issued an order

7   granting Chase's motion to dismiss the RICO claims on pleading grounds but denying the motion

8   with respect to the state law causes of action.  (Dkt. No. 31.)  The Court allowed plaintiffs' state law

9   claims to proceed chiefly based upon plaintiffs' allegations that Chase fraudulently inflated the cost

10  of inspection fees assessed to delinquent borrowers, *i.e.* the mark-up allegations.  (*See id.* at 35–38.)

11       Plaintiffs now argue their lawsuit was the catalyst for the changes Chase made to its PO10.60

12  policy in May 2013.  In plaintiffs' view, Chase changed its policy in May 2013 in response to the

13  Court's order denying the CitiBank defendants' motion to dismiss similar claims in a related case on

14  April 25, 2013.  *See* Case No. 12-cv-3892-YGR, Docket Number 21 (April 25, 2013).  Plaintiffs

15  contend that the CitiBank order sent Chase a "clear signal" that its motion would also be denied.

16  (Dkt. No. 264 at 5:1.)  Notably, however, the CitiBank defendants moved only on pleading grounds

17  and made no jurisdictional arguments.

18       Plaintiffs further contend that their lawsuit was the catalyst for Chase removing property

19  inspection fee charges from borrowers' mortgage accounts.  (Dkt. No. 250-1, "Pifko Decl.," ¶ 2.)

20  They submit that their lawsuit motivated Chase to reclassify these fees at a higher rate than it had

21  previously, reducing the amount of property inspection fees Chase sought from borrowers.  More

22  particularly, plaintiffs contend Chase reclassified these fees to moot plaintiffs' request for injunctive

23  relief and restitution for the unlawful property inspection fee assessment practices.

24       Based thereon, plaintiffs seek an order entitling them to attorneys' fees as a reward for forcing

25  Chase to change its conduct to the benefit of all borrowers whose mortgages Chase services.  Chase

26  opposes, maintaining that it did not change its conduct in response to plaintiffs' lawsuit.  Chase

27  submits evidence tending to show it changed its practices to come into compliance with the OCC

28  Consent Order and the NMS – not in response to this lawsuit.

II.     CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 1021.5

A.  Legislative History

Under the traditional American Rule, attorneys' fees are not ordinarily recoverable by a prevailing party in litigation.  *See Alyeska Pipeline Svc. Co. v. Wilderness Society*, 421 U.S. 240, 247 (1975); *Graham v. DaimlerChrysler Corp*., 34 Cal.4th 553, 565 (2004).  Exceptions exist.  Of course, parties can enter into agreements which provide for the award of attorneys' fees should a dispute arise.  Legislative bodies can enact specific exceptions to the general rule to allow an award of attorneys' fees to prevailing parties under certain federal and state statutes.  *See Serrano v. Priest* *("Serrano III")*, 20 Cal.3d 25, 34 (1977).  In the mid-Twentieth Century, California and federal courts alike fashioned a judicial exception to the America Rule known as the "private attorney general" doctrine.  *Alyeska*, 240 U.S. at 267; *Woodland Hills Residents Ass'n v. City Council of Los Angeles*, 23 Cal.3d 917, 928 (1979).

In 1977, the United States Supreme Court held that federal courts did not have the equitable power to invoke the private attorney general doctrine on behalf of plaintiffs absent specific congressional authorization.  *Alyeska*, 420 U.S. at 269 (federal courts "are not free to fashion drastic new rules with respect to the allowance of attorneys' fees to the prevailing party in federal litigation . . . .")  Two years later, in *Serrano III*, California courts parted ways with the federal rule when the California Supreme Court held that the private attorney general doctrine was appropriately invoked, "[i]f as a result of the efforts of plaintiffs' attorneys rights created or protected by the State Constitution are protected to the benefit of a large number of people."  20 Cal.3d at 46.  The rationale for upholding the private attorney general doctrine was explained by the California Supreme Court:

> In the complex society in which we live it frequently occurs that citizens in great numbers and across a broad spectrum have interests in common. These, while of enormous significance to the society as a whole, do not involve the fortunes of a single individual to the extent necessary to encourage their private vindication in the courts. Although there are within the executive branch of the government offices and institutions (exemplified by the Attorney General) whose function it is to represent the general public in such matters and to ensure proper enforcement, for various reasons the burden of enforcement is not always adequately carried by those offices and institutions, rendering some sort of private action imperative. Because the issues involved in such litigation are often extremely complex and their presentation time-

5

consuming and costly, the availability of representation of such public interests by private attorneys acting *pro bono publico* is limited. Only through the appearance of "public interest" law firms funded by public and foundation monies, argue plaintiffs and amici, has it been possible to secure representation on any large scale. The firms in question, however, are not funded to the extent necessary for the representation of all such deserving interests, and as a result many worthy causes of this nature are without adequate representation under present circumstances. One solution, so the argument goes, within the equitable powers of the judiciary to provide, is the award of substantial attorneys fees to those public-interest litigants and their attorneys (whether private attorneys acting *pro bono publico* or members of "public interest" law firms) who are successful in such cases, to the end that support may be provided for the representation of interests of similar character in future litigation.

*Serrano III*, 20 Cal.3d at 44. The California Supreme Court declined to "address the question as to whether courts may award attorney fees under the 'private attorney general' theory, where the litigation at hand has vindicated a public policy having a statutory, as opposed to, a constitutional basis." *Id*. at 47.

Section 1021.5 of the California Code of Civil Procedure went into effect less than three months after *Serrano III*. *See Woodland Hills*, 23 Cal.3d at 925, n.1. Section 1021.5 provides the "explicit statutory authority for court-awarded attorney fees under a private attorney general theory" where the lawsuit "has resulted in the enforcement of an important right affecting the public interest regardless of its source – constitutional, statutory or other." *Id*. at 925 (quoting Cal. Code Civ. P. 1021.5) (internal quotations and emphasis omitted). Section 1021.5 recognizes that "privately initiated lawsuits are often essential to the effectuation of the fundamental public policies embodied in constitutional or statutory provisions, and that, without some mechanism authorizing the award of attorney fees, private actions to enforce such important public policies will as a practical matter frequently be infeasible." *Graham*, 34 Cal.4th at 565 (quoting *Maria P. v. Riles*, 43 Cal.3d 1281, 1288–89 (1987)). At the same time, compensation under the private attorney general doctrine is not always appropriate even where important public rights are at stake. Instead, whether plaintiffs are entitled to such an award turns on "a comparison of the litigant's private interests with the anticipated costs of suit." *Cal. Licensed Foresters Ass'n v. State Bd. of Forestry*, 30 Cal.App.4th 562, 570 (1994). This balance is necessary to effectuate the intent of Section 1021.5 "as a 'bounty' for

6

pursuing public interest litigation, not a reward for litigants motivated by their own interests who

coincidentally serve the public." *Id.*

## B. Requirements Under Section 1021.5

> Pursuant to Section 1021.5 trial courts have discretion to award attorneys' fees to, *inter alia*:
> [1] a *successful* party against one or more opposing parties, [2] in any action which has resulted in the enforcement of an important right affecting the public interest, if [3] a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, [4] the necessity and financial burden of private enforcement . . . are such as to make the award appropriate . . . .

Cal. Code Civ. P. § 1021.5 (emphasis supplied).  With respect to the first factor, *i.e.* whether the

moving party has been successful, formal judicial relief need not have been secured through the

litigation.  *Graham*, 34 Cal.4th at 565 (the California Supreme Court has "taken a broad, pragmatic

view of what constitutes a 'successful party'").  Rather, in determining whether a plaintiff is a

"successful party," the trial court "must realistically assess the litigation and determine, from a

practical perspective, whether or not the action served to vindicate an important right so as to justify

an attorney fee award under section 1021.5."  *Id.* at 566 (internal quotations omitted).  "The critical

fact is the impact of the action, not the manner of its resolution."  *Folsom v. Butte Cty. Ass'n of

Gov'ts*, 32 Cal.3d 668, 686 (1982).

Relevant here, California recognizes the "catalyst theory" by which a plaintiff may be deemed

successful within the meaning of Section 1021.5 "when it achieves its litigation objectives by means

of defendant's 'voluntary' change in conduct in response to the litigation."  *Graham*, 34 Cal.4th at

572.  In affirming the catalyst theory, the California Supreme Court emphasized that the utility of the

catalyst theory is to lessen the "considerable risk" of not being paid that public interest attorneys

assume each time they take on a case.  *Id.* at 574.  The court also recognized a risk that the catalyst

theory may encourage frivolous litigation.  *Id.* at 575.  The court therefore adopted a three-pronged

test to balance these competing interests.  *Id.*  To be entitled to fees under Section 1021.5 under a

catalyst theory, a plaintiff must show:

> (1) the lawsuit was a catalyst motivating defendants to provide the primary relief sought; (2) that the lawsuit had merit and achieved its catalytic effect by threat of victory, not by dint of nuisance and threat of expense . . .; and (3) that the plaintiffs reasonably attempted to settle the

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

litigation prior to filing the lawsuit.

*Tipton-Whittingham v. City of Los Angeles*, 34 Cal.4th 604, 608 (2004) (citing *Graham*, *supra*).  This test requires there must not only be a causal connection between the lawsuit and the relief obtained, but also a determination by the trial court that the relief obtained was required by law.  *Graham*, 34 Cal.4th at 575.  The trial court should review the pleadings and evidence "not only to determine the lawsuit's catalytic effect but also its merits."  *Id*. at 576.

"To be a catalyst, the lawsuit must have been 'a substantial causal factor' contributing to Defendant's conduct, though the lawsuit need not be the only cause of Defendant's conduct."  *Henderson v. J.M. Smucker Co.*, 2013 WL 3146774, at *4 (C.D. Cal. June 19, 2013) (quoting *Graham*, 34 Cal.4th at 573)).   Because "it can be difficult to prove causation" under a catalyst theory, California law allows an inference of causation where the change in the defendant's conduct occurs after the filing of the lawsuit.  *Californians for Responsible Toxics Mgt. v. Kizer*, 211 Cal.App.3d 961, 968 (1989).  "When action is taken by the defendant after plaintiff's lawsuit is filed the chronology of events may permit the inference that the two events are causally related."  *Id*.  To determine whether such an inference arises, a trial court should look to "(a) the situation immediately prior to the commencement of suit, and (b) the situation today, and the role, if any, played by the litigation in effecting any changes between the two."  *Hogar v. Community Dev. Comm. of the City of Escondido*, 157 Cal.App.4th 1358, 1366 (2008) (quoting *Folsom*, 32 Cal.3d at 685, n. 31).

If plaintiffs raise an inference of causation, the burden shifts to defendants to offer rebuttal evidence.  *Kizer*, 211 Cal.App.3d at 968.  The trial court then "weighs the credibility of the evidence, although remaining mindful that defendants, on the whole, are usually rather reluctant to concede that the litigation prompted them to mend their ways."  *MacDonald v. Ford Motor Co.*, 142 F. Supp. 3d 884, 891 (N.D. Cal. 2015) (internal quotations and citations omitted).  An inference of causation "raised solely by the chronology of events" can be rebutted by credible evidence of the non-litigation genesis of the change in conduct.  *Kizer*, 211 Cal.App.3d at 969.

Trial courts are entrusted with the responsibility to exercise their discretion in determining whether plaintiffs were a "successful party" notwithstanding their inability to secure a judicial victory.  *See Graham*, 34 Cal.4th at 575.  To be sure, "trial court judges close to and familiar with the

8

1    litigation" are best suited to resolve competently whether a party has been successful.  *Id*. at 573.

2    **III.   ANALYSIS**

3           The parties dispute whether, under Section 1021.5, plaintiffs have made the threshold

4    showing they are a "successful party."[4]  Plaintiffs argue they should be considered successful under

5    the catalyst theory because this litigation induced Chase to modify its property inspection policy and

6    reverse property inspection fees at a higher rate.  Plaintiffs rely on chronology to argue an inference

7    should arise that this lawsuit was the catalyst causing Chase to change its behavior.  Chase opposes,

8    arguing it began working to draft its written property inspection policy PO10.60 in response to the

9    OCC Consent Order and NMS, even before the filing of the lawsuit.   Chase submits testimony that

10   none of the changes for which plaintiffs take credit was made in response to the litigation.  For the

11   following reasons, the Court finds that even if plaintiffs were entitled to an inference of causation,[5]

12   Chase has presented evidence sufficient to rebut an inference of causation as to both the May 2013

13   revisions to the PO10.60 policy and the property inspection fee reversals.  The Court addresses the

14   evidence of causation presented by the parties:

15          **A.  May 2013 Changes to the PO10.60 Policy**

16          Relevant here, the May 2013 version of PO10.60 policy added two sets of provisions.  First,

17   the following language was added to the general "Policy Statement" section:

18              Mortgage Banking may collect a default-related fee only if the fee is for
                reasonable and appropriate services actually rendered and one of the
                following conditions is met:

19                  The fee is expressly or generally authorized by the loan
20                  instruments and is not prohibited by law or the [NMS];

                    The fee is permitted by law and is not prohibited by the loan
21                  instruments or the [NMS];

22                  The fee is not prohibited by law, the [NMS] or the loan
                    instruments and is a reasonable fee for a specific service
23                  requested by the borrower; or

                    The fee is collected only after a clear and conspicuous
24

25          _____

              [4]  The parties also dispute the remaining Section 1021.5 factors.  In light of the Court's
26   conclusion that plaintiffs have not shown they are a "successful" party, the Court declines to reach
     the remaining factors.
27
              [5]  For purposes of this analysis the Court will assume, without finding, plaintiffs raised an
28   inference of causation based on chronology.

United States District Court
Northern District of California

disclosure of the fee is made available to the borrower.

(Slifko Decl. ¶ 11.)  Second, version 49 added language to the "Property Inspection" section, namely:

> Property inspection fees must not be unnecessary or duplicative and must not be charged to a borrower more frequently than allowed under the Government Sponsored Enterprise (GSE) or HUD guidelines unless there are specific circumstances supporting the need for additional property inspections.

(*Id.* ¶ 12.)

Ms. Slifko avers that the above changes to the PO10.60 policy were not made in response to this lawsuit.  (*Id.* ¶¶ 11–12.)  Indeed, the above language was taken nearly verbatim from the NMS itself.  (*Id.*)  Ms. Slifko has been in charge of changes to the policy since December 2011, and in that role, she is confident that she would know if any changes were made as a result of plaintiffs' action. (*Id.* ¶ 13.)  However, she did not learn of this lawsuit until 2014.  (*Id.*)

The Court finds no credible evidence that plaintiffs' lawsuit was a substantial factor motivating Chase to add the above language to the policy.  The superficial chronology presented by plaintiffs in their opening motion deserves little credence.  The Court takes particular issue with plaintiffs' bald assertion that they were "unaware of any information produced in discovery or otherwise to support the notion that Defendants' property inspection fee charging policies changed for reasons other than Plaintiffs' lawsuit." (Dkt. No. 250 at 11:3–5.)  Plaintiffs surely were aware of the NMS, which contains language nearly identical to the language plaintiffs take credit for in the May 2013 version of the PO10.60 policy.  For the reasons discussed herein, the two government enforcement actions and the resulting settlements (*i.e.* the NMS and OCC Consent Order) rebut any inference of causation that plaintiffs may have raised in their opening motion by ignoring the same.

As the Court recognized in its order denying class certification, Chase created the PO10.60 policy in 2011 before the lawsuit was filed.  As the timing suggests, Ms. Slifko avers that the policy was centralized in part to implement the requirements of the OCC Consent Order.  Following the initial adoption of the policy in 2011, Chase regularly amended the PO10.60 policy both before and after plaintiffs filed this lawsuit.  And Ms. Slifko, the person directly involved in and in charge of making changes to the policy, confirms that the May 2013 modifications were not triggered by plaintiffs' lawsuit, much less an order entered by this Court in a related case.

10

United States District Court
Northern District of California

1    Plaintiffs cite *MacDonald*, 142 F. Supp. 3d at 891–94, for the proposition that they are

2    entitled to an inference of causation unrebutted by Chase.  In *MacDonald*, consumer plaintiffs sued

3    defendant Ford Motor Company alleging certain vehicles were manufactured with a dangerous

4    design defect and that Ford failed to warn customers.  Approximately 14 months after plaintiffs sent

5    their initial demand letter and filed suit, and approximately 5 months following the court's order

6    denying Ford's motion to dismiss in part, Ford initiated a voluntary recall based on the precise safety

7    concern plaintiffs raised in the litigation.  *Id.* at 887–90.  The voluntary recall mooted the majority of

8    plaintiffs' claims and plaintiffs moved for attorneys' fees under Section 1021.5.  *Id*.  At the outset,

9    the district court found that the chronology established an inference that the lawsuit prompted the

10   voluntary recall.  *Id.* at 891–92.  In rebuttal, Ford submitted a declaration from Lilly, an employee

11   who worked as an early warning data trend specialist in Ford's automotive safety office.  Id. at 888.

12   Lilly averred that he first became aware of the safety issue four years prior to the litigation, but took

13   no action.  *Id.*  The month after the district court denied Ford's motion to dismiss, Lilly again looked

14   into the issue after receiving a notice from a Canadian agency regarding the safety issue.  *Id*. 888–89.

15   Based upon this second investigation, Lilly determined that the safety issue was more prevalent than

16   he previously thought and reported it to Ford's critical concern review group.  *Id.* at 889.  Four

17   months later, the critical concern review group recommended a voluntary recall, which was approved

18   that same month.  *Id.*  Ford did not identify or present any testimony from the persons who actually

19   made the recall decision.  *Id.*  Based thereon, the district court found that Ford's evidence did not

20   overcome the presumption that the lawsuit was a substantial factor in the recall decision for three

21   general reasons: (1) it was unconvincing that the letter from the Canadian agency would prompt Lilly

22   to re-analyze the issue when it had received numerous complaints previously; (2) "Ford's timeline

23   relies too heavily on the power of coincidence" given that Ford knew of the defect since at least eight

24   years before the litigation was filed; and (3) "there are significant holes in Ford's evidence as it

25   pertains to the decision-making process behind the recall or as it pertains to the complaint in this

26   case," including the names of the persons who made the decision.  *Id.* at 892–94.

27        *MacDonald* is readily distinguishable.  As an initial matter, Ford mooted almost all claims by

28   initiating the recall.  Plaintiffs here fail to present evidence of even one claim mooted by the policy

changes.  This is likely because the draft policy was just that – a draft of a written policy.  There is no evidence that memorialization of the language from the NMS in the May 2013 version changed any practice or conferred a benefit on the public.  Moreover, Ford's rebuttal evidence was significantly weaker than that presented by Chase.  Ford's lone non-litigation impetus was a single complaint from a Canadian authority even though Ford previously received many complaints prior to that letter.  By contrast, Chase entered into the OCC Consent Order and the NMS before this lawsuit was filed and Chase began working on the changes mandated by thereby the year before plaintiffs brought this litigation.  While Ford conveniently did not name the person(s) who made the recall decision, Chase submits the declaration of the Ms. Slifko who was in charge of the PO10.60 policy revisions at the time.  She declares under oath that none of the changes, including the May 2013 changes, were made in response to this lawsuit.  *MacDonald* thus highlights the strength of Chase's rebuttal evidence.

In sum, plaintiffs have not shown that this litigation was a substantial motivating factor for Chase to implement changes to its property inspection policy in light of the OCC Consent Order, the NMS, and the uncontroverted declaration of Ms. Slifko.

### B.  Reversal of Property Inspection Fee Charges

Plaintiffs also assert that Chase reversed property inspection fees in response to this lawsuit filed in February 2012.  Chase reversed more than three times the amount in property inspection fee charges[6] between February 2012 and March 2015 as compared to the period between January 2008 and February 2012.  (Dkt. No. 259-2 ¶ 5.)  Plaintiffs also focus on a spike of reversals in May 2013 to argue that Chase began reversing property inspection fees *en masse* when it became clear the Court would deny Chase's motion to dismiss.  Again, even assuming this chronology raised an inference of causation, Chase presents evidence sufficient to rebut the inference.

Principally, the weight of the evidence does not support plaintiffs' theory that Chase reversed property inspection fees in response to their lawsuit.  Jack Evans, a vice president in the property

---

[6]  The figures used herein assume that all amounts reclassified with a certain code actually absolved homeowners of the responsibility to pay, *i.e.* that the amounts were in fact reversed to the benefit of the borrower.  Chase opposed this notion and submits evidence that not all amounts reclassified with this code are property inspection fees and in many instances borrowers remain obligated to pay the amount even after it is reclassified.

United States District Court
Northern District of California

preservation department for Chase submitted a declaration averring that he is "not aware that Chase has refunded inspection charges, or reversed charges that were unpaid, in response to this lawsuit." (Dkt. No. 259-9 ¶ 6.)  As with Ms. Slifko, Mr. Evans stated that in light of his position within Chase, he is "confident that [he] would know if such an expensive step had been made in response to the filing of this lawsuit."  (*Id.*)  And plaintiffs present no evidence tying the reversals to the relief they sought in this litigation.  Said otherwise, there is no evidence that a borrower was relieved from paying a property inspection fee of the sort that plaintiffs claim is unlawful.

Plaintiffs emphasize that the amount reversed between February 2012 and March 2015 is more than three times the amount Chase reversed between January 2008 and February 2012.  Yet the undisputed evidence shows that total inspection charges Chase assessed to borrowers during the two periods are similarly disproportionate.  (*See* Dkt. No. 263-8 at 23.)  The Court agrees with Chase that it is only logical to expect reversals to increase in 2012 in response to the rise in fee assessments.  Certainly plaintiffs are not suggesting that their lawsuit also caused Chase to increase the total amount charged to borrowers three fold, especially when plaintiffs argue their lawsuit was the catalyst for Chase to change its policy regarding when assessment is appropriate.

As to the spike in May 2013, undisputed evidence shows that the month with the single largest amount in reversals following February 2012 was actually July 2012.  (Dkt. No. 263-8 at 23.) It is unsurprising that plaintiffs ignore the July 2012 numbers.  Of course, reversals in July 2012 can be attributed no more to this litigation than to the NMS announced the day prior to plaintiffs filing their original complaint.  Plaintiffs instead focus on the increase in May 2013 to correspond with the timing of the PO10.60 policy change and the Court's denial in part of the CitiBank defendants' motion to dismiss.  But common sense dictates that Chase would not increase reversals in May 2013 as a result of the denial of another litigant's motion to dismiss when even more were reversed ten months prior in July 2012.  As discussed above, the better explanation is that reversals generally increased with the parallel (albeit understandably lacking by about a month) increases in assessments.

Further, the Court declines to award fees to counsel when the named plaintiffs have not received any benefit from the litigation.  As the California Supreme Court noted while examining the meaning of a successful party, "in the context of section 1021.5, the term 'party' refers to a party to

litigation." *Graham*, 34 Cal.4th at 570.  Attorneys who have achieved no success for their own clients are not entitled to fees.  In the normal course, Section 1021.5 authorizes fees where counsel has achieved a benefit not only for the named plaintiffs but also for the public at large through judgment, settlement, or acquiescence of the defendant.  The catalyst theory has been affirmed so that a defendant must compensate the attorneys who have forced the change that mooted their clients' claims.  Here, the reversal of fees did not moot plaintiffs' claims.  The named plaintiffs have not been refunded for any of the property inspection fees Chase assessed against them.  The Court will not label plaintiffs successful where they have not obtained any relief in the litigation.

The Court finds that plaintiffs have not shown they are successful parties as a result of the reversal of property inspection fee assessments that was ongoing since at least 2008.

**IV.   CONCLUSION**

For the foregoing reasons, the Court **DENIES** plaintiffs' motion for order entitling plaintiffs to a catalyst fee award under Cal. Code Civ. P. section 1021.5 (Dkt. No. 250).

This Order terminates Docket Number 250.

**IT IS SO ORDERED**.

Dated: October 5, 2016

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

14